No. 25-1359

_____

# UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

_____

REBECCA HOLLAND, on her own behalf and on behalf of similarly situated others,

Plaintiff-Appellant,

v.

ELEVANCE HEALTH INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court for the District of Maine, Case No. 24–cv–00332–LEW, The Honorable Lance E. Walker

_____

# APPELLANT'S OPENING BRIEF

_____

**NICHOLS KASTER, PLLP**
Anna P. Prakash (#1215819)
Kiese T. Hansen (#1215838)
4700 IDS Center, 80 South Eighth Street
Minneapolis, Minnesota 55402
Office: (612) 256-3200

**SIRIANNI YOUTZ SPOONEMORE HAMBURGER PLLC**
Eleanor Hamburger (#1195146)
Richard E. Spoonemore (#1195147)
Ari Robbins Greene (#121315)
3101 Western Ave., Suite 350
Seattle, WA 98121
Office: (206) 223-0303

**PUBLIC JUSTICE**
Shelby Leighton (#1181304)
1620 L Street NW, Suite 630
Office: (202) 797-8600

*Attorneys for Appellant*

# <u>DISCLOSURE STATEMENT</u>

Pursuant to Fed. R. App. P. 26.1, Plaintiff-Appellant Rebecca Holland makes the following disclosures:

1. For non-governmental corporate parties, please list all parent corporations:

   *There are none.*

2. For non-governmental corporate parties, please list all publicly held companies that hold 10% or more of the party's stock:

   *There are none.*

3. If there is a publicly held corporation which is not a party to the proceeding before this Court, but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

   *There are none.*

Dated: June 23, 2025            */s/ Anna P. Prakash*
                        Anna P. Prakash

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ................................................1

JURISDICTIONAL STATEMENT .........................................................................1

STATEMENT OF THE ISSUES..............................................................................1

INTRODUCTION .....................................................................................................2

STATEMENT OF THE CASE...................................................................................4

    I.     Factual Background.......................................................................................4

          A.     Anthem's Plan Excludes All Prescription Medications to Treat Obesity...................................................................................................4

          B.     Anthem's Obesity Exclusion is Based on Historic Stigma and Prejudice Against People with Obesity ......................................6

          C.     Ms. Holland, an Anthem Enrollee, is Disabled Due to Obesity ...................................................................................................7

          D.     Obesity is Disabling When It Requires Treatment with Prescription Medications ............................................................8

    II.    Procedural History.................................................................................10

SUMMARY OF THE ARGUMENT .....................................................................11

ARGUMENT .........................................................................................................13

    I.     Legal Standard....................................................................................13

    II.    Ms. Holland Sufficiently Pled a Claim for Disability Discrimination ...
......................................................................................................14

          A.     Ms. Holland Plausibly Stated a Claim of Explicit, Facial Discrimination.........................................................................14

B.    Ms. Holland Plausibly Stated a Claim of Proxy Discrimination ...................................................................................17

C.    Ms. Holland Stated a Plausible Disparate Impact Claim..........22

III.   This Court Should Also Reverse the District Court on the Issues of Whether Anthem is a Proper Defendant and Whether Disability Status Could Be Proven on a Class-Wide Basis ...........................................25

A.    Anthem is a Proper Defendant...................................................26

B.    The District Court Improperly Opined on Whether Disability Can Be Proven on a Class-Wide Basis ....................................27

CONCLUSION.......................................................................................28

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(g)(1) ...............31

CERTIFICATE OF SERVICE ...............................................................32

<u>**TABLE OF AUTHORITIES**</u>

**CASES**

*Alexander v. Choate*,
   469 U.S. 287 (1985)..........................................................................13, 23, 24, 25

*Berryman v. Reading Int'l, Inc.*,
   763 F. Supp. 3d 596 (S.D.N.Y. 2025) ............................................................27, 28

*Bos. All. of Gay, Lesbian, Bisexual & Transgender Youth v. United States Dep't of Health & Hum. Servs.*,
   557 F. Supp. 3d 224 (D. Mass. 2021) ..............................................................11

*Bowers v. NCAA*,
   563 F. Supp. 2d 508 (D.N.J. 2008) ...................................................................20

*Bush v. Wang Center for the Performing Arts, Inc.*,
   No. CV 22-10473-NMG, 2022 WL 17812937 (D. Mass. Oct. 31, 2022)
   *report and recommendation adopted*, No. CV 22-10473-NMG,
   2022 WL 17752129 (D. Mass. Dec. 19, 2022)..................................................15

*City of Los Angeles, Calif. v. Patel*,
   576 U.S. 409 (2015).........................................................................................23

*Cmty. Servs. v. Wind Gap Mun. Auth.*,
   421 F.3d 170 (3d Cir. 2005).............................................................................22

*Collins v. Pearson Educ., Inc.*,
   721 F. Supp. 3d 274 (S.D.N.Y. 2024) ............................................................27, 28

*Cook v. State of R.I. Dept. of Mental Health, Retardation, and Hosp.*,
   10 F.3d 17 (1st Cir. 1993) ...............................................................................28

*CRC Health Grp., Inc. v. Town of Warren*,
   No. 2:11-cv-196-DBH, 2014 WL 2444435 (D. Me. Apr. 1, 2014) ....................14

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
   596 U.S. 212 (2022).........................................................................................11

*Davis v. Guam*,
  932 F.3d 822 (9th Cir. 2019)...........................................................24

*Est. of Bennett v. Wainwright*,
  548 F.3d 155 (1st Cir. 2008) ..........................................................14

*Doe v. CVS Pharmacy, Inc.*,
  No. 18-cv-01031-EMC, 2022 UWL 3139516 (N.D. Cal. Aug. 5, 2022) ..........26

*E.E.O.C. v. Steamship Clerks Union, Loc. 1066*,
  48 F.3d 594 (1st Cir. 1995) .......................................................22, 23

*E.S. v. Regence Blueshield*,
  No. 2:17-cv-01609- RAJ, 2022 WL 279028 (W.D. Wash. Jan. 31, 2022)
  ("*Regence I*") ...............................................................................22

*E.S. v. Regence Blueshield*,
  No. C17-1609-RAJ, 2024 WL 1173805 (W.D. Wash. Mar. 19, 2024) ("*Regence
  II*")..............................................................................................21

*Frith v. Whole Foods Mkt., Inc.*,
  38 F.4th 263 (1st Cir. 2022) ....................................................14, 15

*Fuog v. CVS Pharmacy, Inc.*,
  2021 WL 4355402 (D.R.I. Sept. 24, 2021) ("*Fuog I*").....................................23

*Fuog v. CVS Pharmacy, Inc.*,
  No. 20-cv-337 WES, 2022 WL 1473707 (D.R.I. May 10, 2022) ("*Fuog II*")
  ...........................................................................................17,18,19,21

*Hammons v. Univ. of Maryland Med. Sys. Corp.*,
  649 F. Supp. 3d 104 (D. Md. 2023) ...................................................26

*In re Nexium Antitrust Litigation*,
  777 F.3d 9 (1st Cir. 2015) ...........................................................28

*Lewis v. Spurwink Servs., Inc.*,
No. 2:22-CV-00054-NT, 2022 WL 17454078 (D. Me. Dec. 6, 2022) ..............16

*Lovell v. Chandler*,
303 F.3d 1039 (9th Cir. 2002)....................................................................14, 21

*Maine Human Rights Commission v. Sunbury Primary Care, P.A.*,
770 F. Supp. 2d 370 (D. Me. 2011) ...................................................................17

*Manning v. Bos. Med. Ctr. Corp.*,
725 F.3d 34 (1st Cir. 2013) ..........................................................................27, 28

*Mark H. v. Lemahieu*,
513 F.3d 922 (9th Cir. 2008)........................................................................25, 26

*McKay v. Winthrop Bd. of Educ.*,
No. CIV. 96-131-B, 1997 WL 816505 (D. Me. June 6, 1997) ..........................17

*Molina Healthcare of Cal., Inc. v. United States*,
133 Fed. Cl. 14 (2017)........................................................................................3

*Ocasio-Hernandez v. Fortuno-Burset*,
640 F.3d 1 (1st Cir. 2011) ................................................................................14

*Pac. Shores, Prop., LLC v. City of Newport Beach*,
730 F.3d 1142 (9th Cir. 2013).........................................................13, 17, 20, 24

*Palmquist v. Shinseki*,
808 F. Supp. 2d 322 (D. Me. 2011) .............................................................25, 26

*Rice v. Cayetano*,
528 U.S. 495 (2000)...........................................................................................20

*Schmitt v. Kaiser Found. Health Plan of Wash.*,
965 F.3d 945 (9th Cir. 2020).....................................................................*Passim*

*Shine v. N.Y.C. Hous. Auth.*,
No. 19-cv-04347-RA, 2020 WL 5604048 (S.D.N.Y. Sept. 18, 2020)................28

*Silva v. Baptist Health S. Fla., Inc.*,
856 F.3d 824 (11th Cir. 2017)......................................................26, 27

*Smith v. Maine Sch. Admin. Dist. No. 6*,
No. 00-284-P-C, 2001 WL 420361 (D. Me. Apr. 24, 2001)..............................16

*T.S. v. Heart of CarDon, LLC*,
43 F. 4th 737 (7th Cir. 2022)..............................................................27

*Young v. Facebook, Inc.*,
790 F. Supp. 2d 1110 (N.D. Cal. 2011)......................................................15, 16

**STATUTES**

28 U.S.C. § 1291 ..........................................................................1

28 U.S.C. § 1331 ..........................................................................1

42 U.S.C. §§ 300gg-3......................................................................6

42 U.S.C. §§ 300-gg4......................................................................6

42 U.S.C. § 12102 .........................................................................28

42 U.S.C. § 18031 .........................................................................25

42 U.S.C. § 18116 .............................................................*Passim*

**RULES AND REGULATIONS**

29 C.F.R. § 2590.701-2 ..................................................................6

29 C.F.R. § 2590.702(2)(i)(B)...........................................................6

29 C.F.R. § 2590.715-2704 ...............................................................6

29 C.F.R. § 2590.715-2708 ...............................................................6

45 C.F.R. § 92.4 .........................................................................26, 27

## OTHER AUTHORITY

Puhl, R., and Brownell, KD, *Bias, Discrimination, and Obesity*, OBESITY RESEARCH 9 (The Obesity Society 2001), https://doi.org/10.1038/oby.2001.108 ................. 2

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellant respectfully requests oral argument as oral argument would significantly aid in the resolution of this case due to the novel and complex factual and legal issues presented on appeal.

## JURISDICTIONAL STATEMENT

This case arises under Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116. The United States District Court for the District of Maine had original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331. On April 9, 2025, the district court entered final judgment for Defendant Elevance Health, Inc. f/k/a Anthem, Inc. ("Anthem"), *see* ADD-008, after issuing an order granting Defendant's motion to dismiss disposing of Plaintiff's disability discrimination claim under the Affordable Care Act, *see* ADD-001–007. Pursuant to Fed. R. App. P. 4, Plaintiff timely filed a notice of appeal on April 11, 2025. The United States Court of Appeals for the First Circuit has jurisdiction of this appeal pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

I.      Whether the district court erred in holding that Plaintiff Rebecca Holland failed to state a claim under the Affordable Care Act for disability discrimination based on Defendant Elevance Health Inc.'s categorical exclusion of coverage for prescription medications to treat Holland's diagnosed medical

condition and disability of obesity.

II.      Whether the district court's dicta in two footnotes constitute opinions that (A) Anthem is not subject to Section 1557, and (B) a class can never be certified alleging disability discrimination because whether a person has a disability is always an individualized determination, and if so, whether the district court erred in rendering those determinations.

## **<u>INTRODUCTION</u>**

"[O]bese persons are the last acceptable targets of discrimination."[1] But when a health insurer embeds such societal bias into the very structure of its benefit design, it crosses the line into illegal discrimination.

Plaintiff Rebecca Holland has diagnosed obesity, which her doctor prescribed medication to treat. But Anthem, Ms. Holland's insurer, refused to cover the medication because Anthem's health plan categorically excludes coverage for all prescription medications whenever prescribed to treat obesity. Had Ms. Holland been diagnosed with another condition, such as diabetes, the same medication would have been covered. This is discrimination: facial, proxy-based, and disparate impact.

The district court erred in concluding otherwise. It ignored the plan's plain text and misapplied established nondiscrimination law. It dismissed her proxy theory

---

[1] Puhl, R., and Brownell, KD, *Bias, Discrimination, and Obesity*, OBESITY RESEARCH 9: 788 (The Obesity Society 2001), https://doi.org/10.1038/oby.2001.108.

based on incorrect factual assumptions and failed to apply the Affordable Care Act's ("ACA") requirement that insurers affirmatively design inclusive plans. Before the ACA, health insurers routinely used preexisting condition exclusions and benefit carveouts to sideline people with disabilities. Congress ended that practice by enacting the ACA, which prohibits discrimination in any health program or activity receiving federal funds. Specifically, Section 1557 of the ACA—which applies to Anthem—caused a "tectonic shift in the nation's health insurance market." *Molina Healthcare of Cal., Inc. v. United States*, 133 Fed. Cl. 14, 19 (2017). It fundamentally changed how health insurers must operate: benefit design cannot discriminate based on disability. Affirming this principle, a sister circuit posed the key question as "whether the ACA's nondiscrimination mandate imposes any constraints on a health insurer's selection of plan benefits." *Schmitt v. Kaiser Foundation Health Plan of Washington*, 965 F.3d 945, 948 (9th Cir. 2020). Its answer was unambiguous: "We hold that it does." *Id*. This Circuit should as well.

In fact, this Circuit has long recognized that obesity can constitute a disability under federal law. While the district court agreed that Ms. Holland has sufficiently alleged that her obesity is a disability, it failed to protect her from the discrimination built into Anthem's plan. Anthem's plan excludes all prescription drugs used to treat obesity—not because the medications are ineffective or unsafe, but because they are used by people with a disfavored diagnosis. That is not neutral benefit design. It is

deliberate discrimination. And it is unlawful. This Court should reverse.

**STATEMENT OF THE CASE**

## I.     Factual Background

Anthem is a health insurance company that designs, issues, delivers, and administers insured health plans. JA-013, ¶ 38. Anthem offers health insurance plans branded under the Anthem name, like Anthem Blue Cross and Blue Shield, in fourteen states including Maine. Anthem offers these plans through its subsidiaries. *Id.*, ¶ 39. For example, Ms. Holland is enrolled in a health insurance plan issued by Anthem Health Plans of Maine, Inc. doing business as Anthem Blue Cross and Blue Shield, which is a subsidiary of Anthem, i.e., Elevance Health, Inc. *Id.*, ¶ 40. Anthem receives federal financial assistance. JA-034, ¶ 147.

### A. Anthem's Plan Excludes All Prescription Medications to Treat Obesity.

Anthem's health plans generally cover medically necessary medications to treat illness or injury. JA-019–021, ¶¶ 73–82. Anthem's Prescription Drug List recognizes that prescription medications like semaglutide 1, tirzepatide, and others can be medically necessary and effective for the treatment of obesity, a diagnosed medical condition. JA-177–179, 184. Yet, Anthem has designed benefits for insured health plans, like the one in this case, that contain the following exclusions:

- A section titled "Bariatric Surgery / Morbid Obesity" explicitly states that "Benefits are not provided for weight loss medications."

- A section titled "What's Not Covered Under Your Prescription Drug . . . Pharmacy Benefit" lists "Any Drug mainly used for weight loss."

- The plan further states that "[e]xcluded items" like weight loss drugs "will not be covered even if the service, supply, or equipment is Medically Necessary."

JA-009–010, ¶¶ 12–19, JA-104, 117, 125 (collectively, the "Exclusion"). Anthem designed and administers the Exclusion in Ms. Holland's plan and its other insured and administered plans. JA-007–012, ¶¶ 1–29, JA-019–025, ¶¶ 72–100. In effect, the Exclusion denies enrollees with the disabling medical condition of obesity coverage for prescription medications that effectively treat their diagnosed disease. *Id*. Anthem's Exclusion is not based on the medications' safety or efficacy. JA-020, ¶ 77. Rather, the Exclusion is targeted at excluding highly effective treatment required by enrollees diagnosed with obesity. *Id*.

Enrollees who seek coverage for prescription medications for "weight loss" without a diagnosis of obesity are not affected by the Exclusion. *Id.*, ¶ 78. These enrollees do not have a medical diagnosis that requires treatment with prescription medications. *Id.* Enrollees who are merely overweight and seek coverage for prescription medications without any medical diagnosis are ineligible for coverage under the generic prescription drug benefit. JA-016, ¶ 52. They are not the target of the Exclusion.

Thus, enrollees generally have coverage for prescription medications to treat their illness or injury—people diagnosed with obesity do not. JA-019, ¶ 73. Only

people diagnosed with obesity are targeted by the Exclusion. JA-0019–021, ¶¶ 74–80. Indeed, in Ms. Holland's health plan, virtually **all** coverage for obesity is excluded, including prescription medications. JA-020-021, ¶¶ 78–82.[2]

### B. Anthem's Obesity Exclusion is Based on Historic Stigma and Prejudice Against People with Obesity.

Obesity discrimination has been a common part of health insurance since its inception. *See* JA-018–019, ¶¶ 67–71. Commercial health insurance, like that Anthem offers, grew out of contracts established in the 1930s and 1940s in which employers paid physicians a monthly fee for providing healthcare to their employees. JA-018, ¶ 68. Eventually, insurance companies stepped in to provide this coverage for employers. *Id.* They later began to offer direct enrollment to individuals as well as employer-based groups. *Id.* These plans could freely avoid providing coverage to any groups that were viewed as undesirable or risky, including individuals with disabling conditions chronic health conditions (such as obesity). *Id.*

---

[2] There is one extremely limited exception: Anthem imposes a 5-year "waiting period" to be eligible for coverage of treatment with bariatric surgery, which is an additional form of facial disability discrimination under Section 1557, as no other benefit in the Anthem plan includes a 5-year waiting period. JA-009–010, ¶¶ 12–19, JA-104, 117, 125. It is also a violation of the ACA's prohibition on pre-existing condition exclusions. *See* 42 U.S.C. §§ 300gg-3(a), 300-gg4(a); 29 C.F.R. § 2590.715-2704(a)(1); 29 C.F.R. § 2590.701-2 (the definition of "preexisting condition exclusion" includes any limitation or exclusion of an enrollee's benefits as a result of information related to an enrollee's health status before the date coverage is denied); *see also* 29 C.F.R. § 2590.715-2708 (waiting periods for eligibility may not exceed 90 days); 29 C.F.R. § 2590.702(2)(i)(B) ("[B]enefits provided under a plan must be uniformly available to all similarly situated individuals").

Anthem's predecessors did not provide coverage for disability-related conditions, including obesity, for much of its history. JA-019, ¶¶ 70–71 (explaining, by way of example, that Medicare and Medicaid were intended to meet the needs of the elderly and disabled, who were excluded from commercial coverage).

**C. Ms. Holland, an Anthem Enrollee, is Disabled Due to Obesity.**

Ms. Holland is a "qualified person with a disability" because she has been diagnosed with the medical condition of obesity by a licensed health professional, and it substantially limits at least one major life activity. JA-025–28, ¶¶ 103–119. This includes the major life activities of walking, standing, and sleeping. *Id.*, ¶ 107. Specifically, Ms. Holland has been diagnosed with obstructive sleep apnea, has numerous foot, shoulder, and other musculoskeletal injuries that require physical therapy and that have limited her ability to walk and stand for periods of time, and has had high cholesterol, all as a result of her condition of obesity. *Id.*, ¶¶ 107–108. As the district court accepted, Ms. Holland plausibly alleged that she is disabled because her ability to perform major life activities is substantially limited when compared to most people in the general population. *See id.*; ADD-005.

Based on Ms. Holland's disability of obesity, Anthem denied and continues to deny coverage of medication prescribed by Ms. Holland's doctor. JA-026–028, ¶¶ 111–119. So Ms. Holland has obtained semaglutide through a compounding pharmacy and has been paying for it out-of-pocket since approximately February

2023. *Id.*, ¶ 114. With this medication, Ms. Holland has been able to treat her obesity, and her related symptoms have improved. *Id.*

### D. Obesity is Disabling When It Requires Treatment with Prescription Medications.

As Ms. Holland's circumstances demonstrate, diagnosed obesity rises to the level of disability when it reaches the point of requiring treatment with prescription medications. JA-016–018, ¶¶ 54–66, JA-028–029, ¶¶ 122–127. A diagnosis of obesity requires clinical review by a treating medical provider, typically after a basic screening called the Body Mass Index ("BMI"). *Id.* A clinical review for the diagnosis of obesity considers the patient's risk for obesity, history of weight trajectory, and impact of the patient's weight on their health status, quality of life, and functionality. *Id.* Based upon these results, patients may be diagnosed with obesity and may be eligible for recognized and effective medical treatment. *Id.*

Obesity is widely accepted as a medical disease. For more than a decade, the American Medical Association has recognized "obesity as a disease state with multiple pathophysiological aspects requiring a range of interventions to advance obesity treatment and prevention." JA-014–016, ¶¶ 41–53. Dozens of other professional organizations, medical and public health entities, and governmental and non-governmental organizations similarly recognize that obesity is a physiological disease. *Id.* Indeed, obesity involves numerous pathophysiological processes, including changes at the cellular, hormonal, neurochemical, and organ levels. *Id.*,

¶¶ 45–46. It causes or contributes to altered production of numerous hormones, which have pathologic effects across bodily systems and cause further adverse health effects. *Id.* At a neurochemical level, obesity leads to inflammation within appetite control centers in the hypothalamus, which in turn decreases response to hunger and satiety signaling from other parts of the body. *Id.* This appetite dysregulation, which leads to elevated hunger and diminished satiety, makes behavioral changes to decrease food intake progressively more challenging for persons who have obesity. *Id.* This and other biochemical changes likely underlie why sustained weight loss is so difficult for people with obesity. *Id.* Obesity is not merely a risk factor; rather, obesity is a disease that can causally contribute to impairment of major life activities.

In fact, obesity has a strong association with the "impairment of health-related quality of life." *Id.*, ¶ 48. Functional impairments such as osteoarthritis are associated with obesity, as are diabetes, hypertension, cancer, gallstones, and psychological distress from stigmatization. *Id.*, ¶ 49. Obesity influences the quality of living, such as sleeping or moving. *Id.*, ¶ 50. Pain, sleep apnea, other breathing problems, the need to urinate more frequently, and altered regulation of body temperature can result in poor sleep for people with obesity. *Id.*

In sum, obesity is a recognized physiological medical condition that substantially impairs major bodily functions. *Id.*, ¶ 51. This is true for all individuals who are medically diagnosed with obesity and whose physicians recommend

treatment for the disease with prescription medications. *Id.* People diagnosed with obesity experience substantial limitations of their ability to perform major bodily functions when compared to the majority of people in the general population. *Id.*, ¶ 53.[3]

## II.    Procedural History

On September 20, 2024, Ms. Holland brought this action on behalf of herself and a proposed class alleging that Anthem violated Section 1557 of the ACA by designing and administering health plans that discriminate based on the disabling condition of obesity. *See generally*, JA-003–006. Anthem moved to dismiss. *Id.* On April 9, 2025, following the parties' briefing, the district granted Anthem's motion. ADD-001–007. Although the district court accepted that Ms. Holland is a person with a disability, it held that she had not sufficiently alleged discrimination. *Id.* The district court stated:

> For many plan participants, the weight loss exclusion operates even if they are overweight rather than obese. And for both overweight and obese participants, the exclusion operates whether or not they are disabled. Thus, on its face, the exclusion does not turn on disability status, impacts participants whether they are disabled or not, and does not isolate disabled participants for discriminatory treatment. Furthermore, employers have the option to choose a plan with or without coverage for weight loss medication . . .   Finally, and most critically, Holland's Complaint does not include allegations that would support

---

[3] Plaintiff anticipates presenting extensive expert testimony to confirm these allegations, should this case proceed.

a finding, based on any facts, that Elevance or Anthem has ever regarded her (let alone all obese persons) to be disabled.

ADD-006–007. Ms. Holland timely filed a notice of appeal. JA-347.

## SUMMARY OF THE ARGUMENT

Under the ACA, health programs or activities that receive federal funds may not discriminate on the basis of disability. *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 218 (2022). Prohibited discrimination includes the implementation of categorial exclusions or limitations on health services. *See e.g., Bos. All. of Gay, Lesbian, Bisexual & Transgender Youth v. United States Dep't of Health & Hum. Servs.*, 557 F. Supp. 3d 224, 231 (D. Mass. 2021). To plead a viable claim of disability discrimination under the ACA, one must allege: (1) they have a disability; (2) they are otherwise qualified for the benefit; (3) they were denied the benefit by reason of her disability; and (4) the defendant is a covered entity receiving federal financial assistance. *Schmitt v. Kaiser Found. Health Plan of Wash.*, 965 F.3d 945, 954 (9th Cir. 2020). Here, the district court explicitly concluded that Ms. Holland has a disability but dismissed on the third prong of the test: whether Ms. Holland was denied a benefit by reason of her disability. This was error. Ms. Holland has sufficiently alleged that Anthem's Exclusion is discriminatory.

***First,*** the facial language of Anthem's plan expressly targets obesity for exclusion from prescription drug coverage. This is the very definition of intentional,

facial discrimination. It is illegal.

**Second,** Ms. Holland has stated a claim for proxy discrimination because there is a sufficiently close "fit" between "weight loss" medication as used under the plan and obesity. Whether the proxy is actually a close enough "fit" to obesity is a question to be answered after discovery. At the pleading stage, Ms. Holland's allegations suffice while the district court's reasoning does not hold up. For one, the Exclusion does not apply to prescription medications sought by people who are merely overweight but have no medical diagnosis. Under Anthem's plan, enrollees without a medical condition are not eligible for prescription drug coverage, separate and apart from the Exclusion. Further, the district court's concept of "evenhanded" treatment, i.e., offering the same policy to all, does not account for the ACA's prohibition on **benefit design** discrimination. And further still, long-standing anti-discrimination law holds that even a seemingly neutral term—like an exclusion of "weight loss" prescription medications—can be a proxy for discrimination. *See Schmitt*, 965 F.3d at 958.

**Third**, Ms. Holland has sufficiently stated a claim for disparate impact discrimination. As between disparate impact and proxy discrimination, the difference is "one of degree[,]" not kind. *Pac. Shores, Prop., LLC v. City of Newport Beach*, 730 F.3d 1142, 1160, n.23 (9th Cir. 2013). Critically, the ACA's purpose is more expansive and different from that of the Medicaid program at issue in

*Alexander v. Choate*, 469 U.S. 287 (1985), relied upon by Anthem and referenced by the district court. Under the ACA, health plans have an "affirmative obligation" to consider the needs of enrollees with disabilities and not design plan benefits in a manner that excludes them. *Schmitt*, 965 F.3d at 955.

***Finally***, the district court's footnoted commentary on whether Anthem is a proper defendant, ADD-007, n.7, and whether disability status can ever be proven on a class-wide basis, ADD-006, n.6, is wrong. Health insurers like Anthem are proper defendants, and class certification issues are properly decided after discovery.

In sum, the district court erred in ruling that Ms. Holland failed to state her claims of disability discrimination under the ACA, and this Court should reverse.

## ARGUMENT

### I. Legal Standard.

This Court reviews the grant of a motion to dismiss *de novo. Est. of Bennett v. Wainwright*, 548 F.3d 155, 162 (1st Cir. 2008). The question, then, "is whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintiffs, the complaint states a claim for which relief can be granted." *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 7 (1st Cir. 2011). Here, it does.

**II.    Ms. Holland Sufficiently Pled a Claim for Disability Discrimination.**

**A. Ms. Holland Plausibly Stated a Claim of Explicit, Facial Discrimination.**

Intentional discrimination occurs when one is treated less favorably than others because of a protected trait. *See Frith v. Whole Foods Mkt., Inc.*, 38 F.4th 263, 270–71 (1st Cir. 2022). "Facial discrimination is 'by its very terms' intentional discrimination." *CRC Health Grp., Inc. v. Town of Warren,* No. 2:11-cv-196-DBH, 2014 WL 2444435, at *8 (D. Me. Apr. 1, 2014) (quoting *Lovell v. Chandler,* 303 F.3d 1039, 1057 (9th Cir. 2002)). Here, Ms. Holland alleges that Anthem discriminates against enrollees with the disability of obesity by calling out "obesity" and ***expressly excluding*** prescription medications to treat the condition, while covering prescriptions for people with other medical conditions. Explicit, exclusionary terms are visible throughout Anthem's plan. JA-009–010, ¶¶ 12–19, JA-104, 117, 125.

Ignoring the plain language of Anthem's plan, the district court stated that the Exclusion "does not isolate disabled participants for discriminatory treatment[.]" ADD-006–007. The district court is wrong. By its plain language, the Exclusion isolates enrollees who need prescription medical treatment due to obesity and treats them differently than other enrollees who need medical treatment. Under the heading "Bariatric Surgery / Morbid ***Obesity***," JA-104 (emphasis added), Anthem excludes all treatment for obesity, including prescription medications, except for the extremely limited coverage of bariatric surgery. JA-104, 117, 125. Put simply, under

the Exclusion, those diagnosed with obesity cannot access effective prescription drugs to treat their medical condition. Meanwhile, enrollees without a diagnosis of obesity have access to prescription drugs to treat their medical conditions. *See generally*, JA-176–343. That is facial discrimination. *Frith*, 38 F.4th at 270.

Anthem suggested below that, because its Exclusion does not "reference obesity or any other medical condition," it cannot serve as evidence of unlawful discrimination. Dist. Ct. Dkt., ECF No. 12 at 5. Anthem ignores that the Exclusion explicitly calls out obesity in its title, and the text of the Exclusion equates obesity treatment with "weight loss." *See* JA-104, 125 (under benefit labelled Bariatric Surgery/Morbid Obesity, Anthem writes that "[b]enefits are not provided for weight loss medications." ).[4]

Further, intentional discrimination may be established by showing that a defendant "acted with at least deliberate indifference to the strong likelihood that a

---

[4] Anthem's cited cases below are unpersuasive. In *Bush v. Wang Center for the Performing Arts*, *Inc*., the plaintiff brought an ADA claim challenging a mask mandate at a performing arts center. No. CV 22-10473-NMG, 2022 WL 17812937, at *4 (D. Mass. Oct. 31, 2022), *report and recommendation adopted*, No. CV 22-10473-NMG, 2022 WL 17752129 (D. Mass. Dec. 19, 2022). A mask mandate put in place for public health reasons during a pandemic is wholly distinguishable from Anthem's benefit design discrimination. So, too, is *Young v. Facebook, Inc.*, 790 F. Supp. 2d 1110 (N.D. Cal. 2011), where the district court found that the plaintiff did "not allege that Facebook treated her differently *because* of her disability, nor [showed] that Facebook applies its policies in a way that *targets* individuals with disabilities." *Id.* at 1116. In contrast, Ms. Holland, alleges that Anthem excludes prescription medication whenever sought to treat obesity, providing an express link between the challenged conduct and her disability. JA-008.

violation of federally protected rights would result from their action." *Smith v. Maine Sch. Admin. Dist. No. 6*, No. 00-284-P-C, 2001 WL 420361, at *7 (D. Me. Apr. 24, 2001) (quotations omitted and alterations adopted); *see also Lewis v. Spurwink Servs., Inc.*, No. 2:22-CV-00054-NT, 2022 WL 17454078, at *6 (D. Me. Dec. 6, 2022). Here, Ms. Holland alleges that Anthem acted with deliberate indifference in (a) designing and administering the plan to exclude medication whenever sought to treat obesity; (b) considering medically necessary medications and including them on its Prescription Drug List but refusing cover them when used for the express purpose of treating obesity; (c) historically excluding anti-obesity medications; (d) failing to reexamine the Exclusion when the ACA took effect; (e) failing to evaluate whether the Exclusion was based on medical and scientific evidence; (f) not engaging in a cost-benefit analysis; and (g) deliberately designing and administering a health plan where prescription medications for the treatment of obesity would not be covered. JA-007–012, ¶¶ 1–29, JA-019–023, ¶¶ 72–95. This amply alleges Anthem's thoughtless indifference or benign neglect—both of which are forms of intentional discriminatory prejudice. *See Maine Human Rights Commission v. Sunbury Primary Care, P.A.*, 770 F. Supp. 2d 370, 408 (D. Me. 2011); *see also McKay v. Winthrop Bd. of Educ.*, No. CIV. 96-131-B, 1997 WL 816505, at *3 (D. Me. June 6, 1997) (at the pleading stage, the court need not decide the exact nature of the intent to allow a claim of intentional discrimination to proceed).

**B. Ms. Holland Plausibly Stated a Claim of Proxy Discrimination.**

Proxy discrimination occurs when an individual is treated differently based on "seemingly neutral criteria that are so closely associated with the disfavored group that discrimination [based on] such criteria is, constructively, facial discrimination against the disfavored group." *Pac. Shores, Prop., LLC*, 730 F.3d at 1160, n.23. In analyzing a claim of proxy discrimination, the "question is whether the proxy's 'fit' is 'sufficiently close' to make a discriminatory inference plausible." *Fuog v. CVS Pharmacy, Inc.*, No. 20-cv-337 WES, 2022 WL 1473707, at *5 (D.R.I. May 10, 2022) ("*Fuog II*") (quoting S*chmitt*, 965 F.3d at 959).

Ms. Holland alleges that all or nearly all enrollees who are denied under the Exclusion have been diagnosed with obesity **and also** have been prescribed medications to treat obesity because the disease so substantially impairs their major life activities. Anthem's Exclusion is the sole bar to coverage of these prescription medications. The Exclusion, whether considered one of "obesity" or of "weight loss prescription medications" is a close enough proxy for disabling obesity as to infer discrimination. *Fuog II*, 2022 WL 1473707, at *5. By excluding "weight loss medications," Anthem's policy discriminates by proxy because those who seek coverage for "weight loss medications" are overwhelmingly or entirely people diagnosed with disabling obesity. JA-023, ¶¶ 93–95. There is a sufficiently close "fit" between disability and those who are denied under the Exclusion.

The district court rejected these allegations based on the false assumptions that: (1) the Exclusion applies to prescription "weight loss" medications sought by people who are merely overweight and not disabled; (2) a health plan is "evenhanded" when it denies coverage of weight loss medications for disabled and non-disabled enrollees alike; and (3) terms, like an exclusion of "weight loss" medications, are so generic that they cannot be a proxy for discrimination. ADD-006–007. Not only are each of these assumptions wrong, but they all improperly question the alleged proxy's "fit" to disability. "The closeness of the fit is a fact-sensitive determination that will require reliable expert testimony." *Fuog II*, 2022 WL 1473707, at *5. At the pleading stage, it is sufficient to allege that the class of enrollees impacted by Anthem's Exclusion, while "not a perfect correlation with disability," is close enough to plausibly infer proxy discrimination. *Id*. Ms. Holland has done just that.

The district court is flatly wrong in assuming that the Exclusion operates against those who are overweight and thus applies "equally" regardless of whether a person has a disability. ADD-006. ***Enrollees who are overweight but have no medical diagnosis are ineligible for prescription drug coverage under the terms of the plan, separate from the Exclusion.*** Prescription medications are only covered when medically necessary for a diagnosed "illness or injury." JA-169 (plan definition of "Medically Necessary Health Care"); *see also* JA-111, 114 (explaining

that the plan will cover prescription drugs if prescribed by a provider and approved as medically necessary). Ms. Holland explicitly pleads this. *See* JA-024, ¶ 98 ("While non-disabled enrollees may seek weight control services, those services are not typically medical in nature (*i.e.,* they are not prescribed by a licensed health provider and do not treat a diagnosed health condition of obesity or co-morbid condition). Indeed, none of those enrollees would be eligible for coverage of these medications under Anthem's plan. As a result, those nondisabled individuals would not be entitled to coverage, even if the Obesity Exclusion were removed."). In short, the state of being "overweight" is not an "illness or injury" and therefore, no coverage obligation attaches, even without the Exclusion. The Exclusion is not targeted at merely "overweight" enrollees. Both the district court and Anthem ignore this.

Moreover, the district court also assumed—without any analysis—that some enrollees diagnosed with obesity who require prescription medications to treat the condition are not disabled. ADD-005. ***Ms. Holland alleges just the opposite***, i.e., that all people diagnosed with obesity who require treatment with prescription drugs meet the ACA definition of "disability." JA-023, ¶ 93. That is because the disease requires treatment when it results in functional impairments of many activities of daily living. *See generally*, JA-014–018. After discovery and with expert testimony, Ms. Holland will prove as much. *See Fuog II*, 2022 WL 1473707, at *5. And even if

discovery reveals that the Exclusion applies to a small number of non-disabled enrollees with a diagnosis of obesity, Holland's discrimination claim remains plausible. Again, "a perfect correlation with disability," is not required for proxy discrimination. *Id.*

Nor do discriminatory proxies need to be all encompassing for liability to attach. *See e.g., Bowers v. NCAA*, 563 F. Supp. 2d 508, 519 (D.N.J. 2008). An overinclusive or underinclusive claim may proceed so long as the allegations show "the fit" of the alleged proxy. *Schmitt,* 965 F.3d at 959–60. The proxy here, a diagnosis of obesity together with a prescription for "weight loss" medications, correlates closely with disability and is neither overinclusive, nor underinclusive.[5] *See generally*, JA-022–023. Thus, the Exclusion "predominantly affect[s] disabled persons"—those diagnosed with obesity who require prescription medications to treat it. *Schmitt*, 965 F.3d at 959, n.8.[6] Moreover, Plaintiff's allegations about the

---

[5] "[O]verdiscrimination is prohibited." *Schmitt*, 965 F.3d at 958 (citing *Pac. Shores, Prop., LLC,* 730 F.3d at 1160); *see also Rice v. Cayetano*, 528 U.S. 495, 514 (2000). This is true even if many non-disabled individuals are impacted. *Pac. Shores*, 730 F.3d at 1159.

[6] While Anthem may offer some coverage for surgical treatment for obesity, such that the proxy is "underinclusive," this coverage does not cure, counter, or mitigate the discrimination resulting from the prescription drug exclusion. *See Lovell*, 303 F.3d at 1052. As Ms. Holland explained, the surgical treatment offered by Anthem is more invasive, more expensive, less effective than treatment with prescription drugs, extremely limited, and on its own, discriminatory. *See generally*, JA-020–021, 024. It is therefore unreasonable to infer that surgery "serve[s] the needs of most individuals" with obesity. *Schmitt*, 965 F.3d at 959.

history, circumstance, and application of the exclusion further support proxy discrimination. JA-022-23, 020 ¶ 77 ("the Obesity Exclusion is not based upon clinical or medical evidence."), ¶ 78 ("[It] is targeted at excluding . . . treatment [for] obesity."). These "historical facts matter" when evaluating the plausibility of a complaint. *See E.S. by & through R.S. v. Regence BlueShield,* No. C17-1609-RAJ, 2024 WL 1173805, at *3 (W.D. Wash. Mar. 19, 2024) ("*Regence II*").

Anthem argued below that Ms. Holland did not provide sufficient detail as to the number of plan participants eligible for prescription weight loss drug coverage or the percentage of plan participants who are prescribed anti-obesity medications. Dist. Ct. Dkt., ECF No. 12 at 16–17. However, it is impossible for Ms. Holland to plead such detailed statistics without discovery. *See e.g., Schmitt*, 965 F.3d at 959, n.8. ***All*** relevant evidence regarding if and how non-disabled enrollees are impacted by the Exclusion is controlled by Anthem. *Id.* ("[P]rior to discovery it may be difficult for [plaintiffs] to allege with statistical accuracy the number of policy claims by disabled persons relative to non-disabled persons that were denied under the [] exclusion, as this information may reside exclusively with [the defendant]."); *see also E.S. v. Regence Blueshield*, No. 2:17-cv-01609- RAJ, 2022 WL 279028, at *25 (W.D. Wash. Jan. 31, 2022) ("*Regence I*") ("[I]nsureds are not required to use statistics."). If anything, Anthem's arguments illustrate why this case should proceed to discovery: these are facts that the parties would seek in discovery. *See Fuog II*,

2022 WL 1473707 at *5.

For these reasons, Ms. Holland has sufficiently alleged proxy discrimination. Just as "a classification based on 'service dogs' could, in many contexts, constitute a proxy for discrimination 'because of' a handicap[,]" so could a classification related to "prescription medications for weight loss" constitute a proxy for disabling obesity in health insurance. *Cmty. Servs. v. Wind Gap Mun. Auth.*, 421 F.3d 170, 179 (3d Cir. 2005). At this stage, Ms. Holland's proxy allegations are sufficient.

### C. Ms. Holland Stated a Plausible Disparate Impact Claim.

Disparate impact discrimination occurs when a policy is facially neutral but falls more harshly on one group than another. *E.E.O.C. v. Steamship Clerks Union, Loc. 1066*, 48 F.3d 594, 601 (1st Cir. 1995). Ms. Holland has alleged just this. As alleged in her Complaint, "[e]nrollees diagnosed with obesity do not receive prescription drug treatment for their health condition, such that they do not have 'meaningful access' to the prescription drug benefit. At the same time, enrollees with other diagnosed health conditions have access to medically necessary medications to treat their conditions." JA-023–024, ¶¶ 96–98. The district court summarily dismissed these arguments by opining that there can be no discrimination when the policy applies to everyone, including those without disabilities. ADD-005. Anthem argued the same below, citing *Alexander v. Choate,* 469 U.S. 287, 304 (1985). Dist. Ct. Dkt., ECF No. 12 at 19. But that is not how disparate impact discrimination

works.

By definition, disparate impact discrimination occurs when a neutral policy applies to everyone but nonetheless "falls more harshly on one group than another[.]" *Fuog v. CVS Pharmacy, Inc.* 2021 WL 4355402, at *4 (D.R.I. Sept. 24, 2021) ("*Fuog I*"); *see also E.E.O.C.*, 48 F.3d at 601. After all, anti-discrimination law focuses on those "for whom the law is a restriction, not the group for whom the law is irrelevant." *City of Los Angeles, Calif. v. Patel*, 576 U.S. 409, 418 (2015). Even if the Exclusion applies to some people who are not disabled, such "over-discrimination" does not relieve Anthem from liability so long is it disproportionately excludes people with disabilities. *See Schmitt*, 965 F.3d at 959.

Further, whether in the context of disparate impact or otherwise, *Choate*, which Anthem cited below and the district court acknowledged, is not contrary. In *Choate*, the state of Tennessee proposed reducing the number of annual days of inpatient hospital care covered by its state Medicaid program. 469 U.S. at 289–292. The Court considered whether, based on the reduction, people with disabilities had a cognizable claim under the Rehabilitation Act. *Id*. It held they did not. *Id*. Anthem argued and the district court implies that *Choate* matters here, where the ACA incorporates the Rehabilitation Act. Not so.

Here, the trait at issue—a need for prescription medications to treat obesity— *is* associated with a disability. That is plain from the face of Anthem's plan.

Moreover, *Choate* did not eliminate benefit design discrimination under the Rehabilitation Act. Rather, the Supreme Court insisted that access to benefits be "meaningful" in order to avoid discrimination. 460 U.S. at 301. The Court carefully distinguished the benefit in question—a cap on the number of days for inpatient hospitalization—from benefit exclusions or limitations that either facially apply to disabling conditions or that prevent a condition "occurring with greater frequency among [the disabled]" from being "effectively treated." *Id.* at 302, n.22. Both types of benefit design claims remain viable after *Choate.* And both are present here: facial discrimination, *see supra* at 14–16,[7] and proxy/disparate impact discrimination, *see supra* at 17–25.

Finally, the Supreme Court concluded that the purpose of the relevant statute must be carefully considered to determine if the challenged policy was inconsistent with it. *Choate,* 469 U.S. at 295–301. Here, the district court failed to properly consider the Exclusion in light of the expansive purposes of the ACA. *See Schmitt*, 965 F.3d at 955 (the ACA's purposes include protecting against discriminatory benefit design in order to provide adequate health care to as many as possible); *see also e.g.*, 42 U.S.C. § 18031(c)(1)(A). In sum, this Court should conclude that the "ACA allows a claim for discriminatory benefit design notwithstanding that, under

---

[7] Proxy discrimination is a form of facial discrimination. *Davis v. Guam*, 932 F.3d 822, 837 (9th Cir. 2019) (relying on *Pac. Shores Props., LLC*, 730 F.3d at 1160 n.23).

*Choate,* the Rehabilitation Act does not." *Schmitt*, 965 F.3d at 955.

Ultimately, there is no question that the Exclusion falls more harshly on enrollees with disabling obesity than enrollees who are not disabled. Enrollees with obesity are denied coverage of all prescription drugs that could effectively treat their medical condition. At the same time, enrollees without disabling obesity have access to prescription drugs needed to treat their medical condition, whatever it may be. Contrary to the district court's conclusion, Ms. Holland does not seek preferential treatment. Rather, she seeks access to the ***same, generic*** prescription drug coverage for obesity that is available for all other medical conditions under the Anthem plan. She has adequately alleged that Anthem's Exclusion denies "meaningful access" to coverage for treatment for obesity since the predominant effective form of treatment, prescription medications, are wholly excluded. [8]

---

[8] The district court faulted Ms. Holland for not alleging that Anthem "regarded her . . . to be disabled." *See supra* at 10–11. To the extent the district court meant that Ms. Holland failed to adequately pled intent, that is error. ADD-005–006. A "policy that expressly treats a protected class differently from others evinces discriminatory intent, precluding the need for further inquiry into [ ] motive." *Palmquist v. Shinseki*, 808 F. Supp. 2d 322, 340 (D. Me. 2011); *see also Schmitt*, 965 F.3d at 954 (when an insurer "design[s] its plan benefits in a discriminatory way[, that] inherently involves intentional conduct."); *Mark H. v. Lemahieu*, 513 F.3d 922, 936 (9th Cir. 2008) ("To 'design' something . . . involves some measure of intentionality"). Discriminatory intent is more than plausibly alleged.

**III. This Court Should Also Reverse the District Court on the Issues of Whether Anthem is a Proper Defendant and Whether Disability Status Could Be Proven on a Class-Wide Basis.**

The district court erred in its commentary on whether (A) Anthem is a proper defendant; and (B) disability status can be proven on a class-wide basis.

**A. Anthem is a Proper Defendant.**

The ACA extends to "any health program or activity, ***any part of which*** is receiving federal financial assistance." 42 U.S.C. § 18116 (a) (emphasis added). This includes "[a]ll of the operations of any entity principally engaged in the provision or administration of any health projects, enterprises, ventures, or undertakings[.]" 45 C.F.R. § 92.4 (2). This includes health insurers like Anthem and its subsidiaries. "It has never been established that only the entity directly responsible for the discriminatory program, and not the entity's parent corporation, can be held liable under Section 1557[.]" *Hammons v. Univ. of Maryland Med. Sys. Corp.*, 649 F. Supp. 3d 104, 117–18 (D. Md. 2023); *see also Doe v. CVS Pharmacy, Inc.*, No. 18-cv-01031-EMC, 2022 WL 3139516, at *7–14 (N.D. Cal. Aug. 5, 2022); *Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824, 842 (11th Cir. 2017) (a parent corporation may be liable for discrimination under Section 504).

Here, the parent company, Anthem, "designs, issues, delivers and administers health plans and continues to offer health plans branded under the Anthem name" through its subsidiaries. JA-013, ¶ 38. Because the parent company itself and/or any

one of its subsidiaries is alleged to be engaged in the healthcare business (here health insurance) and receives federal financial assistance, it is a proper defendant. 45 C.F.R. § 92.4(b); *see e.g., T.S. v. Heart of CarDon*, LLC, 43 F. 4th 737, 743 (7th Cir. 2022) ("[A]ll [of defendant's] operations are considered part of a 'health program or activity[.]'"); *Schmitt*, 965 F.3d at 948 ("Section 1557 . . . prohibits covered health insurers from discriminating based on various grounds, including disability.").

### B. The District Court Improperly Opined on Whether Disability Can Be Proven on a Class-Wide Basis.

The district court erred by prematurely weighing in on the question of class certification and reaching the wrong conclusion. ADD-005–006, n.6. For one, Anthem did not challenge Ms. Holland's class claim, and this issue was not briefed before the district court. Rather, the district court, *sua sponte*, ruled on this issue.

Striking class allegations at the pleading stage is widely disfavored "because it requires a reviewing court to preemptively terminate the class aspects of . . . litigation, solely on the basis of what is alleged in the complaint, and before plaintiffs are permitted to complete the discovery to which they would otherwise be entitled on questions relevant to class certification." *Manning v. Bos. Med. Ctr. Corp.*, 725 F.3d 34, 59 (1st Cir. 2013) (quotations omitted); *see also e.g., Berryman v. Reading Int'l, Inc.,* 763 F. Supp. 3d 596, 607 (S.D.N.Y. 2025); *Collins v. Pearson Educ., Inc.*, 721 F. Supp. 3d 274, 290 (S.D.N.Y. 2024).

Here, the class allegations are proper. As alleged and described above, when

obesity reaches the point of requiring prescription medications, it is disabling because of the progression of the disease. *See supra* at 8; *see also generally*, JA-014–019, 028–032. Ms. Holland has sufficiently pled a class claim in describing obesity as a physical impairment that substantially limits one or more major life activities. *Id.*; *see also* 42 U.S.C. § 12102(1). When individuals with disabling obesity are prescribed medically necessary medications, it is because their obesity has reached the point where it limits major life activities and requires medical treatment. *See Cook v. Rhode Is. Dep't of Mental Retardation*, 10 F.3d 17, 23 (1st Cir. 1993) (recognizing obesity as physical impairment that affects major life functions); *Shine v. N.Y.C. Hous. Auth.*, No. 19-cv-04347-RA, 2020 WL 5604048 (S.D.N.Y. Sept. 18, 2020) (holding that an impairment so severe as to require medical treatment can rise to the level of substantially limiting a major life activity); *see also In re Nexium Antitrust Litigation*, 777 F.3d 9, 21–23 (1st Cir. 2015) ("[I]t is difficult to understand why the presence of uninjured class members at the preliminary stage should defeat class certification.").

Regardless, these are factual issues that require discovery. The court erred in suggesting that, at this stage of litigation, no class could be certified.

## CONCLUSION

For decades, people with disabilities—especially those with obesity—have faced exclusion not just from medical care, but from the very health insurance

structures meant to protect them. Section 1557 of the Affordable Care Act was enacted to end that legacy of exclusion. It imposes a clear and enforceable obligation on health insurers: do not design benefit plans that discriminate on the basis of disability. Anthem has violated that mandate. It designed a plan that carves out coverage for a recognized disabling condition and then denied Ms. Holland the only treatment that her physician determined was medically necessary—solely because of her diagnosis.

This case is not about preferential treatment. It is about equal access. Ms. Holland is not seeking special coverage for an unrecognized condition. She is seeking access to the same basic prescription drug benefit that is available to every other enrollee—except those with obesity. Anthem's exclusion is not neutral, and it is not legal, as it is based on stigma rather than science.

The district court's decision reflects a fundamental misunderstanding of disability discrimination law and the purpose of the ACA. It embraced outdated logic that has been rejected by Congress and the courts: that exclusions which apply "to all" can never be discriminatory. That logic has no place under the ACA, as the ACA creates an affirmative obligation for health insurers not to discriminate in the provision of health care and extends that obligation to benefit design.

Ms. Holland pled sufficient allegations of facial, proxy, and disparate impact discrimination. She has shown that Anthem's plan targets a vulnerable group of

disabled enrollees for inferior coverage—and does so based not on medical or scientific judgment, but on the identity of the people who need the treatment. That is exactly the kind of exclusion the ACA prohibits.

If the ACA means what it says, then enrollees with disabilities cannot be written out of coverage through categorical exclusions. This Court should reverse the district court's decision and affirm what the ACA requires: that benefit design must be inclusive, evidence-based, and free of discrimination. Ms. Holland has stated a claim and deserves her day in court. The Court should reverse.

Dated: June 23, 2025          Respectfully submitted,

**NICHOLS KASTER, PLLP**

*/s/Anna P. Prakash*
Anna P. Prakash (#1215819)
Kiese T. Hansen (#1215838)
4700 IDS Center, 80 South Eighth Street
Minneapolis, Minnesota 55402
Office: (612) 256-3200

**SIRIANNI YOUTZ SPOONEMORE HAMBURGER PLLC**
Eleanor Hamburger (#1195146)
Richard E. Spoonemore (#1195147)
Ari Robbins Greene (#121315)
3101 Western Ave., Suite 350
Seattle, WA 98121
Office: (206) 223-0303

**PUBLIC JUSTICE**
Shelby Leighton (#1181304)

1620 L Street NW, Suite 630
Office: (202) 797-8600

*Attorneys for Appellant*

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(g)(1)

1.    This brief complies with the length limitations of Fed. R. App. P. 32(a)(7). The brief contains 7,118 words, excluding the items exempted by Fed. R. App. P. 32(f).

2.    This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6). It was prepared using Microsoft Office Word in 14-point, proportionally spaced Times New Roman font.

Dated: June 23, 2025               /s/*Anna P. Prakash*
                                 Anna P. Prakash

                                 *Attorney for Appellant*

# CERTIFICATE OF SERVICE

I hereby certify that on June 23, 2025, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that the following parties or their counsel of record are registered as ECF Filers and that they will be served by the CM/ECF system:

Raymond Cardozo
Simon Doughty
Eleanor Hamburger
Kiese Hansen
Daniel Hofmeister
Shelby Leighton
Carol Lewis
Anna P. Prakash
Christopher T. Roach
Ari Robbins Greene
Richard E. Spoonemore
Bryan M. Webster
Colin E. Wrabley

*/s/Anna P. Prakash*
Anna P. Prakash

**No. 25-1359**

_____

**UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT**

_____

REBECCA HOLLAND, on her own behalf and on behalf of similarly situated others,

Plaintiff-Appellant,

v.

ELEVANCE HEALTH, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court for the District of Maine,
Case No. 2:24-cv-00332-LEW, The Honorable Lance E. Walker

_____

**APPELLANT'S ADDENDUM**

_____

**NICHOLS KASTER, PLLP**
Anna P. Prakash (#1215819)
Kiese T. Hansen (#1215838)
4700 IDS Center, 80 South Eighth Street
Minneapolis, Minnesota 55402
Office: (612) 256-3200

**SIRIANNI YOUTZ SPOONEMORE
HAMBURGER PLLC**
Eleanor Hamburger (#1195146)
Richard E. Spoonemore (#1195147)
Ari Robbins Greene (#1216315)
3101 Western Ave., Suite 350
Seattle, WA 98121
Office: (206) 223-0303

**PUBLIC JUSTICE**
Shelby Leighton (#1181304)
1620 L Street NW, Suite 630
Washington, DC 20036
Office: (207) 844-4243

*Attorneys for Appellant*

**Appellant's Addendum**
**Table of Contents**

Order on Motion to Dismiss, *Holland v. Elevance Health, INC.*, Case No. 2:24-cv-00332-LEW (D. Maine April 09, 2025) (ECF No. 21) ..............................ADD-001

Judgment of Dismissal, *Holland v. Elevance Health, INC.,* Case No. 2:24-cv-00332-LEW (D. Maine April 09, 2025) (ECF No. 22)..........................................ADD-008

*Statutes*

28 U.S.C. § 1291 ....................................................................................ADD-009

28 U.S.C. § 1331 ....................................................................................ADD-011

42 U.S.C. §§ 300gg-3................................................................................ADD-012

42 U.S.C. §§ 300-gg4................................................................................ADD-017

42 U.S.C. § 12102 ..................................................................................ADD-019

42 U.S.C. § 18031 ..................................................................................ADD-021

42 U.S.C. § 18116..................................................................................ADD-028

*Administrative and executive materials*

29 C.F.R. § 2590.701-2................................................................................ADD-030

29 C.F.R. § 2590.702(2)(i)(B) ....................................................................ADD-036

29 C.F.R. § 2590.715-2704..........................................................................ADD-038

29 C.F.R. § 2590.715-2708..........................................................................ADD-038

45 C.F.R. § 92.4 ....................................................................................ADD-043

UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| REBECCA HOLLAND, on her own behalf and on behalf of those similarly situated, | ) ) ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | No. 2:24-cv-00332-LEW |
| | ) | |
| ELEVANCE HEALTH, INC. f/k/a ANTHEM, INC., | ) ) | |
| | ) | |
| Defendant | ) | |

## <u>ORDER ON MOTION TO DISMISS</u>

In this putative class action, Plaintiff Rebecca Holland alleges that Defendant Elevance Health, Inc., designs and administers health insurance plans or programs that discriminate against the disabled because they deny coverage for weight loss medication. She alleges that whenever a health care provider diagnoses a plan participant as obese and prescribes a weight loss medication the participant must be deemed disabled, and that Elevance's failure to provide coverage for the prescription is a species of disability discrimination.

The matter is before the Court on Elevance Health's Motion to Dismiss, which I grant for reasons that follow.[1]

---

[1] This is a sister case to *Whittemore v. Cigna Health and Life Insurance Company*, No. 2:24-cv-206-LEW. On February 12, 2025, I similarly dismissed that action.

**ADD-001**

## BACKGROUND

The Affordable Care Act ("ACA") contains a non-discrimination provision that states:

> "[A]n individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964, title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975, or section 794 of Title 29, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, <u>or contracts of insurance</u> . . . .

42 U.S.C. § 18116(a) (emphasis added). These protections extend to disability discrimination prohibited under the Rehabilitation Act, which provides:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

29 U.S.C. § 794(a).

Rebecca Holland is a participant in an Anthem[2] health insurance plan that qualifies as a health program or activity under the ACA. Her plan, the Maine Education Association Benefits Trust ("MEABT"), includes an exclusion of coverage for medications prescribed for the purpose of weight loss.[3] Holland's healthcare provider has diagnosed her as obese and has prescribed her a weight loss medication. However, the MEABT's weight loss

---

[2] Holland acknowledges that her plan is provided and administered through an Elevance subsidiary, Anthem Blue Cross and Blue Shield. Compl. ¶ 40.

[3] *See* Certificate of Coverage, Compl. Ex. 1 at 86. The weight loss exclusion is consistent with the approach taken by the Centers for Medicare and Medicaid Services, which excludes from its Part D coverage weight loss "[a]gents when used for anorexia, weight loss, or weight gain (even if used for a non-cosmetic purpose (i.e., morbid obesity))." *See* Medicare Prescription Drug Benefit Manual Chapter 6 – Part D Drugs and Formulary Requirements, Section 20 (ECF No. 12-1).

exclusion applies to participants who are overweight even if the member's healthcare provider concludes that the weight loss medication is medically necessary to treat obesity.[4]

Not all Anthem plans exclude coverage for weight loss medications. Employers select whether to provide their employees with a plan that covers weight loss medications. Holland's employer, Falmouth Public Schools, chooses to participate in the MEABT, which excludes weight loss medications.

Relying on language from *Cook v. Rhode Island Department of Mental Retardation*, 10 F.3d 17 (1st Cir. 1993), and a medical consensus that describes obesity as a disease state with multiple pathophysiological aspects, Holland alleges that she and all similarly situated persons enrolled in her plan (*i.e.*, all participants diagnosed with obesity who obtain a prescription for a weight loss medication) are qualified individuals with disabilities, and that an exclusion of coverage for weight loss medications amounts to disability discrimination.[5] *Id.* ¶¶ 22-23, 41-42.

Although common sense teaches us that all manner of workplaces can include employees who meet the criteria for inclusion in Holland's prospective class, Holland alleges, counter-intuitively, that there is a pervasive discriminatory bias against these class members that arises from the belief that they "cannot participate in work, benefit from

---

[4] Evidently, there is an exception to the exclusion for morbid obesity, but coverage for morbid obesity is subject to a five-year waiting period. Holland alleges that the waiting period is discriminatory, as no other benefit in the MEABT is subject to that kind of waiting period. Compl. ¶¶ 81-82. I do not address the waiting period in this case because Holland is not in that category and she lacks standing to pursue class action litigation for a class she is not in.

[5] Holland also alleges that she is disabled based on personal limitations related to her obesity diagnosis, which she identifies as limitations in walking, standing, and sleeping.

**ADD-003**

medical treatment, or fully engage in other aspects of society," *id.* ¶ 26, and that health insurance plans that exclude coverage for weight loss medications are the product of this invidious, societal bias.    Holland also alleges that the bias is changing as medical professionals increasingly understand the obesity disease process, and that "Anthem's failure to evaluate whether its Obesity Exclusion was a form of disability discrimination is 'thoughtless indifference' or 'benign neglect' of the coverage needs of insureds with disabilities, a form of discriminatory prejudice." *Id.* ¶ 28.

## DISCUSSION

On a motion to dismiss, I am required to treat the plaintiff's well-pleaded factual allegations as true and to draw all reasonable inferences in the plaintiff's favor, but need not do so for allegations that are conclusory or conjectural in nature. *Barchock v. CVS Health Corp.*, 886 F.3d 43, 48 (1st Cir. 2018).    Ultimately, to overcome the motion, the plaintiff's factual allegations must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).    "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).    A claim will not suffice if it rests, ultimately, on "'naked assertions' devoid of 'further factual development.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

Holland alleges that the exclusion of coverage in her healthcare plan for weight loss medications is the product of intentional discrimination, proxy discrimination, disparate impact discrimination, and/or deliberate indifference to the possibility of one of these forms of discrimination.    Compl. ¶¶ 83-100.    Elevance argues that Holland fails to state a claim

4

for relief.  Elevance's overarching point is that the weight loss exclusion applies to plan enrollees regardless of disability status, applying equally to overweight persons, obese persons who are not disabled, and obese persons who may be disabled.  Given the MEABT's "evenhanded treatment" of persons interested in weight loss medication, Elevance states that the MEABT does not discriminate on the basis of disability and that Holland's suit is actually an attempt to secure preferential access to medication coverage for her health condition.  Mot. at 1 (quoting *Alexander v. Choate*, 469 U.S. 287, 304 (1985)).  Elevance denies discrimination for these reasons, and also notes that there are Anthem plans that afford coverage for weight loss medications, subject to the payment of a different premium.

I grant Elevance's Motion to Dismiss.  Although I reject as conclusory and conjectural Holland's allegation that she and every other participant in the MEABT who has an obesity diagnosis coupled with a prescription for weight loss medication are disabled, I accept for purposes of the Motion to Dismiss that Holland has alleged individual limitations that make her allegation of disability plausible.[6]  That is not enough, however,

---

[6] Disability means "a physical or mental impairment that substantially limits one or more major life activities," 42 U.S.C. § 12102(1); 29 U.S.C. § 705(9)(B), or "results in a substantial impediment to employment," 29 U.S.C. § 705(9)(A), (20).  Whether a health condition like obesity results in disability is not a formulaic inquiry based on a mere diagnosis and prescription.  It is an individualized inquiry.

> In assessing whether someone is disabled under the ADA, we must consider the impairment's effect on the particular individual.  The limitation caused by the impairment must be permanent or long-term.  Evidence of a medical diagnosis of impairment, standing alone, is insufficient to prove a disability.  What is required is evidence showing that the impairment limits this particular plaintiff to a substantial extent.

*Ramos-Echevarria v. Pichis*, *Inc*., 659 F.3d 182, 187 (1st Cir. 2011) (citation omitted).  *See also Albertson's*, *Inc. v. Kirkingburg*, 527 U.S. 555, 566 (1999).  A so-called "obese" body mass index score

**ADD-005**

for her case to proceed.  Holland's allegation of discrimination is likewise conclusory and

conjectural.  To state a claim, the law requires a plausible factual basis to conclude that

Anthem's exclusion of weight loss medications under the MEABT denies to Holland the

desired coverage benefit "solely by reason of her disability."  29 U.S.C. § 794(a).  The fact

that the MEABT does not provide Holland or similarly situated putative class members

with coverage for weight loss medications is not a sufficient factual basis to state a

plausible claim that the denial is based solely on the presumed presence of a disability.  For

many plan participants, the weight loss exclusion operates even if they are overweight

rather than obese.  And for both overweight and obese participants, the exclusion operates

whether or not they are disabled.  Thus, on its face, the exclusion does not turn on disability

status, impacts participants whether they are disabled or not, and does not isolate disabled

---

will for many individuals not even suggest a physical impairment, let alone a disability.  A physician's willingness to prescribe a weight-loss medication does not dictate the answer, either.

Holland attempts to short-circuit an individualized inquiry by relying on *Cook v. Rhode Island Department of Mental Retardation*, 10 F.3d 17 (1st Cir. 1993).  There, the First Circuit considered the "pathbreaking 'perceived disability' case" of Cook, a morbidly obese individual denied employment, who alleged she was not substantially limited in her ability to perform the job (had, in fact, passed the physical examination) and proceeded on the basis of being perceived as disabled.  *Id.* at 20-21.  The Court upheld Cook's favorable jury verdict because the jury could have found either that Cook *was not impaired or was impaired but not substantially limited* in regard to major life activities, and yet the employer treated her as both impaired and substantially limited due to morbid obesity.  *Id.* at 23.  As to the employer's perception of Cook's impairment, the Court held that the jury could have concluded that the employer deemed Cook impaired based on "expert testimony that morbid obesity is a physiological disorder involving a dysfunction of both the metabolic system and the neurological appetite-suppressing signal system, capable of causing adverse effects within the musculoskeletal, respiratory, and cardiovascular systems."  *Id.*

Holland asserts that if the medical community's consensus is that obesity is a physiological disorder involving the dysfunction of one or more body systems then *Cook* has the talismanic effect of rendering all obese plan participants in the First Circuit impaired, minimally, and that the addition of a doctor's prescription conclusively establishes disability.  Opp'n (ECF No. 15) at 7-8, 11-12.  I do not find this convoluted theorem to be a valid basis for inferring that all obese individuals with a prescription for weight loss medication are disabled or perceived as such, much less denied coverage for weight loss medication based solely on discriminatory bias.

ADD-006

participants for discriminatory treatment.  Furthermore, employers have the option to choose a plan with or without coverage for weight loss medication.  Holland's employer chose the MEABT plan design.  Finally, and most critically, Holland's Complaint does not include allegations that would support a finding, based on any facts, that Elevance or Anthem[7] has ever regarded her (let alone all obese persons) to be disabled.  For these reasons, I conclude that Holland's bare conclusory allegations to the contrary do not support a plausible finding that Anthem's exclusion of coverage for weight loss medications amounts to intentional, proxy, disparate impact, or deliberate indifference discrimination against Holland or the putative class.

## CONCLUSION

The Motion to Dismiss (ECF No. 12) is GRANTED.  The case is DISMISSED.

SO ORDERED.                                        Dated this 9th day of April, 2025.

                                                   /s/ Lance E. Walker
                                                   Chief U.S. District Judge

---

[7] Elevance also argues that Holland has sued the wrong entity, since the MEABT is administered by an Anthem subsidiary, citing *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries.").  Holland responds that Elevance is a proper defendant because Elevance and its subsidiaries comprise a "program or activity, any part of which is receiving federal financial assistance."  Opp'n at 5 (quoting 42 U.S.C. § 18116(a)).  Holland also quotes 45 C.F.R. § 92.4(2), which defines a "health program or activity" to include "[a]ll of the operations of any entity principally engaged in the provision or administration of any health projects, enterprises, ventures, or undertakings."  Because the program or activity here is the MEABT, the logical defendant is the entity that provides and/or administers the MEABT.  Furthermore, the § 92.4 definition may not aid Holland because a subsidiary is not a mere operation of a parent entity, or vice versa.  On the other hand, the First Circuit might rule in Holland's favor in the particularized context of the ACA based on its view of "public convenience, fairness, and equity."  *See*, *e.g.*, *Bhd. of Locomotive Eng'rs v. Springfield Terminal Ry. Co.*, 210 F.3d 18, 25-26 (1st Cir. 2000) (2-1) (quoting *Town of Brookline v. Gorsuch*, 667 F.2d 215, 221 (1st Cir. 1981)).  Given the lack of reliable guidance on the issue, I rest my decision to dismiss the case on the failure to state a claim of disability discrimination.

ADD-007

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| REBECCA HOLLAND, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   CIVIL NO. 2:24-cv-00332-LEW |
| | ) |
| ELEVANCE HEALTH INC., | ) |
| | ) |
| Defendant, | ) |

JUDGMENT OF DISMISSAL

In accordance with the Order on Motion to Dismiss entered by Chief U.S. District

Judge Lance E. Walker on April 9, 2025,

JUDGMENT of Dismissal is hereby entered.


CHRISTA K. BERRY
CLERK


By:      /s/ Charity Pelletier
Deputy Clerk


Dated: April 9, 2025

**ADD-008**

## Statutory Notes and Related Subsidiaries

### Effective Date

Section effective 90 days after Oct. 21, 1976, see section 8 of Pub. L. 94–583, set out as a note under section 1602 of this title.

## § 1331. Federal question

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

(June 25, 1948, ch. 646, 62 Stat. 930; Pub. L. 85–554, § 1, July 25, 1958, 72 Stat. 415; Pub. L. 94–574, § 2, Oct. 21, 1976, 90 Stat. 2721; Pub. L. 96–486, § 2(a), Dec. 1, 1980, 94 Stat. 2369.)

### Historical and Revision Notes

Based on title 28, U.S.C., 1940 ed., § 41(1) (Mar. 3, 1911, ch. 231, § 24, par. 1, 36 Stat. 1091; May 14, 1934, ch. 283, § 1, 48 Stat. 775; Aug. 21, 1937, ch. 726, § 1, 50 Stat. 738; Apr. 20, 1940, ch. 117, 54 Stat. 143).

Jurisdiction of federal questions arising under other sections of this chapter is not dependent upon the amount in controversy. (See annotations under former section 41 of title 28, U.S.C.A., and 35 C.J.S., p. 833 et seq., §§ 30–43. See, also, reviser's note under section 1332 of this title.)

Words "wherein the matter in controversy exceeds the sum or value of $3,000, exclusive of interest and costs," were added to conform to rulings of the Supreme Court. See construction of provision relating to jurisdictional amount requirement in cases involving a Federal question in *United States v. Sayward*, 16 S.Ct. 371, 160 U.S. 493, 40 L.Ed. 508; *Fishback v. Western Union Tel. Co.*, 16 S.Ct. 506, 161 U.S. 96, 40 L.Ed. 630; and *Halt v. Indiana Manufacturing Co.*, 1900, 20 S.Ct. 272, 176 U.S. 68, 44 L.Ed. 374.

Words "all civil actions" were substituted for "all suits of a civil nature, at common law or in equity" to conform with Rule 2 of the Federal Rules of Civil Procedure.

Words "or treaties" were substituted for "or treaties made, or which shall be made under their authority," for purposes of brevity.

The remaining provisions of section 41(1) of title 28, U.S.C., 1940 ed., are incorporated in sections 1332, 1341, 1342, 1345, 1354, and 1359 of this title.

Changes were made in arrangement and phraseology.

### Editorial Notes

#### Amendments

1980—Pub. L. 96–486 struck out "; amount in controversy; costs" in section catchline, struck out minimum amount in controversy requirement of $10,000 for original jurisdiction in federal question cases which necessitated striking the exception to such required minimum amount that authorized original jurisdiction in actions brought against the United States, any agency thereof, or any officer or employee thereof in an official capacity, struck out provision authorizing the district court except where express provision therefore was made in a federal statute to deny costs to a plaintiff and in fact impose such costs upon such plaintiff where plaintiff was adjudged to be entitled to recover less than the required amount in controversy, computed without regard to set-off or counterclaim and exclusive of interests and costs, and struck out existing subsection designations.

1976—Subsec. (a). Pub. L. 94–574 struck out $10,000 jurisdictional amount where action is brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity.

1958—Pub. L. 85–554 included costs in section catchline, designated existing provisions as subsec. (a), substituted "$10,000" for "$3,000", and added subsec. (b).

## Statutory Notes and Related Subsidiaries

### Effective Date of 1980 Amendment; Applicability

Pub. L. 96–486, § 4, Dec. 1, 1980, 94 Stat. 2370, provided: "This Act [amending this section and section 2072 of Title 15, Commerce and Trade, and enacting provisions set out as a note under section 1 of this title] shall apply to any civil action pending on the date of enactment of this Act [Dec. 1, 1980]."

### Effective Date of 1958 Amendment

Pub. L. 85–554, § 3, July 25, 1958, 72 Stat. 415, provided that: "This Act [amending this section and sections 1332 and 1345 of this title] shall apply only in the case of actions commenced after the date of the enactment of this Act [July 25, 1958]."

## § 1332. Diversity of citizenship; amount in controversy; costs

(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between—

(1) citizens of different States;

(2) citizens of a State and citizens or subjects of a foreign state, except that the district courts shall not have original jurisdiction under this subsection of an action between citizens of a State and citizens or subjects of a foreign state who are lawfully admitted for permanent residence in the United States and are domiciled in the same State;

(3) citizens of different States and in which citizens or subjects of a foreign state are additional parties; and

(4) a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States.

(b) Except when express provision therefor is otherwise made in a statute of the United States, where the plaintiff who files the case originally in the Federal courts is finally adjudged to be entitled to recover less than the sum or value of $75,000, computed without regard to any setoff or counterclaim to which the defendant may be adjudged to be entitled, and exclusive of interest and costs, the district court may deny costs to the plaintiff and, in addition, may impose costs on the plaintiff.

(c) For the purposes of this section and section 1441 of this title—

(1) a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business, except that in any direct action against the insurer of a policy or contract of liability insurance, whether incorporated or unincorporated, to which action the insured is not joined as a party-defendant, such insurer shall be deemed a citizen of—

(A) every State and foreign state of which the insured is a citizen;

(B) every State and foreign state by which the insurer has been incorporated; and

(C) the State or foreign state where the insurer has its principal place of business; and

(2) the legal representative of the estate of a decedent shall be deemed to be a citizen only of the same State as the decedent, and the

Sec.
1292.    Interlocutory decisions.
[1293.    Repealed.]
1294.    Circuits in which decisions reviewable.
1295.    Jurisdiction of the United States Court of Appeals for the Federal Circuit.
1296.    Review of certain agency actions.

### Editorial Notes

#### AMENDMENTS

1996—Pub. L. 104–331, §3(a)(2), Oct. 26, 1996, 110 Stat. 4069, added item 1296.

1984—Pub. L. 98–620, title IV, §402(29)(C), Nov. 8, 1984, 98 Stat. 3359, struck out item 1296 "Precedence of cases in the United States Court of Appeals for the Federal Circuit".

1982—Pub. L. 97–164, title I, §127(b), Apr. 2, 1982, 96 Stat. 39, added items 1295 and 1296.

1978—Pub. L. 95–598, title II, §236(b), Nov. 6, 1978, 92 Stat. 2667, directed the addition of item 1293, "Bankruptcy appeals", which amendment did not become effective pursuant to section 402(b) of Pub. L. 95–598, as amended, set out as an Effective Date note preceding section 101 of Title 11, Bankruptcy.

1961—Pub. L. 87–189, §4, Aug. 30, 1961, 75 Stat. 417, struck out item 1293 "Final decisions of Puerto Rico and Hawaii Supreme Courts".

## § 1291. Final decisions of district courts

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

(June 25, 1948, ch. 646, 62 Stat. 929; Oct. 31, 1951, ch. 655, §48, 65 Stat. 726; Pub. L. 85–508, §12(e), July 7, 1958, 72 Stat. 348; Pub. L. 97–164, title I, §124, Apr. 2, 1982, 96 Stat. 36.)

#### HISTORICAL AND REVISION NOTES

Based on title 28, U.S.C., 1940 ed., §§225(a), 933(a)(1), and section 1356 of title 48, U.S.C., 1940 ed., Territories and Insular Possessions, and sections 61 and 62 of title 7 of the Canal Zone Code (Mar. 3, 1911, ch. 231, §128, 36 Stat. 1133; Aug. 24, 1912, ch. 390, §9, 37 Stat. 566; Jan. 28, 1915, ch. 22, §2, 38 Stat. 804; Feb. 7, 1925, ch. 150, 43 Stat. 813; Sept. 21, 1922, ch. 370, §3, 42 Stat. 1006; Feb. 13, 1925, ch. 229, §1, 43 Stat. 936; Jan. 31, 1928, ch. 14, §1, 45 Stat. 54; May 17, 1932, ch. 190, 47 Stat. 158; Feb. 16, 1933, ch. 91, §3, 47 Stat. 817; May 31, 1935, ch. 160, 49 Stat. 313; June 20, 1938, ch. 526, 52 Stat. 779; Aug. 2, 1946, ch. 753, §412(a)(1), 60 Stat. 844).

This section rephrases and simplifies paragraphs "First", "Second", and "Third" of section 225(a) of title 28, U.S.C., 1940 ed., which referred to each Territory and Possession separately, and to sections 61 and 62 of the Canal Zone Code, section 933(a)(1) of said title relating to jurisdiction of appeals in tort claims cases, and the provisions of section 1356 of title 48, U.S.C., 1940 ed., relating to jurisdiction of appeals from final judgments of the district court for the Canal Zone.

The district courts for the districts of Hawaii and Puerto Rico are embraced in the term "district courts of the United States." (See definitive section 451 of this title.)

Paragraph "Fourth" of section 225(a) of title 28, U.S.C., 1940 ed., is incorporated in section 1293 of this title.

Words "Fifth. In the United States Court for China, in all cases" in said section 225(a) were omitted. (See reviser's note under section 411 of this title.)

Venue provisions of section 1356 of title 48, U.S.C., 1940 ed., are incorporated in section 1295 of this title.

Section 61 of title 7 of the Canal Zone Code is also incorporated in sections 1291 and 1295 of this title.

In addition to the jurisdiction conferred by this chapter, the courts of appeals also have appellate jurisdiction in proceedings under Title 11, Bankruptcy, and jurisdiction to review:

(1) Orders of the Secretary of the Treasury denying an application for, suspending, revoking, or annulling a basic permit under chapter 8 of title 27;

(2) Orders of the Interstate Commerce Commission, the Federal Communications Commission, the Civil Aeronautics Board, the Board of Governors of the Federal Reserve System, and the Federal Trade Commission, based on violations of the antitrust laws or unfair or deceptive acts, methods, or practices in commerce;

(3) Orders of the Secretary of the Army under sections 504, 505 and 516 of title 33, U.S.C., 1940 ed., Navigation and Navigable Waters;

(4) Orders of the Civil Aeronautics Board under chapter 9 of title 49, except orders as to foreign air carriers which are subject to the President's approval.

(5) Orders under chapter 1 of title 7, refusing to designate boards of trade as contract markets or suspending or revoking such designations, or excluding persons from trading in contract markets;

(6) Orders of the Federal Power Commission under chapter 12 of title 16;

(7) Orders of the Federal Security Administrator under section 371(e) of title 21, in a case of actual controversy as to the validity of any such order, by any person adversely affected thereby;

(8) Orders of the Federal Power Commission under chapter 15B of title 15;

(9) Final orders of the National Labor Relations Board;

(10) Cease and desist orders under section 193 of title 7;

(11) Orders of the Securities and Exchange Commission;

(12) Orders to cease and desist from violating section 1599 of title 7;

(13) Wage orders of the Administrator of the Wage and Hour Division of the Department of Labor under section 208 of title 29;

(14) Orders under sections 81r and 1641 of title 19, U.S.C., 1940 ed., Customs Duties.

The courts of appeals also have jurisdiction to enforce:

(1) Orders of the Interstate Commerce Commission, the Federal Communications Commission, the Civil Aeronautics Board, the Board of Governors of the Federal Reserve System, and the Federal Trade Commission, based on violations of the antitrust laws or unfair or deceptive acts, methods, or practices in commerce;

(2) Final orders of the National Labor Relations Board;

(3) Orders to cease and desist from violating section 1599 of title 7.

The Court of Appeals for the District of Columbia also has jurisdiction to review orders of the Post Office Department under section 576 of title 39 relating to discriminations in sending second-class publications by freight; Maritime Commission orders denying transfer to foreign registry of vessels under subsidy contract; sugar allotment orders; decisions of the Federal Communications Commission granting or refusing applications for construction permits for radio stations, or for radio station licenses, or for renewal or modification of radio station licenses, or suspending any radio operator's license.

Changes were made in phraseology.

### Editorial Notes

#### AMENDMENTS

1982—Pub. L. 97–164, §124, inserted "(other than the United States Court of Appeals for the Federal Cir-

cuit)" after "The court of appeals" and inserted provision that the jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

1958—Pub. L. 85–508 struck out provisions which gave courts of appeals jurisdiction of appeals from District Court for Territory of Alaska. See section 81A of this title which establishes a United States District Court for the State of Alaska.

1951—Act Oct. 31, 1951, inserted reference to District Court of Guam.

### Statutory Notes and Related Subsidiaries

EFFECTIVE DATE OF 1982 AMENDMENT

Amendment by Pub. L. 97–164 effective Oct. 1, 1982, see section 402 of Pub. L. 97–164, set out as a note under section 171 of this title.

EFFECTIVE DATE OF 1958 AMENDMENT

Amendment by Pub. L. 85–508 effective Jan. 3, 1959, on admission of Alaska into the Union pursuant to Proc. No. 3269, Jan. 3, 1959, 24 F.R. 81, 73 Stat. c.16 as required by sections 1 and 8(c) of Pub. L. 85–508, see notes set out under section 81A of this title and preceding section 21 of Title 48, Territories and Insular Possessions.

TERMINATION OF UNITED STATES DISTRICT COURT FOR THE DISTRICT OF THE CANAL ZONE

For termination of the United States District Court for the District of the Canal Zone at end of the "transition period", being the 30-month period beginning Oct. 1, 1979, and ending midnight Mar. 31, 1982, see Paragraph 5 of Article XI of the Panama Canal Treaty of 1977 and sections 2101 and 2201 to 2203 of Pub. L. 96–70, title II, Sept. 27, 1979, 93 Stat. 493, formerly classified to sections 3831 and 3841 to 3843, respectively, of Title 22, Foreign Relations and Intercourse.

## § 1292. Interlocutory decisions

(a) Except as provided in subsections (c) and (d) of this section, the courts of appeals shall have jurisdiction of appeals from:

(1) Interlocutory orders of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court;

(2) Interlocutory orders appointing receivers, or refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof, such as directing sales or other disposals of property;

(3) Interlocutory decrees of such district courts or the judges thereof determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed.

(b) When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: *Provided, however,* That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

(c) The United States Court of Appeals for the Federal Circuit shall have exclusive jurisdiction—

(1) of an appeal from an interlocutory order or decree described in subsection (a) or (b) of this section in any case over which the court would have jurisdiction of an appeal under section 1295 of this title; and

(2) of an appeal from a judgment in a civil action for patent infringement which would otherwise be appealable to the United States Court of Appeals for the Federal Circuit and is final except for an accounting.

(d)(1) When the chief judge of the Court of International Trade issues an order under the provisions of section 256(b) of this title, or when any judge of the Court of International Trade, in issuing any other interlocutory order, includes in the order a statement that a controlling question of law is involved with respect to which there is a substantial ground for difference of opinion and that an immediate appeal from that order may materially advance the ultimate termination of the litigation, the United States Court of Appeals for the Federal Circuit may, in its discretion, permit an appeal to be taken from such order, if application is made to that Court within ten days after the entry of such order.

(2) When the chief judge of the United States Court of Federal Claims issues an order under section 798(b) of this title, or when any judge of the United States Court of Federal Claims, in issuing an interlocutory order, includes in the order a statement that a controlling question of law is involved with respect to which there is a substantial ground for difference of opinion and that an immediate appeal from that order may materially advance the ultimate termination of the litigation, the United States Court of Appeals for the Federal Circuit may, in its discretion, permit an appeal to be taken from such order, if application is made to that Court within ten days after the entry of such order.

(3) Neither the application for nor the granting of an appeal under this subsection shall stay proceedings in the Court of International Trade or in the Court of Federal Claims, as the case may be, unless a stay is ordered by a judge of the Court of International Trade or of the Court of Federal Claims or by the United States Court of Appeals for the Federal Circuit or a judge of that court.

(4)(A) The United States Court of Appeals for the Federal Circuit shall have exclusive jurisdiction of an appeal from an interlocutory order of a district court of the United States, the District Court of Guam, the District Court of the Virgin Islands, or the District Court for the Northern Mariana Islands, granting or denying, in whole or in part, a motion to transfer an action to the United States Court of Federal Claims under section 1631 of this title.

(B) When a motion to transfer an action to the Court of Federal Claims is filed in a district

health insurance coverage in the individual or group market, or all markets, in a State, health insurance coverage may be discontinued by the issuer only in accordance with applicable State law and if—

(i) the issuer provides notice to the applicable State authority and to each plan sponsor or individual, as applicable,[2] (and participants and beneficiaries covered under such coverage) of such discontinuation at least 180 days prior to the date of the discontinuation of such coverage; and

(ii) all health insurance issued or delivered for issuance in the State in such market (or markets) are discontinued and coverage under such health insurance coverage in such market (or markets) is not renewed.

**(B) Prohibition on market reentry**

In the case of a discontinuation under subparagraph (A) in a market, the issuer may not provide for the issuance of any health insurance coverage in the market and State involved during the 5-year period beginning on the date of the discontinuation of the last health insurance coverage not so renewed.

**(d) Exception for uniform modification of coverage**

At the time of coverage renewal, a health insurance issuer may modify the health insurance coverage for a product offered to a group health plan—

(1) in the large group market; or

(2) in the small group market if, for coverage that is available in such market other than only through one or more bona fide associations, such modification is consistent with State law and effective on a uniform basis among group health plans with that product.

**(e) Application to coverage offered only through associations**

In applying this section in the case of health insurance coverage that is made available by a health insurance issuer in the small or large group market to employers only through one or more associations, a reference to "plan sponsor" is deemed, with respect to coverage provided to an employer member of the association, to include a reference to such employer.

(July 1, 1944, ch. 373, title XXVII, §2703, as added and amended Pub. L. 111–148, title I, §§1201(4), 1563(c)(9), formerly §1562(c)(9), title X, §10107(b)(1), Mar. 23, 2010, 124 Stat. 156, 267, 911.)

EDITORIAL NOTES

REFERENCES IN TEXT

Section 2711, referred to in subsec. (b)(5), is a reference to section 2711 of act July 1, 1944. Section 2711, which was classified to section 300gg–11 of this title, was renumbered section 2731 and amended and transferred by Pub. L. 111–148, title I, §§1001(3), 1563(c)(8), formerly §1562(c)(8), title X, §10107(b)(1), Mar. 23, 2010, 124 Stat. 130, 266, 911, to the end of section 2702 of act July 1, 1944, as added by Pub. L. 111–148, title I, §1201(4), Mar. 23, 2010, 124 Stat. 156, and classified to section 300gg–1 of this title. A new section 2711 of act July 1, 1944, related to no lifetime or annual limits, was added by Pub.

---

[2] So in original.

L. 111–148, title I, §1001(5), Mar. 23, 2010, 124 Stat. 131, effective for plan years beginning on or after the date that is 6 months after Mar. 23, 2010, and is classified to section 300gg–11 of this title.

CODIFICATION

The text of section 300gg–12 of this title, which was amended and transferred to subsecs. (b) to (e) of this section by Pub. L. 111–148, §1563(c)(9), formerly §1562(c)(9), as renumbered by Pub. L. 111–148, §10107(b)(1), was based on act July 1, 1944, ch. 373, title XXVII, §2732, formerly §2712, as added Pub. L. 104–191, title I, §102(a), Aug. 21, 1996, 110 Stat. 1964; renumbered §2732, Pub. L. 111–148, title I, §1001(3), Mar. 23, 2010, 124 Stat. 130.

PRIOR PROVISIONS

A prior section 2703 of act July 1, 1944, was successively renumbered by subsequent acts and transferred, see section 238b of this title.

AMENDMENTS

2010—Pub. L. 111–148, §1563(c)(9), formerly §1562(c)(9), as renumbered by Pub. L. 111–148, §10107(b)(1), transferred section 300gg–12 of this title to the end of this section after amending it by striking out the section catchline "Guaranteed renewability of coverage for employers in group market", by striking subsec. (a) which required a health insurance issuer offering coverage in connection with a group health plan to renew such coverage at the option of the plan sponsor, by amending subsec. (b) by substituting "health insurance coverage offered in the group or individual market" for "group health plan in the small or large group market" in introductory provisions, inserting ", or individual, as applicable," after "plan sponsor" in pars. (1) and (2), adding par. (3), and striking out former par. (3) which related to violation of participation or contribution rules, and by amending subsec. (c) by substituting "group or individual health insurance coverage" for "group health insurance coverage offered in the small or large group market" in introductory provisions of par. (1), inserting "or individual, as applicable," after "plan sponsor" in par. (1)(A) and (B), inserting "or individual health insurance coverage" in par. (1)(B), inserting "or individuals, as applicable," after "those sponsors" in par. (1)(C), substituting "individual or group market, or all markets," for "small group market or the large group market, or both markets," in introductory provisions of par. (2)(A), and inserting "or individual, as applicable," after "plan sponsor" in par. (2)(A)(i). Amendment inserting "or individual health insurance coverage" in subsec. (c)(1)(B) was executed by making the insertion after "group health plan" as the probable intent of Congress, notwithstanding that the directory language did not specify where in subsec. (c)(1)(B) to make the insertion.

STATUTORY NOTES AND RELATED SUBSIDIARIES

EFFECTIVE DATE

Section effective for plan years beginning on or after Jan. 1, 2014, see section 1255 of Pub. L. 111–148, set out as a note under section 300gg of this title.

**§ 300gg–3. Prohibition of preexisting condition exclusions or other discrimination based on health status**

**(a) In general**

A group health plan and a health insurance issuer offering group or individual health insurance coverage may not impose any preexisting condition exclusion with respect to such plan or coverage.

**(b) Definitions**

For purposes of this part—

**(1) Preexisting condition exclusion**

**(A) In general**

The term "preexisting condition exclusion" means, with respect to coverage, a limitation or exclusion of benefits relating to a condition based on the fact that the condition was present before the date of enrollment for such coverage, whether or not any medical advice, diagnosis, care, or treatment was recommended or received before such date.

**(B) Treatment of genetic information**

Genetic information shall not be treated as a condition described in subsection (a)(1)[1] in the absence of a diagnosis of the condition related to such information.

**(2) Enrollment date**

The term "enrollment date" means, with respect to an individual covered under a group health plan or health insurance coverage, the date of enrollment of the individual in the plan or coverage or, if earlier, the first day of the waiting period for such enrollment.

**(3) Late enrollee**

The term "late enrollee" means, with respect to coverage under a group health plan, a participant or beneficiary who enrolls under the plan other than during—

(A) the first period in which the individual is eligible to enroll under the plan, or

(B) a special enrollment period under subsection (f).

**(4) Waiting period**

The term "waiting period" means, with respect to a group health plan and an individual who is a potential participant or beneficiary in the plan, the period that must pass with respect to the individual before the individual is eligible to be covered for benefits under the terms of the plan.

**(c) Rules relating to crediting previous coverage**

**(1) "Creditable coverage" defined**

For purposes of this subchapter, the term "creditable coverage" means, with respect to an individual, coverage of the individual under any of the following:

(A) A group health plan.

(B) Health insurance coverage.

(C) Part A or part B of title XVIII of the Social Security Act [42 U.S.C. 1395c et seq., 1395j et seq.].

(D) Title XIX of the Social Security Act [42 U.S.C. 1396 et seq.], other than coverage consisting solely of benefits under section 1928 [42 U.S.C. 1396s].

(E) Chapter 55 of title 10.

(F) A medical care program of the Indian Health Service or of a tribal organization.

(G) A State health benefits risk pool.

(H) A health plan offered under chapter 89 of title 5.

(I) A public health plan (as defined in regulations).

(J) A health benefit plan under section 2504(e) of title 22.

Such term does not include coverage consisting solely of coverage of excepted benefits (as defined in section 300gg–91(c) of this title).

**(2) Not counting periods before significant breaks in coverage**

**(A) In general**

A period of creditable coverage shall not be counted, with respect to enrollment of an individual under a group or individual health plan, if, after such period and before the enrollment date, there was a 63-day period during all of which the individual was not covered under any creditable coverage.

**(B) Waiting period not treated as a break in coverage**

For purposes of subparagraph (A) and subsection (d)(4), any period that an individual is in a waiting period for any coverage under a group or individual health plan (or for group health insurance coverage) or is in an affiliation period (as defined in subsection (g)(2)) shall not be taken into account in determining the continuous period under subparagraph (A).

**(C) TAA-eligible individuals**

In the case of plan years beginning before January 1, 2014—

**(i) TAA pre-certification period rule**

In the case of a TAA-eligible individual, the period beginning on the date the individual has a TAA-related loss of coverage and ending on the date that is 7 days after the date of the issuance by the Secretary (or by any person or entity designated by the Secretary) of a qualified health insurance costs credit eligibility certificate for such individual for purposes of section 7527 of title 26 shall not be taken into account in determining the continuous period under subparagraph (A).

**(ii) Definitions**

The terms "TAA-eligible individual" and "TAA-related loss of coverage" have the meanings given such terms in section 300bb–5(b)(4) of this title.

**(3) Method of crediting coverage**

**(A) Standard method**

Except as otherwise provided under subparagraph (B), for purposes of applying subsection (a)(3),[1] a group health plan, and a health insurance issuer offering group or individual health insurance coverage, shall count a period of creditable coverage without regard to the specific benefits covered during the period.

**(B) Election of alternative method**

A group health plan, or a health insurance issuer offering group or individual health insurance, may elect to apply subsection (a)(3)[1] based on coverage of benefits within each of several classes or categories of benefits specified in regulations rather than as provided under subparagraph (A). Such election shall be made on a uniform basis for all participants and beneficiaries. Under such election a group health plan or issuer shall

---

[1] See References in Text note below.

count a period of creditable coverage with respect to any class or category of benefits if any level of benefits is covered within such class or category.

**(C) Plan notice**

In the case of an election with respect to a group health plan under subparagraph (B) (whether or not health insurance coverage is provided in connection with such plan), the plan shall—

(i) prominently state in any disclosure statements concerning the plan, and state to each enrollee at the time of enrollment under the plan, that the plan has made such election, and

(ii) include in such statements a description of the effect of this election.

**(D) Issuer notice**

In the case of an election under subparagraph (B) with respect to health insurance coverage offered by an issuer in the individual or group group[2] market, the issuer—

(i) shall prominently state in any disclosure statements concerning the coverage, and to each employer at the time of the offer or sale of the coverage, that the issuer has made such election, and

(ii) shall include in such statements a description of the effect of such election.

**(4) Establishment of period**

Periods of creditable coverage with respect to an individual shall be established through presentation of certifications described in subsection (e) or in such other manner as may be specified in regulations.

**(d) Exceptions**

**(1) Exclusion not applicable to certain newborns**

Subject to paragraph (4), a group health plan, and a health insurance issuer offering group or individual health insurance coverage, may not impose any preexisting condition exclusion in the case of an individual who, as of the last day of the 30-day period beginning with the date of birth, is covered under creditable coverage.

**(2) Exclusion not applicable to certain adopted children**

Subject to paragraph (4), a group health plan, and a health insurance issuer offering group or individual health insurance coverage, may not impose any preexisting condition exclusion in the case of a child who is adopted or placed for adoption before attaining 18 years of age and who, as of the last day of the 30-day period beginning on the date of the adoption or placement for adoption, is covered under creditable coverage. The previous sentence shall not apply to coverage before the date of such adoption or placement for adoption.

**(3) Exclusion not applicable to pregnancy**

A group health plan, and health insurance issuer offering group or individual health insurance coverage, may not impose any preexisting condition exclusion relating to pregnancy as a preexisting condition.

---

[2] So in original.

**(4) Loss if break in coverage**

Paragraphs (1) and (2) shall no longer apply to an individual after the end of the first 63-day period during all of which the individual was not covered under any creditable coverage.

**(e) Certifications and disclosure of coverage**

**(1) Requirement for certification of period of creditable coverage**

**(A) In general**

A group health plan, and a health insurance issuer offering group or individual health insurance coverage, shall provide the certification described in subparagraph (B)—

(i) at the time an individual ceases to be covered under the plan or otherwise becomes covered under a COBRA continuation provision,

(ii) in the case of an individual becoming covered under such a provision, at the time the individual ceases to be covered under such provision, and

(iii) on the request on behalf of an individual made not later than 24 months after the date of cessation of the coverage described in clause (i) or (ii), whichever is later.

The certification under clause (i) may be provided, to the extent practicable, at a time consistent with notices required under any applicable COBRA continuation provision.

**(B) Certification**

The certification described in this subparagraph is a written certification of—

(i) the period of creditable coverage of the individual under such plan and the coverage (if any) under such COBRA continuation provision, and

(ii) the waiting period (if any) (and affiliation period, if applicable) imposed with respect to the individual for any coverage under such plan.

**(C) Issuer compliance**

To the extent that medical care under a group health plan consists of group health insurance coverage, the plan is deemed to have satisfied the certification requirement under this paragraph if the health insurance issuer offering the coverage provides for such certification in accordance with this paragraph.

**(2) Disclosure of information on previous benefits**

In the case of an election described in subsection (c)(3)(B) by a group health plan or health insurance issuer, if the plan or issuer enrolls an individual for coverage under the plan and the individual provides a certification of coverage of the individual under paragraph (1)—

(A) upon request of such plan or issuer, the entity which issued the certification provided by the individual shall promptly disclose to such requesting plan or issuer information on coverage of classes and categories of health benefits available under such entity's plan or coverage, and

(B) such entity may charge the requesting plan or issuer for the reasonable cost of disclosing such information.

**(3) Regulations**

The Secretary shall establish rules to prevent an entity's failure to provide information under paragraph (1) or (2) with respect to previous coverage of an individual from adversely affecting any subsequent coverage of the individual under another group health plan or health insurance coverage.

**(f) Special enrollment periods**

**(1) Individuals losing other coverage**

A group health plan, and a health insurance issuer offering group health insurance coverage in connection with a group health plan, shall permit an employee who is eligible, but not enrolled, for coverage under the terms of the plan (or a dependent of such an employee if the dependent is eligible, but not enrolled, for coverage under such terms) to enroll for coverage under the terms of the plan if each of the following conditions is met:

(A) The employee or dependent was covered under a group health plan or had health insurance coverage at the time coverage was previously offered to the employee or dependent.

(B) The employee stated in writing at such time that coverage under a group health plan or health insurance coverage was the reason for declining enrollment, but only if the plan sponsor or issuer (if applicable) required such a statement at such time and provided the employee with notice of such requirement (and the consequences of such requirement) at such time.

(C) The employee's or dependent's coverage described in subparagraph (A)—

(i) was under a COBRA continuation provision and the coverage under such provision was exhausted; or

(ii) was not under such a provision and either the coverage was terminated as a result of loss of eligibility for the coverage (including as a result of legal separation, divorce, death, termination of employment, or reduction in the number of hours of employment) or employer contributions toward such coverage were terminated.

(D) Under the terms of the plan, the employee requests such enrollment not later than 30 days after the date of exhaustion of coverage described in subparagraph (C)(i) or termination of coverage or employer contribution described in subparagraph (C)(ii).

**(2) For dependent beneficiaries**

**(A) In general**

If—

(i) a group health plan makes coverage available with respect to a dependent of an individual,

(ii) the individual is a participant under the plan (or has met any waiting period applicable to becoming a participant under the plan and is eligible to be enrolled under the plan but for a failure to enroll during a previous enrollment period), and

(iii) a person becomes such a dependent of the individual through marriage, birth, or adoption or placement for adoption,

the group health plan shall provide for a dependent special enrollment period described in subparagraph (B) during which the person (or, if not otherwise enrolled, the individual) may be enrolled under the plan as a dependent of the individual, and in the case of the birth or adoption of a child, the spouse of the individual may be enrolled as a dependent of the individual if such spouse is otherwise eligible for coverage.

**(B) Dependent special enrollment period**

A dependent special enrollment period under this subparagraph shall be a period of not less than 30 days and shall begin on the later of—

(i) the date dependent coverage is made available, or

(ii) the date of the marriage, birth, or adoption or placement for adoption (as the case may be) described in subparagraph (A)(iii).

**(C) No waiting period**

If an individual seeks to enroll a dependent during the first 30 days of such a dependent special enrollment period, the coverage of the dependent shall become effective—

(i) in the case of marriage, not later than the first day of the first month beginning after the date the completed request for enrollment is received;

(ii) in the case of a dependent's birth, as of the date of such birth; or

(iii) in the case of a dependent's adoption or placement for adoption, the date of such adoption or placement for adoption.

**(3) Special rules for application in case of Medicaid and CHIP**

**(A) In general**

A group health plan, and a health insurance issuer offering group health insurance coverage in connection with a group health plan, shall permit an employee who is eligible, but not enrolled, for coverage under the terms of the plan (or a dependent of such an employee if the dependent is eligible, but not enrolled, for coverage under such terms) to enroll for coverage under the terms of the plan if either of the following conditions is met:

**(i) Termination of Medicaid or CHIP coverage**

The employee or dependent is covered under a Medicaid plan under title XIX of the Social Security Act [42 U.S.C. 1396 et seq.] or under a State child health plan under title XXI of such Act [42 U.S.C. 1397aa et seq.] and coverage of the employee or dependent under such a plan is terminated as a result of loss of eligibility for such coverage and the employee requests coverage under the group health plan (or health insurance coverage) not later than 60 days after the date of termination of such coverage.

**(ii) Eligibility for employment assistance under Medicaid or CHIP**

The employee or dependent becomes eligible for assistance, with respect to coverage under the group health plan or health insurance coverage, under such Medicaid plan or State child health plan (including under any waiver or demonstration project conducted under or in relation to such a plan), if the employee requests coverage under the group health plan or health insurance coverage not later than 60 days after the date the employee or dependent is determined to be eligible for such assistance.

**(B) Coordination with Medicaid and CHIP**

**(i) Outreach to employees regarding availability of Medicaid and CHIP coverage**

**(I) In general**

Each employer that maintains a group health plan in a State that provides medical assistance under a State Medicaid plan under title XIX of the Social Security Act [42 U.S.C. 1396 et seq.], or child health assistance under a State child health plan under title XXI of such Act [42 U.S.C. 1397aa et seq.], in the form of premium assistance for the purchase of coverage under a group health plan, shall provide to each employee a written notice informing the employee of potential opportunities then currently available in the State in which the employee resides for premium assistance under such plans for health coverage of the employee or the employee's dependents. For purposes of compliance with this subclause, the employer may use any State-specific model notice developed in accordance with section 1181(f)(3)(B)(i)(II) of title 29.

**(II) Option to provide concurrent with provision of plan materials to employee**

An employer may provide the model notice applicable to the State in which an employee resides concurrent with the furnishing of materials notifying the employee of health plan eligibility, concurrent with materials provided to the employee in connection with an open season or election process conducted under the plan, or concurrent with the furnishing of the summary plan description as provided in section 1024(b) of title 29.

**(ii) Disclosure about group health plan benefits to States for Medicaid and CHIP eligible individuals**

In the case of an enrollee in a group health plan who is covered under a Medicaid plan of a State under title XIX of the Social Security Act [42 U.S.C. 1396 et seq.] or under a State child health plan under title XXI of such Act [42 U.S.C. 1397aa et seq.], the plan administrator of the group health plan shall disclose to the State, upon request, information about the benefits available under the group health plan in sufficient specificity, as determined under regulations of the Secretary of Health and Human Services in consultation with the Secretary that require use of the model coverage coordination disclosure form developed under section 311(b)(1)(C) of the Children's Health Insurance[3] Reauthorization Act of 2009, so as to permit the State to make a determination (under paragraph (2)(B), (3), or (10) of section 2105(c) of the Social Security Act [42 U.S.C. 1397ee(c)(2)(B), (3), (10)] or otherwise) concerning the cost-effectiveness of the State providing medical or child health assistance through premium assistance for the purchase of coverage under such group health plan and in order for the State to provide supplemental benefits required under paragraph (10)(E) of such section or other authority.

**(g) Use of affiliation period by HMOs as alternative to preexisting condition exclusion**

**(1) In general**

A health maintenance organization which offers health insurance coverage in connection with a group health plan and which does not impose any preexisting condition exclusion allowed under subsection (a) with respect to any particular coverage option may impose an affiliation period for such coverage option, but only if—

(A) such period is applied uniformly without regard to any health status-related factors; and

(B) such period does not exceed 2 months (or 3 months in the case of a late enrollee).

**(2) Affiliation period**

**(A) "Affiliation period" defined**

For purposes of this subchapter, the term "affiliation period" means a period which, under the terms of the health insurance coverage offered by the health maintenance organization, must expire before the health insurance coverage becomes effective. The organization is not required to provide health care services or benefits during such period and no premium shall be charged to the participant or beneficiary for any coverage during the period.

**(B) Beginning**

Such period shall begin on the enrollment date.

**(C) Runs concurrently with waiting periods**

An affiliation period under a plan shall run concurrently with any waiting period under the plan.

**(3) Alternative methods**

A health maintenance organization described in paragraph (1) may use alternative methods, from those described in such paragraph, to address adverse selection as approved by the State insurance commissioner or official or officials designated by the State to enforce the requirements of this part for the State involved with respect to such issuer.

---

[3] So in original. Probably should be followed by the word "Program".

(July 1, 1944, ch. 373, title XXVII, § 2704, formerly § 2701, as added Pub. L. 104–191, title I, § 102(a), Aug. 21, 1996, 110 Stat. 1955; amended Pub. L. 111–3, title III, § 311(b)(2), Feb. 4, 2009, 123 Stat. 70; Pub. L. 111–5, div. B, title I, § 1899D(c), Feb. 17, 2009, 123 Stat. 426; renumbered § 2704 and amended Pub. L. 111–148, title I, §§ 1201(2), 1563(c)(1), formerly § 1562(c)(1), title X, § 10107(b)(1), Mar. 23, 2010, 124 Stat. 154, 264, 911; Pub. L. 111–344, title I, § 114(c), Dec. 29, 2010, 124 Stat. 3615; Pub. L. 112–40, title II, § 242(a)(3), (4), Oct. 21, 2011, 125 Stat. 419.)

### Editorial Notes

#### References in Text

Subsection (a), referred to in subsecs. (b)(1)(B) and (c)(3)(A), (B), was struck out, and a new subsec. (a) was added, by Pub. L. 111–148, title I, § 1201(2)(A), Mar. 23, 2010, 124 Stat. 154, and as so amended, subsec. (a) no longer contains paragraphs.

The Social Security Act, referred to in subsecs. (c)(1)(C), (D) and (f)(3)(A)(i), (B)(i)(I), (ii), is act Aug. 14, 1935, ch. 531, 49 Stat. 620. Parts A and B of title XVIII of the Act are classified generally to parts A (§ 1395c et seq.) and B (§ 1395j et seq.), respectively, of subchapter XVIII of chapter 7 of this title. Titles XIX and XXI of the Act are classified generally to subchapters XIX (§ 1396 et seq.) and XXI (§ 1397aa et seq.), respectively, of chapter 7 of this title. For complete classification of this Act to the Code, see section 1305 of this title and Tables.

Section 311(b)(1)(C) of the Children's Health Insurance Program Reauthorization Act of 2009, referred to in subsec. (f)(3)(B)(ii), is section 311(b)(1)(C) of Pub. L. 111–3, which is set out as a note under section 1181 of Title 29, Labor.

#### Codification

Section was classified to section 300gg of this title prior to amendment and renumbering by Pub. L. 111–148.

Section 242(a)(3) of Pub. L. 112–40 amended section 2701 of act July 1, 1944, "as in effect for plan years beginning before January 1, 2014", which was classified to section 300gg of this title prior to amendment and renumbering by Pub. L. 111–148. Section 242(a)(4) of Pub. L. 112–40 made identical amendment to section 2704 of act July 1, 1944, "as in effect for plan years beginning on or after January 1, 2014", which is set out as this section. See 2011 Amendment note below. For effective date of renumbering by section 1201(2) of Pub. L. 111–148, see Effective Date of 2010 Amendment note below.

#### Prior Provisions

A prior section 2704 of act July 1, 1944, was renumbered section 2725 and is classified to section 300gg–25 of this title.

Another prior section 2704 of act July 1, 1944, was successively renumbered by subsequent acts and transferred, see section 238c of this title.

#### Amendments

2011—Subsec. (c)(2)(C). Pub. L. 112–40 substituted "January 1, 2014" for "February 13, 2011" in introductory provisions. See Codification note above.

2010—Pub. L. 111–148, § 1201(2)(A), substituted "Prohibition of preexisting condition exclusions or other discrimination based on health status" for "Increased portability through limitation on preexisting condition exclusions" in section catchline, added subsec. (a), and struck out former subsec. (a) which related to limitation on preexisting condition exclusion period.

Subsec. (c)(2)(A), (B). Pub. L. 111–148, § 1563(c)(1)(A)(i), formerly § 1562(c)(1)(A)(i), as renumbered by Pub. L. 111–148, § 10107(b)(1), substituted "group or individual health plan" for "group health plan".

Subsec. (c)(2)(C). Pub. L. 111–344 substituted "February 13, 2011" for "January 1, 2011" in introductory provisions.

Subsec. (c)(3)(A), (B). Pub. L. 111–148, § 1563(c)(1)(A)(ii)(I), formerly § 1562(c)(1)(A)(ii)(I), as renumbered by Pub. L. 111–148, § 10107(b)(1), substituted "group or individual health insurance" for "group health insurance".

Subsec. (c)(3)(D). Pub. L. 111–148, § 1563(c)(1)(A)(ii)(II), formerly § 1562(c)(1)(A)(ii)(II), as renumbered by Pub. L. 111–148, § 10107(b)(1), substituted "individual or group" for "small or large" in introductory provisions.

Subsec. (d)(1) to (3). Pub. L. 111–148, § 1563(c)(1)(B), formerly § 1562(c)(1)(B), as renumbered by Pub. L. 111–148, § 10107(b)(1), substituted "group or individual health insurance" for "group health insurance".

Subsec. (e)(1)(A). Pub. L. 111–148, § 1563(c)(1)(C), formerly § 1562(c)(1)(C), as renumbered by Pub. L. 111–148, § 10107(b)(1), substituted "group or individual health insurance" for "group health insurance" in introductory provisions.

2009—Subsec. (c)(2)(C). Pub. L. 111–5 added subpar. (C).

Subsec. (f)(3). Pub. L. 111–3 added par. (3).

### Statutory Notes and Related Subsidiaries

#### Effective Date of 2011 Amendment

Amendment by Pub. L. 112–40 applicable to plan years beginning after Feb. 12, 2011, with transitional rules, see section 242(b) of Pub. L. 112–40, set out as a note under section 9801 of Title 26, Internal Revenue Code.

#### Effective Date of 2010 Amendment

Amendment by Pub. L. 111–344 applicable to plan years beginning after Dec. 31, 2010, see section 114(d) of Pub. L. 111–344, set out as a note under section 9801 of Title 26, Internal Revenue Code.

Amendment by section 1201(2) of Pub. L. 111–148 effective for plan years beginning on or after Jan. 1, 2014, except that the provisions of this section, as they apply to enrollees who are under 19 years of age, effective for plan years beginning on or after the date that is 6 months after Mar. 23, 2010, see section 1255 of Pub. L. 111–148, set out as an Effective Date note under section 300gg of this title.

#### Effective Date of 2009 Amendment

Except as otherwise provided and subject to certain applicability provisions, amendment by Pub. L. 111–5 effective upon the expiration of the 90-day period beginning on Feb. 17, 2009, see section 1891 of Pub. L. 111–5, set out as an Effective and Termination Dates of 2009 Amendment note under section 2271 of Title 19, Customs Duties.

Amendment by Pub. L. 111–5 applicable to plan years beginning after Feb. 17, 2009, see section 1899D(d) of Pub. L. 111–5, set out as a note under section 9801 of Title 26, Internal Revenue Code.

Amendment by Pub. L. 111–3 effective Apr. 1, 2009, and applicable to child health assistance and medical assistance provided on or after that date, with certain exceptions, see section 3 of Pub. L. 111–3, set out as an Effective Date note under section 1396 of this title.

## § 300gg–4. Prohibiting discrimination against individual participants and beneficiaries based on health status

### (a) In general

A group health plan and a health insurance issuer offering group or individual health insurance coverage may not establish rules for eligibility (including continued eligibility) of any individual to enroll under the terms of the plan or coverage based on any of the following health status-related factors in relation to the individual or a dependent of the individual:

ADD-017

(1) Health status.

(2) Medical condition (including both physical and mental illnesses).

(3) Claims experience.

(4) Receipt of health care.

(5) Medical history.

(6) Genetic information.

(7) Evidence of insurability (including conditions arising out of acts of domestic violence).

(8) Disability.

(9) Any other health status-related factor determined appropriate by the Secretary.

**(b) In premium contributions**

**(1) In general**

A group health plan, and a health insurance issuer offering group or individual health insurance coverage, may not require any individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution which is greater than such premium or contribution for a similarly situated individual enrolled in the plan on the basis of any health status-related factor in relation to the individual or to an individual enrolled under the plan as a dependent of the individual.

**(2) Construction**

Nothing in paragraph (1) shall be construed—

(A) to restrict the amount that an employer or individual may be charged for coverage under a group health plan except as provided in paragraph (3) or individual health coverage, as the case may be; or

(B) to prevent a group health plan, and a health insurance issuer offering group health insurance coverage, from establishing premium discounts or rebates or modifying otherwise applicable copayments or deductibles in return for adherence to programs of health promotion and disease prevention.

**(3) No group-based discrimination on basis of genetic information**

**(A) In general**

For purposes of this section, a group health plan, and health¹ insurance issuer offering group health insurance coverage in connection with a group health plan, may not adjust premium or contribution amounts for the group covered under such plan on the basis of genetic information.

**(B) Rule of construction**

Nothing in subparagraph (A) or in paragraphs (1) and (2) of subsection (d) shall be construed to limit the ability of a health insurance issuer offering group or individual health insurance coverage to increase the premium for an employer based on the manifestation of a disease or disorder of an individual who is enrolled in the plan. In such case, the manifestation of a disease or disorder in one individual cannot also be used as genetic information about other group members and to further increase the premium for the employer.

¹ So in original. Probably should be preceded by "a".

**(c) Genetic testing**

**(1) Limitation on requesting or requiring genetic testing**

A group health plan, and a health insurance issuer offering health insurance coverage in connection with a group health plan, shall not request or require an individual or a family member of such individual to undergo a genetic test.

**(2) Rule of construction**

Paragraph (1) shall not be construed to limit the authority of a health care professional who is providing health care services to an individual to request that such individual undergo a genetic test.

**(3) Rule of construction regarding payment**

**(A) In general**

Nothing in paragraph (1) shall be construed to preclude a group health plan, or a health insurance issuer offering health insurance coverage in connection with a group health plan, from obtaining and using the results of a genetic test in making a determination regarding payment (as such term is defined for the purposes of applying the regulations promulgated by the Secretary under part C of title XI of the Social Security Act [42 U.S.C. 1320d et seq.] and section 264 of the Health Insurance Portability and Accountability Act of 1996, as may be revised from time to time) consistent with subsection (a).

**(B) Limitation**

For purposes of subparagraph (A), a group health plan, or a health insurance issuer offering health insurance coverage in connection with a group health plan, may request only the minimum amount of information necessary to accomplish the intended purpose.

**(4) Research exception**

Notwithstanding paragraph (1), a group health plan, or a health insurance issuer offering health insurance coverage in connection with a group health plan, may request, but not require, that a participant or beneficiary undergo a genetic test if each of the following conditions is met:

(A) The request is made pursuant to research that complies with part 46 of title 45, Code of Federal Regulations, or equivalent Federal regulations, and any applicable State or local law or regulations for the protection of human subjects in research.

(B) The plan or issuer clearly indicates to each participant or beneficiary, or in the case of a minor child, to the legal guardian of such beneficiary, to whom the request is made that—

(i) compliance with the request is voluntary; and

(ii) non-compliance will have no effect on enrollment status or premium or contribution amounts.

(C) No genetic information collected or acquired under this paragraph shall be used for underwriting purposes.

**ADD-018**

12205a of this title, amending this section, sections 12102, 12111 to 12114, 12201, and 12206 to 12213 of this title, section 705 and former section 706 of Title 29, Labor, and enacting provisions set out as notes under this section and section 705 of Title 29] may be cited as the 'ADA Amendments Act of 2008'.''

SHORT TITLE

Pub. L. 101–336, §1(a), July 26, 1990, 104 Stat. 327, provided that: ''This Act [enacting this chapter and section 225 of Title 47, Telecommunications, amending section 706 of Title 29, Labor, and sections 152, 221, and 611 of Title 47, and enacting provisions set out as notes under sections 12111, 12131, 12141, 12161, and 12181 of this title] may be cited as the 'Americans with Disabilities Act of 1990'.''

FINDINGS AND PURPOSES OF PUB. L. 110–325

Pub. L. 110–325, §2, Sept. 25, 2008, 122 Stat. 3553, provided that:

''(a) FINDINGS.—Congress finds that—

''(1) in enacting the Americans with Disabilities Act of 1990 (ADA) [42 U.S.C. 12101 et seq.], Congress intended that the Act 'provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities' and provide broad coverage;

''(2) in enacting the ADA, Congress recognized that physical and mental disabilities in no way diminish a person's right to fully participate in all aspects of society, but that people with physical and mental disabilities are frequently precluded from doing so because of prejudice, antiquated attitudes, or the failure to remove societal and institutional barriers;

''(3) while Congress expected that the definition of disability under the ADA would be interpreted consistently with how courts had applied the definition of a handicapped individual under the Rehabilitation Act of 1973 [29 U.S.C. 701 et seq.], that expectation has not been fulfilled;

''(4) the holdings of the Supreme Court in Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999) and its companion cases have narrowed the broad scope of protection intended to be afforded by the ADA, thus eliminating protection for many individuals whom Congress intended to protect;

''(5) the holding of the Supreme Court in Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184 (2002) further narrowed the broad scope of protection intended to be afforded by the ADA;

''(6) as a result of these Supreme Court cases, lower courts have incorrectly found in individual cases that people with a range of substantially limiting impairments are not people with disabilities;

''(7) in particular, the Supreme Court, in the case of Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184 (2002), interpreted the term 'substantially limits' to require a greater degree of limitation than was intended by Congress; and

''(8) Congress finds that the current Equal Employment Opportunity Commission ADA regulations defining the term 'substantially limits' as 'significantly restricted' are inconsistent with congressional intent, by expressing too high a standard.

''(b) PURPOSES.—The purposes of this Act [see Short Title of 2008 Amendment note above] are—

''(1) to carry out the ADA's objectives of providing 'a clear and comprehensive national mandate for the elimination of discrimination' and 'clear, strong, consistent, enforceable standards addressing discrimination' by reinstating a broad scope of protection to be available under the ADA;

''(2) to reject the requirement enunciated by the Supreme Court in Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999) and its companion cases that whether an impairment substantially limits a major life activity is to be determined with reference to the ameliorative effects of mitigating measures;

''(3) to reject the Supreme Court's reasoning in Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999) with regard to coverage under the third prong of the definition of disability and to reinstate the reasoning of the Supreme Court in School Board of Nassau County v. Arline, 480 U.S. 273 (1987) which set forth a broad view of the third prong of the definition of handicap under the Rehabilitation Act of 1973;

''(4) to reject the standards enunciated by the Supreme Court in Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184 (2002), that the terms 'substantially' and 'major' in the definition of disability under the ADA 'need to be interpreted strictly to create a demanding standard for qualifying as disabled,' and that to be substantially limited in performing a major life activity under the ADA 'an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives';

''(5) to convey congressional intent that the standard created by the Supreme Court in the case of Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184 (2002) for 'substantially limits', and applied by lower courts in numerous decisions, has created an inappropriately high level of limitation necessary to obtain coverage under the ADA, to convey that it is the intent of Congress that the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations, and to convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis; and

''(6) to express Congress' expectation that the Equal Employment Opportunity Commission will revise that portion of its current regulations that defines the term 'substantially limits' as 'significantly restricted' to be consistent with this Act, including the amendments made by this Act.''

STUDY BY GENERAL ACCOUNTING OFFICE OF EXISTING
DISABILITY-RELATED EMPLOYMENT INCENTIVES

Pub. L. 106–170, title III, §303(a), Dec. 17, 1999, 113 Stat. 1903, provided that, as soon as practicable after Dec. 17, 1999, the Comptroller General was to undertake a study to assess existing tax credits and other disability-related employment incentives under the Americans with Disabilities Act of 1990 (42 U.S.C. 12101 et seq.) and other Federal laws, specifically addressing the extent to which such credits and other incentives would encourage employers to hire and retain individuals with disabilities; and that, not later than 3 years after Dec. 17, 1999, the Comptroller General was to transmit to the appropriate congressional committees a written report presenting the results of the study and any appropriate recommendations for legislative or administrative changes.

## § 12102. Definition of disability

As used in this chapter:

**(1) Disability**

The term ''disability'' means, with respect to an individual—

(A) a physical or mental impairment that substantially limits one or more major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment (as described in paragraph (3)).

**(2) Major life activities**

**(A) In general**

For purposes of paragraph (1), major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breath-

ing, learning, reading, concentrating, thinking, communicating, and working.

**(B) Major bodily functions**

For purposes of paragraph (1), a major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.

**(3) Regarded as having such an impairment**

For purposes of paragraph (1)(C):

(A) An individual meets the requirement of ''being regarded as having such an impairment'' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

(B) Paragraph (1)(C) shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less.

**(4) Rules of construction regarding the definition of disability**

The definition of ''disability'' in paragraph (1) shall be construed in accordance with the following:

(A) The definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter.

(B) The term ''substantially limits'' shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008.

(C) An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability.

(D) An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

(E)(i) The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as—

(I) medication, medical supplies, equipment, or appliances, low-vision devices (which do not include ordinary eyeglasses or contact lenses), prosthetics including limbs and devices, hearing aids and cochlear implants or other implantable hearing devices, mobility devices, or oxygen therapy equipment and supplies;

(II) use of assistive technology;

(III) reasonable accommodations or auxiliary aids or services; or

(IV) learned behavioral or adaptive neurological modifications.

(ii) The ameliorative effects of the mitigating measures of ordinary eyeglasses or contact lenses shall be considered in determining whether an impairment substantially limits a major life activity.

(iii) As used in this subparagraph—

(I) the term ''ordinary eyeglasses or contact lenses'' means lenses that are intended to fully correct visual acuity or eliminate refractive error; and

(II) the term ''low-vision devices'' means devices that magnify, enhance, or otherwise augment a visual image.

(Pub. L. 101–336, § 3, July 26, 1990, 104 Stat. 329; Pub. L. 110–325, § 4(a), Sept. 25, 2008, 122 Stat. 3555.)

### Editorial Notes

#### REFERENCES IN TEXT

This chapter, referred to in text, was in the original ''this Act'', meaning Pub. L. 101–336, July 26, 1990, 104 Stat. 327, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 12101 of this title and Tables.

The ADA Amendments Act of 2008, referred to in par. (4)(B), is Pub. L. 110–325, Sept. 25, 2008, 122 Stat. 3553. Section 2 of the Act, relating to the findings and purposes of the Act, is set out as a note under section 12101 of this title. For complete classification of this Act to the Code, see Short Title of 2008 Amendment note under section 12101 of this title and Tables.

#### AMENDMENTS

2008—Pub. L. 110–325 amended section generally. Prior to amendment, section consisted of pars. (1) to (3) defining for purposes of this chapter ''auxiliary aids and services'', ''disability'', and ''State''.

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE OF 2008 AMENDMENT

Amendment by Pub. L. 110–325 effective Jan. 1, 2009, see section 8 of Pub. L. 110–325, set out as a note under section 705 of Title 29, Labor.

## § 12103. Additional definitions

As used in this chapter:

**(1) Auxiliary aids and services**

The term ''auxiliary aids and services'' includes—

(A) qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments;

(B) qualified readers, taped texts, or other effective methods of making visually delivered materials available to individuals with visual impairments;

(C) acquisition or modification of equipment or devices; and

(D) other similar services and actions.

**(2) State**

The term ''State'' means each of the several States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, the Virgin Islands of the United States, the Trust Territory of the Pacific Islands, and the Commonwealth of the Northern Mariana Islands.''.

(Pub. L. 101–336, § 4, as added Pub. L. 110–325, § 4(b), Sept. 25, 2008, 122 Stat. 3556.)

Editorial Notes

REFERENCES IN TEXT

This title, referred to in subsecs. (a) to (d), is title I of Pub. L. 111–148, Mar. 23, 2010, 124 Stat. 130, which enacted this chapter and enacted, amended, and transferred numerous other sections and notes in the Code. For complete classification of title I to the Code, see Tables.

AMENDMENTS

2015—Subsec. (b)(1). Pub. L. 114–60, §2(a)(1), substituted "51" for "101".
Subsec. (b)(2). Pub. L. 114–60, §2(a)(2), substituted "50" for "100".
Subsec. (b)(3). Pub. L. 114–60, §2(a)(3), amended par. (3) generally. Prior to amendment, text read as follows: "In the case of plan years beginning before January 1, 2016, a State may elect to apply this subsection by substituting '51 employees' for '101 employees' in paragraph (1) and by substituting '50 employees' for '100 employees' in paragraph (2)."
2010—Subsec. (e). Pub. L. 111–148, §10104(d), added subsec. (e).

PART B—CONSUMER CHOICES AND INSURANCE COMPETITION THROUGH HEALTH BENEFIT EXCHANGES

## § 18031. Affordable choices of health benefit plans

### (a) Assistance to States to establish American Health Benefit Exchanges

#### (1) Planning and establishment grants

There shall be appropriated to the Secretary, out of any moneys in the Treasury not otherwise appropriated, an amount necessary to enable the Secretary to make awards, not later than 1 year after March 23, 2010, to States in the amount specified in paragraph (2) for the uses described in paragraph (3).

#### (2) Amount specified

For each fiscal year, the Secretary shall determine the total amount that the Secretary will make available to each State for grants under this subsection.

#### (3) Use of funds

A State shall use amounts awarded under this subsection for activities (including planning activities) related to establishing an American Health Benefit Exchange, as described in subsection (b).

#### (4) Renewability of grant

##### (A) In general

Subject to subsection (d)(4), the Secretary may renew a grant awarded under paragraph (1) if the State recipient of such grant—

(i) is making progress, as determined by the Secretary, toward—

(I) establishing an Exchange; and
(II) implementing the reforms described in subtitles A and C (and the amendments made by such subtitles); and

(ii) is meeting such other benchmarks as the Secretary may establish.

##### (B) Limitation

No grant shall be awarded under this subsection after January 1, 2015.

#### (5) Technical assistance to facilitate participation in SHOP Exchanges

The Secretary shall provide technical assistance to States to facilitate the participation of qualified small businesses in such States in SHOP Exchanges.

### (b) American Health Benefit Exchanges

#### (1) In general

Each State shall, not later than January 1, 2014, establish an American Health Benefit Exchange (referred to in this title [1] as an "Exchange") for the State that—

(A) facilitates the purchase of qualified health plans;

(B) provides for the establishment of a Small Business Health Options Program (in this title [1] referred to as a "SHOP Exchange") that is designed to assist qualified employers in the State who are small employers in facilitating the enrollment of their employees in qualified health plans offered in the small group market in the State; and

(C) meets the requirements of subsection (d).

#### (2) Merger of individual and SHOP Exchanges

A State may elect to provide only one Exchange in the State for providing both Exchange and SHOP Exchange services to both qualified individuals and qualified small employers, but only if the Exchange has adequate resources to assist such individuals and employers.

### (c) Responsibilities of the Secretary

#### (1) In general

The Secretary shall, by regulation, establish criteria for the certification of health plans as qualified health plans. Such criteria shall require that, to be certified, a plan shall, at a minimum—

(A) meet marketing requirements, and not employ marketing practices or benefit designs that have the effect of discouraging the enrollment in such plan by individuals with significant health needs;

(B) ensure a sufficient choice of providers (in a manner consistent with applicable network adequacy provisions under section 2702(c) of the Public Health Service Act [42 U.S.C. 300gg–1(c)]), and provide information to enrollees and prospective enrollees on the availability of in-network and out-of-network providers;

(C) include within health insurance plan networks those essential community providers, where available, that serve predominately low-income, medically-underserved individuals, such as health care providers defined in section 340B(a)(4) of the Public Health Service Act [42 U.S.C. 256b(a)(4)] and providers described in section 1927(c)(1)(D)(i)(IV) of the Social Security Act [42 U.S.C. 1396r–8(c)(1)(D)(i)(IV)] as set forth by section 221 of Public Law 111–8, except that nothing in this subparagraph shall be construed to require any health plan to pro-

[1] See References in Text note below.

vide coverage for any specific medical procedure;

(D)(i) be accredited with respect to local performance on clinical quality measures such as the Healthcare Effectiveness Data and Information Set, patient experience ratings on a standardized Consumer Assessment of Healthcare Providers and Systems survey, as well as consumer access, utilization management, quality assurance, provider credentialing, complaints and appeals, network adequacy and access, and patient information programs by any entity recognized by the Secretary for the accreditation of health insurance issuers or plans (so long as any such entity has transparent and rigorous methodology and scoring criteria); or

(ii) receive such accreditation within a period established by an Exchange for such accreditation that is applicable to all qualified health plans;

(E) implement a quality improvement strategy described in subsection (g)(1);

(F) utilize a uniform enrollment form that qualified individuals and qualified employers may use (either electronically or on paper) in enrolling in qualified health plans offered through such Exchange, and that takes into account criteria that the National Association of Insurance Commissioners develops and submits to the Secretary;

(G) utilize the standard format established for presenting health benefits plan options;

(H) provide information to enrollees and prospective enrollees, and to each Exchange in which the plan is offered, on any quality measures for health plan performance endorsed under section 399JJ of the Public Health Service Act [42 U.S.C. 280j–2], as applicable; and

(I) report to the Secretary at least annually and in such manner as the Secretary shall require, pediatric quality reporting measures consistent with the pediatric quality reporting measures established under section 1139A of the Social Security Act [42 U.S.C. 1320b–9a].

**(2) Rule of construction**

Nothing in paragraph (1)(C) shall be construed to require a qualified health plan to contract with a provider described in such paragraph if such provider refuses to accept the generally applicable payment rates of such plan.

**(3) Rating system**

The Secretary shall develop a rating system that would rate qualified health plans offered through an Exchange in each benefits level on the basis of the relative quality and price. The Exchange shall include the quality rating in the information provided to individuals and employers through the Internet portal established under paragraph (4).

**(4) Enrollee satisfaction system**

The Secretary shall develop an enrollee satisfaction survey system that would evaluate the level of enrollee satisfaction with qualified health plans offered through an Exchange, for each such qualified health plan that had more than 500 enrollees in the previous year. The Exchange shall include enrollee satisfaction information in the information provided to individuals and employers through the Internet portal established under paragraph (5) in a manner that allows individuals to easily compare enrollee satisfaction levels between comparable plans.

**(5) Internet portals**

The Secretary shall—

(A) continue to operate, maintain, and update the Internet portal developed under section 18003(a) of this title and to assist States in developing and maintaining their own such portal; and

(B) make available for use by Exchanges a model template for an Internet portal that may be used to direct qualified individuals and qualified employers to qualified health plans, to assist such individuals and employers in determining whether they are eligible to participate in an Exchange or eligible for a premium tax credit or cost-sharing reduction, and to present standardized information (including quality ratings) regarding qualified health plans offered through an Exchange to assist consumers in making easy health insurance choices.

Such template shall include, with respect to each qualified health plan offered through the Exchange in each rating area, access to the uniform outline of coverage the plan is required to provide under section 2716[1] of the Public Health Service Act and to a copy of the plan's written policy.

**(6) Enrollment periods**

The Secretary shall require an Exchange to provide for—

(A) an initial open enrollment, as determined by the Secretary (such determination to be made not later than July 1, 2012);

(B) annual open enrollment periods, as determined by the Secretary for calendar years after the initial enrollment period;

(C) special enrollment periods specified in section 9801 of title 26 and other special enrollment periods under circumstances similar to such periods under part D of title XVIII of the Social Security Act [42 U.S.C. 1395w–101 et seq.]; and

(D) special monthly enrollment periods for Indians (as defined in section 1603 of title 25).

**(7) Reenrollment of certain individuals in qualified health plans in certain exchanges**

**(A) In general**

In the case of an Exchange that the Secretary operates pursuant to section 18041(c)(1) of this title, the Secretary shall establish a process under which an individual described in subparagraph (B) is reenrolled for plan year 2021 in a qualified health plan offered through such Exchange. Such qualified health plan under which such individual is so reenrolled shall be—

(i) if available for plan year 2021, the qualified health plan under which such individual is enrolled during the annual open enrollment period for such plan year; and

(ii) if such qualified health plan is not available for plan year 2021, a qualified health plan offered through such Exchange determined appropriate by the Secretary.

**(B) Individual described**

An individual described in this subsection is an individual who, with respect to plan year 2020—

(i) resides in a State with an Exchange described in subparagraph (A);

(ii) is enrolled in a qualified health plan during such plan year and does not enroll in a qualified health plan for plan year 2021 during the annual open enrollment period for such plan year 2021; and

(iii) does not elect to disenroll under a qualified health plan for plan year 2021 during such annual open enrollment period.

**(d) Requirements**

**(1) In general**

An Exchange shall be a governmental agency or nonprofit entity that is established by a State.

**(2) Offering of coverage**

**(A) In general**

An Exchange shall make available qualified health plans to qualified individuals and qualified employers.

**(B) Limitation**

**(i) In general**

An Exchange may not make available any health plan that is not a qualified health plan.

**(ii) Offering of stand-alone dental benefits**

Each Exchange within a State shall allow an issuer of a plan that only provides limited scope dental benefits meeting the requirements of section 9832(c)(2)(A) of title 26 to offer the plan through the Exchange (either separately or in conjunction with a qualified health plan) if the plan provides pediatric dental benefits meeting the requirements of section 18022(b)(1)(J) of this title).

**(3) Rules relating to additional required benefits**

**(A) In general**

Except as provided in subparagraph (B), an Exchange may make available a qualified health plan notwithstanding any provision of law that may require benefits other than the essential health benefits specified under section 18022(b) of this title.

**(B) States may require additional benefits**

**(i) In general**

Subject to the requirements of clause (ii), a State may require that a qualified health plan offered in such State offer benefits in addition to the essential health benefits specified under section 18022(b) of this title.

**(ii) State must assume cost**

A State shall make payments—

(I) to an individual enrolled in a qualified health plan offered in such State; or

(II) on behalf of an individual described in subclause (I) directly to the qualified health plan in which such individual is enrolled;

to defray the cost of any additional benefits described in clause (i).

**(4) Functions**

An Exchange shall, at a minimum—

(A) implement procedures for the certification, recertification, and decertification, consistent with guidelines developed by the Secretary under subsection (c), of health plans as qualified health plans;

(B) provide for the operation of a toll-free telephone hotline to respond to requests for assistance;

(C) maintain an Internet website through which enrollees and prospective enrollees of qualified health plans may obtain standardized comparative information on such plans;

(D) assign a rating to each qualified health plan offered through such Exchange in accordance with the criteria developed by the Secretary under subsection (c)(3);

(E) utilize a standardized format for presenting health benefits plan options in the Exchange, including the use of the uniform outline of coverage established under section 2715 of the Public Health Service Act [42 U.S.C. 300gg–15];

(F) in accordance with section 18083 of this title, inform individuals of eligibility requirements for the medicaid program under title XIX of the Social Security Act [42 U.S.C. 1396 et seq.], the CHIP program under title XXI of such Act [42 U.S.C. 1397aa et seq.], or any applicable State or local public program and if through screening of the application by the Exchange, the Exchange determines that such individuals are eligible for any such program, enroll such individuals in such program;

(G) establish and make available by electronic means a calculator to determine the actual cost of coverage after the application of any premium tax credit under section 36B of title 26 and any cost-sharing reduction under section 18071 of this title;

(H) subject to section 18081 of this title, grant a certification attesting that, for purposes of the individual responsibility penalty under section 5000A of title 26, an individual is exempt from the individual requirement or from the penalty imposed by such section because—

(i) there is no affordable qualified health plan available through the Exchange, or the individual's employer, covering the individual; or

(ii) the individual meets the requirements for any other such exemption from the individual responsibility requirement or penalty;

(I) transfer to the Secretary of the Treasury—

(i) a list of the individuals who are issued a certification under subparagraph

(H), including the name and taxpayer identification number of each individual;

(ii) the name and taxpayer identification number of each individual who was an employee of an employer but who was determined to be eligible for the premium tax credit under section 36B of title 26 because—

(I) the employer did not provide minimum essential coverage; or

(II) the employer provided such minimum essential coverage but it was determined under section 36B(c)(2)(C) of such title to either be unaffordable to the employee or not provide the required minimum actuarial value; and

(iii) the name and taxpayer identification number of each individual who notifies the Exchange under section 18081(b)(4) of this title that they have changed employers and of each individual who ceases coverage under a qualified health plan during a plan year (and the effective date of such cessation);

(J) provide to each employer the name of each employee of the employer described in subparagraph (I)(ii) who ceases coverage under a qualified health plan during a plan year (and the effective date of such cessation); and

(K) establish the Navigator program described in subsection (i).

**(5) Funding limitations**

**(A) No Federal funds for continued operations**

In establishing an Exchange under this section, the State shall ensure that such Exchange is self-sustaining beginning on January 1, 2015, including allowing the Exchange to charge assessments or user fees to participating health insurance issuers, or to otherwise generate funding, to support its operations.

**(B) Prohibiting wasteful use of funds**

In carrying out activities under this subsection, an Exchange shall not utilize any funds intended for the administrative and operational expenses of the Exchange for staff retreats, promotional giveaways, excessive executive compensation, or promotion of Federal or State legislative and regulatory modifications.

**(6) Consultation**

An Exchange shall consult with stakeholders relevant to carrying out the activities under this section, including—

(A) educated health care consumers who are enrollees in qualified health plans;

(B) individuals and entities with experience in facilitating enrollment in qualified health plans;

(C) representatives of small businesses and self-employed individuals;

(D) State Medicaid offices; and

(E) advocates for enrolling hard to reach populations.

**(7) Publication of costs**

An Exchange shall publish the average costs of licensing, regulatory fees, and any other payments required by the Exchange, and the administrative costs of such Exchange, on an Internet website to educate consumers on such costs. Such information shall also include monies lost to waste, fraud, and abuse.

**(e) Certification**

**(1) In general**

An Exchange may certify a health plan as a qualified health plan if—

(A) such health plan meets the requirements for certification as promulgated by the Secretary under subsection (c)(1); and

(B) the Exchange determines that making available such health plan through such Exchange is in the interests of qualified individuals and qualified employers in the State or States in which such Exchange operates, except that the Exchange may not exclude a health plan—

(i) on the basis that such plan is a fee-for-service plan;

(ii) through the imposition of premium price controls; or

(iii) on the basis that the plan provides treatments necessary to prevent patients' deaths in circumstances the Exchange determines are inappropriate or too costly.

**(2) Premium considerations**

The Exchange shall require health plans seeking certification as qualified health plans to submit a justification for any premium increase prior to implementation of the increase. Such plans shall prominently post such information on their websites. The Exchange shall take this information, and the information and the recommendations provided to the Exchange by the State under section 2794(b)(1) of the Public Health Service Act [42 U.S.C. 300gg–94(b)(1)] (relating to patterns or practices of excessive or unjustified premium increases), into consideration when determining whether to make such health plan available through the Exchange. The Exchange shall take into account any excess of premium growth outside the Exchange as compared to the rate of such growth inside the Exchange, including information reported by the States.

**(3) Transparency in coverage**

**(A) In general**

The Exchange shall require health plans seeking certification as qualified health plans to submit to the Exchange, the Secretary, the State insurance commissioner, and make available to the public, accurate and timely disclosure of the following information:

(i) Claims payment policies and practices.

(ii) Periodic financial disclosures.

(iii) Data on enrollment.

(iv) Data on disenrollment.

(v) Data on the number of claims that are denied.

(vi) Data on rating practices.

(vii) Information on cost-sharing and payments with respect to any out-of-network coverage.

(viii) Information on enrollee and participant rights under this title.[1]

(ix) Other information as determined appropriate by the Secretary.

**(B) Use of plain language**

The information required to be submitted under subparagraph (A) shall be provided in plain language. The term ''plain language'' means language that the intended audience, including individuals with limited English proficiency, can readily understand and use because that language is concise, well-organized, and follows other best practices of plain language writing. The Secretary and the Secretary of Labor shall jointly develop and issue guidance on best practices of plain language writing.

**(C) Cost sharing transparency**

The Exchange shall require health plans seeking certification as qualified health plans to permit individuals to learn the amount of cost-sharing (including deductibles, copayments, and coinsurance) under the individual's plan or coverage that the individual would be responsible for paying with respect to the furnishing of a specific item or service by a participating provider in a timely manner upon the request of the individual. At a minimum, such information shall be made available to such individual through an Internet website and such other means for individuals without access to the Internet.

**(D) Group health plans**

The Secretary of Labor shall update and harmonize the Secretary's rules concerning the accurate and timely disclosure to participants by group health plans of plan disclosure, plan terms and conditions, and periodic financial disclosure with the standards established by the Secretary under subparagraph (A).

**(f) Flexibility**

**(1) Regional or other interstate exchanges**

An Exchange may operate in more than one State if—

(A) each State in which such Exchange operates permits such operation; and

(B) the Secretary approves such regional or interstate Exchange.

**(2) Subsidiary Exchanges**

A State may establish one or more subsidiary Exchanges if—

(A) each such Exchange serves a geographically distinct area; and

(B) the area served by each such Exchange is at least as large as a rating area described in section 2701(a) of the Public Health Service Act [42 U.S.C. 300gg(a)].

**(3) Authority to contract**

**(A) In general**

A State may elect to authorize an Exchange established by the State under this section to enter into an agreement with an eligible entity to carry out 1 or more responsibilities of the Exchange.

**(B) Eligible entity**

In this paragraph, the term ''eligible entity'' means—

(i) a person—

(I) incorporated under, and subject to the laws of, 1 or more States;

(II) that has demonstrated experience on a State or regional basis in the individual and small group health insurance markets and in benefits coverage; and

(III) that is not a health insurance issuer or that is treated under subsection (a) or (b) of section 52 of title 26 as a member of the same controlled group of corporations (or under common control with) as a health insurance issuer; or

(ii) the State medicaid agency under title XIX of the Social Security Act [42 U.S.C. 1396 et seq.].

**(g) Rewarding quality through market-based incentives**

**(1) Strategy described**

A strategy described in this paragraph is a payment structure that provides increased reimbursement or other incentives for—

(A) improving health outcomes through the implementation of activities that shall include quality reporting, effective case management, care coordination, chronic disease management, medication and care compliance initiatives, including through the use of the medical home model, for treatment or services under the plan or coverage;

(B) the implementation of activities to prevent hospital readmissions through a comprehensive program for hospital discharge that includes patient-centered education and counseling, comprehensive discharge planning, and post discharge reinforcement by an appropriate health care professional;

(C) the implementation of activities to improve patient safety and reduce medical errors through the appropriate use of best clinical practices, evidence based medicine, and health information technology under the plan or coverage;

(D) the implementation of wellness and health promotion activities; and

(E) the implementation of activities to reduce health and health care disparities, including through the use of language services, community outreach, and cultural competency trainings.

**(2) Guidelines**

The Secretary, in consultation with experts in health care quality and stakeholders, shall develop guidelines concerning the matters described in paragraph (1).

**(3) Requirements**

The guidelines developed under paragraph (2) shall require the periodic reporting to the applicable Exchange of the activities that a qualified health plan has conducted to implement a strategy described in paragraph (1).

**(h) Quality improvement**

**(1) Enhancing patient safety**

Beginning on January 1, 2015, a qualified health plan may contract with—

(A) a hospital with greater than 50 beds only if such hospital—

(i) utilizes a patient safety evaluation system as described in part C of title IX of the Public Health Service Act [42 U.S.C. 299b–21 et seq.]; and

(ii) implements a mechanism to ensure that each patient receives a comprehensive program for hospital discharge that includes patient-centered education and counseling, comprehensive discharge planning, and post discharge reinforcement by an appropriate health care professional; or

(B) a health care provider only if such provider implements such mechanisms to improve health care quality as the Secretary may by regulation require.

**(2) Exceptions**

The Secretary may establish reasonable exceptions to the requirements described in paragraph (1).

**(3) Adjustment**

The Secretary may by regulation adjust the number of beds described in paragraph (1)(A).

## (i) Navigators

**(1) In general**

An Exchange shall establish a program under which it awards grants to entities described in paragraph (2) to carry out the duties described in paragraph (3).

**(2) Eligibility**

**(A) In general**

To be eligible to receive a grant under paragraph (1), an entity shall demonstrate to the Exchange involved that the entity has existing relationships, or could readily establish relationships, with employers and employees, consumers (including uninsured and underinsured consumers), or self-employed individuals likely to be qualified to enroll in a qualified health plan.

**(B) Types**

Entities described in subparagraph (A) may include trade, industry, and professional associations, commercial fishing industry organizations, ranching and farming organizations, community and consumer-focused nonprofit groups, chambers of commerce, unions, resource partners of the Small Business Administration, other licensed insurance agents and brokers, and other entities that—

(i) are capable of carrying out the duties described in paragraph (3);

(ii) meet the standards described in paragraph (4); and

(iii) provide information consistent with the standards developed under paragraph (5).

**(3) Duties**

An entity that serves as a navigator under a grant under this subsection shall—

(A) conduct public education activities to raise awareness of the availability of qualified health plans;

(B) distribute fair and impartial information concerning enrollment in qualified health plans, and the availability of premium tax credits under section 36B of title 26 and cost-sharing reductions under section 18071 of this title;

(C) facilitate enrollment in qualified health plans;

(D) provide referrals to any applicable office of health insurance consumer assistance or health insurance ombudsman established under section 2793 of the Public Health Service Act [42 U.S.C. 300gg–93], or any other appropriate State agency or agencies, for any enrollee with a grievance, complaint, or question regarding their health plan, coverage, or a determination under such plan or coverage; and

(E) provide information in a manner that is culturally and linguistically appropriate to the needs of the population being served by the Exchange or Exchanges.

**(4) Standards**

**(A) In general**

The Secretary shall establish standards for navigators under this subsection, including provisions to ensure that any private or public entity that is selected as a navigator is qualified, and licensed if appropriate, to engage in the navigator activities described in this subsection and to avoid conflicts of interest. Under such standards, a navigator shall not—

(i) be a health insurance issuer; or

(ii) receive any consideration directly or indirectly from any health insurance issuer in connection with the enrollment of any qualified individuals or employees of a qualified employer in a qualified health plan.

**(5) Fair and impartial information and services**

The Secretary, in collaboration with States, shall develop standards to ensure that information made available by navigators is fair, accurate, and impartial.

**(6) Funding**

Grants under this subsection shall be made from the operational funds of the Exchange and not Federal funds received by the State to establish the Exchange.

## (j) Applicability of mental health parity

Section 2726 of the Public Health Service Act [42 U.S.C. 300gg–26] shall apply to qualified health plans in the same manner and to the same extent as such section applies to health insurance issuers and group health plans.

## (k) Conflict

An Exchange may not establish rules that conflict with or prevent the application of regulations promulgated by the Secretary under this subchapter.

(Pub. L. 111–148, title I, § 1311, title X, §§ 10104(e)–(h), 10203(a), Mar. 23, 2010, 124 Stat. 173, 900, 901, 927; Pub. L. 116–94, div. N, title I, § 608, Dec. 20, 2019, 133 Stat. 3130.)

**Editorial Notes**

References in Text

Subtitles A and C, referred to in subsec. (a)(4)(A)(i)(II), are subtitles A (§§ 1001–1004) and C

(§§ 1201–1255), respectively, of title I of Pub. L. 111–148, Mar. 23, 2010, 124 Stat. 130, 154. Subtitle A enacted sections 300gg–11 to 300gg–19, 300gg–93, and 300gg–94 of this title, transferred sections 300gg–4 to 300gg–7 and 300gg–13 of this title to sections 300gg–25 to 300gg–28 and 300gg–9 of this title, respectively, amended sections 300gg–11, 300gg–12, and 300gg–21 to 300gg–23 of this title, and enacted provisions set out as a note under section 300gg–11 of this title. Subtitle C enacted subchapter II of this chapter and establishes section 300gg to 300gg–2 and 300gg–4 to 300gg–7 of this title, transferred section 300gg of this title to section 300gg–3 of this title, amended sections 300gg–1 and 300gg–4 of this title, and enacted provisions set out as a note under section 300gg of this title. For complete classification of subtitles A and C to the Code, see Tables.

This title, referred to in subsecs. (b)(1) and (e)(3)(A)(viii), is title I of Pub. L. 111–148, Mar. 23, 2010, 124 Stat. 130, which enacted this chapter and enacted, amended, and transferred numerous other sections and notes in the Code. For complete classification of title I to the Code, see Tables.

Section 2716 of the Public Health Service Act, referred to in subsec. (c)(5), probably should be section 2715 of the Public Health Service Act, act July 1, 1944, which is classified to section 300gg–15 of this title and requires the Secretary to develop a uniform explanation of coverage documents and standardized definitions. Section 2716 of act July 1, 1944, which is classified to section 300gg–16 of this title, relates to prohibition on discrimination in favor of highly compensated individuals.

The Social Security Act, referred to in subsecs. (c)(6)(C), (d)(4)(F), and (f)(3)(B)(ii), is act Aug. 14, 1935, ch. 531, 49 Stat. 620. Part D of title XVIII of the Act is classified generally to part D (§1395w–101 et seq.) of subchapter XVIII of chapter 7 of this title. Titles XIX and XXI of the Act are classified generally to subchapters XIX (§1396 et seq.) and XXI (§1397aa et seq.), respectively, of chapter 7 of this title. For complete classification of this Act to the Code, see section 1305 of this title and Tables.

The Public Health Service Act, referred to in subsec. (h)(1)(A)(i), is act July 1, 1944, ch. 373, 58 Stat. 682. Part C of title IX of the Act is classified generally to part C (§299b–21 et seq.) of subchapter VII of chapter 6A of this title. For complete classification of this Act to the Code, see Short Title note set out under section 201 of this title and Tables.

This subchapter, referred to in subsec. (k), was in the original "this subtitle", meaning subtitle D of title I of Pub. L. 111–148, Mar. 23, 2010, 124 Stat. 162, which enacted this subchapter and amended sections 501, 4958, and 6033 of Title 26, Internal Revenue Code.

### AMENDMENTS

2019—Subsec. (c)(7). Pub. L. 116–94 added par. (7).

2010—Subsec. (c)(1)(I). Pub. L. 111–148, §10203(a), added subpar. (I).

Subsec. (d)(3)(B)(ii). Pub. L. 111–148, §10104(e)(1), added cl. (ii) and struck out former cl. (ii). Prior to amendment, text read as follows: "A State shall make payments to or on behalf of an individual eligible for the premium tax credit under section 36B of title 26 and any cost-sharing reduction under section 18071 of this title to defray the cost to the individual of any additional benefits described in clause (i) which are not eligible for such credit or reduction under section 36B(b)(3)(D) of title 26 and section 18071(c)(4) of this title."

Subsec. (d)(6)(A). Pub. L. 111–148, §10104(e)(2), inserted "educated" before "health care".

Subsec. (e)(2). Pub. L. 111–148, §10104(f)(1), which directed substitution of "shall" for "may" in second sentence, was executed by making the substitution in third sentence before "take" to reflect the probable intent of Congress because the word "shall" already appeared in second sentence.

Subsec. (e)(3). Pub. L. 111–148, §10104(f)(2), added par. (3).

Subsec. (g)(1)(E). Pub. L. 111–148, §10104(g), added subpar. (E).

Subsec. (i)(2)(B). Pub. L. 111–148, §10104(h), substituted "resource partners of the Small Business Administration" for "small business development centers".

### Statutory Notes and Related Subsidiaries

#### ESTABLISHING A GRANT PROGRAM FOR EXCHANGE MODERNIZATION

Pub. L. 117–2, title II, §2801, Mar. 11, 2021, 135 Stat. 49, provided that:

"(a) IN GENERAL.—Out of funds appropriated under subsection (b), the Secretary of Health and Human Services (in this subtitle [subtitle I (§2801) of title II of Pub. L. 117–2] referred to as the 'Secretary') shall award grants to each American Health Benefits Exchange established under section 1311(b) of the Patient Protection and Affordable Care Act (42 U.S.C. 18031(b)) (other than an Exchange established by the Secretary under section 1321(c) of such Act (42 U.S.C. 18041(c))) that submits to the Secretary an application at such time and in such manner, and containing such information, as specified by the Secretary, for purposes of enabling such Exchange to modernize or update any system, program, or technology utilized by such Exchange to ensure such Exchange is compliant with all applicable requirements.

"(b) FUNDING.—In addition to amounts otherwise available, there is appropriated, for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $20,000,000, to remain available until September 30, 2022, for carrying out this section."

## § 18032. Consumer choice

### (a) Choice

#### (1) Qualified individuals

A qualified individual may enroll in any qualified health plan available to such individual and for which such individual is eligible.

#### (2) Qualified employers

##### (A) Employer may specify level

A qualified employer may provide support for coverage of employees under a qualified health plan by selecting any level of coverage under section 18022(d) of this title to be made available to employees through an Exchange.

##### (B) Employee may choose plans within a level

Each employee of a qualified employer that elects a level of coverage under subparagraph (A) may choose to enroll in a qualified health plan that offers coverage at that level.

### (b) Payment of premiums by qualified individuals

A qualified individual enrolled in any qualified health plan may pay any applicable premium owed by such individual to the health insurance issuer issuing such qualified health plan.

### (c) Single risk pool

#### (1) Individual market

A health insurance issuer shall consider all enrollees in all health plans (other than grandfathered health plans) offered by such issuer in the individual market, including those enrollees who do not enroll in such plans through

**ADD-027**

care entity to discrimination on the basis that the entity does not provide any health care item or service furnished for the purpose of causing, or for the purpose of assisting in causing, the death of any individual, such as by assisted suicide, euthanasia, or mercy killing.

**(b) Definition**

In this section, the term ''health care entity'' includes an individual physician or other health care professional, a hospital, a provider-sponsored organization, a health maintenance organization, a health insurance plan, or any other kind of health care facility, organization, or plan.

**(c) Construction and treatment of certain services**

Nothing in subsection (a) shall be construed to apply to, or to affect, any limitation relating to—

(1) the withholding or withdrawing of medical treatment or medical care;

(2) the withholding or withdrawing of nutrition or hydration;

(3) abortion; or

(4) the use of an item, good, benefit, or service furnished for the purpose of alleviating pain or discomfort, even if such use may increase the risk of death, so long as such item, good, benefit, or service is not also furnished for the purpose of causing, or the purpose of assisting in causing, death, for any reason.

**(d) Administration**

The Office for Civil Rights of the Department of Health and Human Services is designated to receive complaints of discrimination based on this section.

(Pub. L. 111–148, title I, §1553, Mar. 23, 2010, 124 Stat. 259.)

**Editorial Notes**

REFERENCES IN TEXT

This Act, referred to in subsec. (a), is Pub. L. 111–148, Mar. 23, 2010, 124 Stat. 119, known as the Patient Protection and Affordable Care Act. For complete classification of this Act to the Code, see Short Title note set out under section 18001 of this title and Tables.

**§ 18114. Access to therapies**

Notwithstanding any other provision of this Act, the Secretary of Health and Human Services shall not promulgate any regulation that—

(1) creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care;

(2) impedes timely access to health care services;

(3) interferes with communications regarding a full range of treatment options between the patient and the provider;

(4) restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions;

(5) violates the principles of informed consent and the ethical standards of health care professionals; or

(6) limits the availability of health care treatment for the full duration of a patient's medical needs.

(Pub. L. 111–148, title I, §1554, Mar. 23, 2010, 124 Stat. 259.)

**Editorial Notes**

REFERENCES IN TEXT

This Act, referred to in text, is Pub. L. 111–148, Mar. 23, 2010, 124 Stat. 119, known as the Patient Protection and Affordable Care Act. For complete classification of this Act to the Code, see Short Title note set out under section 18001 of this title and Tables.

**§ 18115. Freedom not to participate in Federal health insurance programs**

No individual, company, business, nonprofit entity, or health insurance issuer offering group or individual health insurance coverage shall be required to participate in any Federal health insurance program created under this Act (or any amendments made by this Act), or in any Federal health insurance program expanded by this Act (or any such amendments), and there shall be no penalty or fine imposed upon any such issuer for choosing not to participate in such programs.

(Pub. L. 111–148, title I, §1555, Mar. 23, 2010, 124 Stat. 260.)

**Editorial Notes**

REFERENCES IN TEXT

This Act, referred to in text, is Pub. L. 111–148, Mar. 23, 2010, 124 Stat. 119, known as the Patient Protection and Affordable Care Act. For complete classification of this Act to the Code, see Short Title note set out under section 18001 of this title and Tables.

**§ 18116. Nondiscrimination**

**(a) In general**

Except as otherwise provided for in this title [1] (or an amendment made by this title),[1] an individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.), or section 794 of title 29, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title [1] (or amendments). The enforcement mechanisms provided for and available under such title VI, title IX, section 794, or such Age Discrimination Act shall apply for purposes of violations of this subsection.

**(b) Continued application of laws**

Nothing in this title [1] (or an amendment made by this title) [1] shall be construed to invalidate or limit the rights, remedies, procedures, or legal standards available to individuals aggrieved under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e et seq.), title IX of the Education Amendments of 1972 (20 U.S.C.

---

[1] See References in Text note below.

1681 et seq.), section 794 of title 29, or the Age Discrimination Act of 1975 [42 U.S.C. 6101 et seq.], or to supersede State laws that provide additional protections against discrimination on any basis described in subsection (a).

### (c) Regulations

The Secretary may promulgate regulations to implement this section.

(Pub. L. 111–148, title I, § 1557, Mar. 23, 2010, 124 Stat. 260.)

#### Editorial Notes

##### References in Text

This title, referred to in subsecs. (a) and (b), is title I of Pub. L. 111–148, Mar. 23, 2010, 124 Stat. 130, which enacted this chapter and enacted, amended, and transferred numerous other sections and notes in the Code. For complete classification of title I to the Code, see Tables.

The Civil Rights Act of 1964, referred to in subsecs. (a) and (b), is Pub. L. 88–352, July 2, 1964, 78 Stat. 241. Titles VI and VII of the Act are classified generally to subchapters V (§ 2000d et seq.) and VI (§ 2000e et seq.), respectively, of chapter 21 of this title. For complete classification of this Act to the Code, see Short Title note set out under section 2000a of this title and Tables.

The Education Amendments of 1972, referred to in subsecs. (a) and (b), is Pub. L. 92–318, June 23, 1972, 86 Stat. 235. Title IX of the Act, known as the Patsy Takemoto Mink Equal Opportunity in Education Act, is classified principally to chapter 38 (§ 1681 et seq.) of Title 20, Education. For complete classification of title IX to the Code, see Short Title note set out under section 1681 of Title 20 and Tables.

The Age Discrimination Act of 1975, referred to in subsecs. (a) and (b), is title III of Pub. L. 94–135, Nov. 28, 1975, 89 Stat. 728, which is classified generally to chapter 76 (§ 6101 et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 6101 of this title and Tables.

### § 18117. Oversight

The Inspector General of the Department of Health and Human Services shall have oversight authority with respect to the administration and implementation of this title [1] as it relates to such Department.

(Pub. L. 111–148, title I, § 1559, Mar. 23, 2010, 124 Stat. 261.)

#### Editorial Notes

##### References in Text

This title, referred to in text, is title I of Pub. L. 111–148, Mar. 23, 2010, 124 Stat. 130, which enacted this chapter and enacted, amended, and transferred numerous other sections and notes in the Code. For complete classification of title I to the Code, see Tables.

### § 18118. Rules of construction

### (a) No effect on antitrust laws

Nothing in this title [1] (or an amendment made by this title) [1] shall be construed to modify, impair, or supersede the operation of any of the antitrust laws. For the purposes of this section, the term "antitrust laws" has the meaning given such term in subsection (a) of section 12 of title 15, except that such term includes section

45 of title 15 to the extent that section 45 applies to unfair methods of competition.

### (b) Rule of construction regarding Hawaii's Prepaid Health Care Act

Nothing in this title [1] (or an amendment made by this title) [1] shall be construed to modify or limit the application of the exemption for Hawaii's Prepaid Health Care Act (Haw. Rev. Stat. §§ 393–1 et seq.) as provided for under section 1144(b)(5) of title 29.

### (c) Student health insurance plans

Nothing in this title [1] (or an amendment made by this title) [1] shall be construed to prohibit an institution of higher education (as such term is defined for purposes of the Higher Education Act of 1965 [20 U.S.C. 1001 et seq.]) from offering a student health insurance plan, to the extent that such requirement is otherwise permitted under applicable Federal, State or local law.

### (d) No effect on existing requirements

Nothing in this title [1] (or an amendment made by this title,[1] unless specified by direct statutory reference) shall be construed to modify any existing Federal requirement concerning the State agency responsible for determining eligibility for programs identified in section 18083 of this title.

(Pub. L. 111–148, title I, § 1560, Mar. 23, 2010, 124 Stat. 261.)

#### Editorial Notes

##### References in Text

This title, where footnoted in text, is title I of Pub. L. 111–148, Mar. 23, 2010, 124 Stat. 130, which enacted this chapter and enacted, amended, and transferred numerous other sections and notes in the Code. For complete classification of title I to the Code, see Tables.

The Higher Education Act of 1965, referred to in subsec. (c), is Pub. L. 89–329, Nov. 8, 1965, 79 Stat. 1219, which is classified generally to chapter 28 (§ 1001 et seq.) of Title 20, Education. For complete classification of this Act to the Code, see Short Title note set out under section 1001 of Title 20 and Tables.

### § 18119. Small business procurement

Part 19 of the Federal Acquisition Regulation, section 644 of title 15, and any other applicable laws or regulations establishing procurement requirements relating to small business concerns (as defined in section 632 of title 15) may not be waived with respect to any contract awarded under any program or other authority under this Act or an amendment made by this Act.

(Pub. L. 111–148, title I, § 1563, as added Pub. L. 111–148, title X, § 10107(b)(2), Mar. 23, 2010, 124 Stat. 912.)

#### Editorial Notes

##### References in Text

This Act, referred to in text, is Pub. L. 111–148, Mar. 23, 2010, 124 Stat. 119, known as the Patient Protection and Affordable Care Act. For complete classification of this Act to the Code, see Short Title note set out under section 18001 of this title and Tables.

##### Codification

Another section 1563 of Pub. L. 111–148 enacted section 18120 of this title, section 9815 of Title 26, Internal

---

[1] See References in Text note below.
[1] See References in Text note below.

similarly situated dependents are no longer eligible for coverage under the terms of the plan, or upon the occurrence of certain specified events.

(d)(1) Under ERISA section 609(a)(4), a qualified medical child support order may not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan, except to the extent necessary to meet the requirements of a law relating to medical child support described in section 1908 of the Social Security Act, 42 U.S.C. 1396g–1.

(2) The Notice satisfies the conditions of ERISA section 609(a)(4) because it requires the plan to provide to an alternate recipient only those benefits that the plan provides to any dependent of a participant who is enrolled in the plan, and any other benefits that are necessary to meet the requirements of a State law described in such section 1908.

(e) For the purposes of this section, an ''Issuing Agency'' is a State agency that administers the child support enforcement program under Part D of Title IV of the Social Security Act.

[65 FR 82142, Dec. 27, 2000]

## Subpart B—Health Coverage Portability, Nondiscrimination, and Renewability

SOURCE: 62 FR 16941, Apr. 8, 1997, unless otherwise noted. Redesignated at 65 FR 82142, Dec. 27, 2000.

### §2590.701–1  Basis and scope.

(a) *Statutory basis.* This Subpart B implements Part 7 of Subtitle B of Title I of the Employee Retirement Income Security Act of 1974, as amended (hereinafter ERISA or the Act).

(b) *Scope.* A group health plan or health insurance issuer offering group health insurance coverage may provide greater rights to participants and beneficiaries than those set forth in this Subpart B. This Subpart B sets forth minimum requirements for group health plans and group health insurance issuers offering group health insurance coverage concerning certain consumer protections of the Health Insurance Portability and Accountability Act (HIPAA), including special enroll-

ment periods and the prohibition against discrimination based on a health factor, as amended by the Patient Protection and Affordable Care Act (Affordable Care Act). Other consumer protection provisions, including other protections provided by the Affordable Care Act and the Mental Health Parity and Addiction Equity Act, are set forth in Subpart C of this part.

[69 FR 78763, Dec. 30, 2004, as amended at 74 FR 51683, Oct. 7, 2009; 79 FR 10308, Feb. 24, 2014]

### §2590.701–2  Definitions.

Unless otherwise provided, the definitions in this section govern in applying the provisions of §§2590.701 through 2590.734.

*Affiliation period* means a period of time that must expire before health insurance coverage provided by an HMO becomes effective, and during which the HMO is not required to provide benefits.

*COBRA* definitions:

(1) *COBRA* means Title X of the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

(2) *COBRA continuation coverage* means coverage, under a group health plan, that satisfies an applicable COBRA continuation provision.

(3) *COBRA continuation provision* means sections 601–608 of the Act, section 4980B of the Internal Revenue Code (other than paragraph (f)(1) of such section 4980B insofar as it relates to pediatric vaccines), or Title XXII of the PHS Act.

(4) *Exhaustion of COBRA continuation coverage* means that an individual's COBRA continuation coverage ceases for any reason other than either failure of the individual to pay premiums on a timely basis, or for cause (such as making a fraudulent claim or an intentional misrepresentation of a material fact in connection with the plan). An individual is considered to have exhausted COBRA continuation coverage if such coverage ceases—

(i) Due to the failure of the employer or other responsible entity to remit premiums on a timely basis;

(ii) When the individual no longer resides, lives, or works in the service area of an HMO or similar program

555

(whether or not within the choice of the individual) and there is no other COBRA continuation coverage available to the individual; or

(iii) When the individual incurs a claim that would meet or exceed a lifetime limit on all benefits and there is no other COBRA continuation coverage available to the individual.

*Condition* means a *medical condition*.

*Creditable coverage* means *creditable coverage* within the meaning of § 2590.701–4(a).

*Dependent* means any individual who is or may become eligible for coverage under the terms of a group health plan because of a relationship to a participant.

*Enroll* means to become covered for benefits under a group health plan (that is, when coverage becomes effective), without regard to when the individual may have completed or filed any forms that are required in order to become covered under the plan. For this purpose, an individual who has health coverage under a group health plan is enrolled in the plan regardless of whether the individual elects coverage, the individual is a dependent who becomes covered as a result of an election by a participant, or the individual becomes covered without an election.

*Enrollment date* means the first day of coverage or, if there is a waiting period, the first day of the waiting period. If an individual receiving benefits under a group health plan changes benefit packages, or if the plan changes group health insurance issuers, the individual's enrollment date does not change.

*Excepted benefits* means the benefits described as excepted in § 2590.732(c).

*First day of coverage* means, in the case of an individual covered for benefits under a group health plan, the first day of coverage under the plan and, in the case of an individual covered by health insurance coverage in the individual market, the first day of coverage under the policy or contract.

*Genetic information* has the meaning given the term in § 2590.702–1(a)(3) of this Part.

*Group health insurance coverage* means health insurance coverage offered in connection with a group health plan. Individual health insurance coverage reimbursed by the arrangements described in 29 CFR 2510.3–1(l) is not offered in connection with a group health plan, and is not group health insurance coverage, provided all the conditions in 29 CFR 2510.3–1(l) are satisfied.

*Group health plan* or *plan* means a *group health plan* within the meaning of § 2590.732(a).

*Group market* means the market for health insurance coverage offered in connection with a group health plan. (However, certain very small plans may be treated as being in the individual market, rather than the group market; see the definition of *individual market* in this section.)

*Health insurance coverage* means benefits consisting of medical care (provided directly, through insurance or reimbursement, or otherwise) under any hospital or medical service policy or certificate, hospital or medical service plan contract, or HMO contract offered by a health insurance issuer. Health insurance coverage includes group health insurance coverage, individual health insurance coverage, and short-term, limited-duration insurance.

*Health insurance issuer* or *issuer* means an insurance company, insurance service, or insurance organization (including an HMO) that is required to be licensed to engage in the business of insurance in a State and that is subject to State law that regulates insurance (within the meaning of section 514(b)(2) of the Act). Such term does not include a group health plan.

*Health maintenance organization* or *HMO* means—

(1) A federally qualified health maintenance organization (as defined in section 1301(a) of the PHS Act);

(2) An organization recognized under State law as a health maintenance organization; or

(3) A similar organization regulated under State law for solvency in the same manner and to the same extent as such a health maintenance organization.

*Individual health insurance coverage* means health insurance coverage offered to individuals in the individual market, but does not include short-term, limited-duration insurance. Individual health insurance coverage can include dependent coverage.

**ADD-031**

*Individual market* means the market for health insurance coverage offered to individuals other than in connection with a group health plan. Unless a State elects otherwise in accordance with section 2791(e)(1)(B)(ii) of the PHS Act, such term also includes coverage offered in connection with a group health plan that has fewer than two participants who are current employees on the first day of the plan year.

*Internal Revenue Code* means the Internal Revenue Code of 1986, as amended (Title 26, United States Code).

*Issuer* means a *health insurance issuer*.

*Late enrollee* means an individual whose enrollment in a plan is a late enrollment.

*Late enrollment* means enrollment of an individual under a group health plan other than on the earliest date on which coverage can become effective for the individual under the terms of the plan; or through special enrollment. (For rules relating to special enrollment, see § 2590.701–6.) If an individual ceases to be eligible for coverage under a plan, and then subsequently becomes eligible for coverage under the plan, only the individual's most recent period of eligibility is taken into account in determining whether the individual is a late enrollee under the plan with respect to the most recent period of coverage. Similar rules apply if an individual again becomes eligible for coverage following a suspension of coverage that applied generally under the plan.

*Medical care* means amounts paid for—

(1) The diagnosis, cure, mitigation, treatment, or prevention of disease, or amounts paid for the purpose of affecting any structure or function of the body;

(2) Transportation primarily for and essential to medical care referred to in paragraph (1) of this definition; and

(3) Insurance covering medical care referred to in paragraphs (1) and (2) of this definition.

*Medical condition* or *condition* means any condition, whether physical or mental, including, but not limited to, any condition resulting from illness, injury (whether or not the injury is accidental), pregnancy, or congenital malformation. However, genetic information is not a condition.

*Participant* means *participant* within the meaning of section 3(7) of the Act.

*Placement, or being placed, for adoption* means the assumption and retention of a legal obligation for total or partial support of a child by a person with whom the child has been placed in anticipation of the child's adoption. The child's placement for adoption with such person ends upon the termination of such legal obligation.

*Plan year* means the year that is designated as the plan year in the plan document of a group health plan, except that if the plan document does not designate a plan year or if there is no plan document, the plan year is—

(1) The deductible or limit year used under the plan;

(2) If the plan does not impose deductibles or limits on a yearly basis, then the plan year is the policy year;

(3) If the plan does not impose deductibles or limits on a yearly basis, and either the plan is not insured or the insurance policy is not renewed on an annual basis, then the plan year is the employer's taxable year; or

(4) In any other case, the plan year is the calendar year.

*Preexisting condition exclusion* means a limitation or exclusion of benefits (including a denial of coverage) based on the fact that the condition was present before the effective date of coverage (or if coverage is denied, the date of the denial) under a group health plan or group or individual health insurance coverage (or other coverage provided to Federally eligible individuals pursuant to 45 CFR part 148), whether or not any medical advice, diagnosis, care, or treatment was recommended or received before that day. A preexisting condition exclusion includes any limitation or exclusion of benefits (including a denial of coverage) applicable to an individual as a result of information relating to an individual's health status before the individual's effective date of coverage (or if coverage is denied, the date of the denial) under a group health plan, or group or individual health insurance coverage (or other coverage provided to Federally eligible individuals pursuant to 45 CFR part 148), such as a condition identified

**ADD-032**

as a result of a pre-enrollment questionnaire or physical examination given to the individual, or review of medical records relating to the pre-enrollment period.

*Public health plan* means *public health plan* within the meaning of § 2590.701–4(a)(1)(ix).

*Public Health Service Act (PHS Act)* means the Public Health Service Act (42 U.S.C. 201, *et seq.*).

*Short-term, limited-duration insurance* means health insurance coverage provided pursuant to a policy, certificate, or contract of insurance with an issuer that meets the conditions of paragraph (1) of this definition.

(1) *Short-term, limited-duration insurance* means health insurance coverage provided pursuant to a policy, certificate, or contract of insurance with an issuer that:

(i) Has an expiration date specified in the policy, certificate, or contract of insurance that is no more than 3 months after the original effective date of the policy, certificate, or contract of insurance, and taking into account any renewals or extensions, has a duration no longer than 4 months in total. For purposes of this paragraph (1)(i), a renewal or extension includes the term of a new short-term, limited-duration insurance policy, certificate, or contract of insurance issued by the same issuer, or if the issuer is a member of a controlled group, any other issuer that is a member of such controlled group, to the same policyholder within the 12-month period beginning on the original effective date of the initial policy, certificate, or contract of insurance; and

(ii) Displays prominently on the first page (in either paper or electronic form, including on a website) of the policy, certificate, or contract of insurance, and in any marketing, application, and enrollment materials (including reenrollment materials) provided to individuals at or before the time an individual has the opportunity to enroll (or reenroll) in the coverage, in at least 14-point font, the language in the following notice:

ADD-033

**IMPORTANT: This is a short-term, limited-duration policy,
NOT comprehensive health coverage**

This is a temporary limited policy that has fewer benefits and Federal protections than other types of health insurance options, like those on HealthCare.gov.

| This policy | Insurance on HealthCare.gov |
|---|---|
| **Might not cover you** due to preexisting health conditions like diabetes, cancer, stroke, arthritis, heart disease, mental health & substance use disorders | Can't deny you coverage due to preexisting health conditions |
| **Might not cover** things like prescription drugs, preventive screenings, maternity care, emergency services, hospitalization, pediatric care, physical therapy & more | Covers all essential health benefits |
| Might have **no limit on what you pay** out-of-pocket for care | Protects you with limits on what you pay each year out-of-pocket for essential health benefits |
| You **won't qualify** for Federal financial help to pay premiums & out-of-pocket costs | Many people qualify for Federal financial help |
| **Doesn't have to meet** Federal standards for comprehensive health coverage | All plans must meet Federal standards |

**Looking for comprehensive health insurance?**
- **Visit HealthCare.gov** or call **1-800-318-2596** (TTY: 1-855-889-4325) to find health coverage options.
- To find out if you can get health insurance through your job, or a family member's job, contact the employer.

**Questions about this policy?**
For questions or complaints about this policy, contact your State Department of Insurance. Find their number on the National Association of Insurance Commissioners' website (naic.org) under "Insurance Departments."

(2) For purposes of paragraph (1)(i) of this definition, the term ''controlled group'' means any group treated as a single employer under section 52(a), 52(b), 414(m), or 414(o) of the Internal Revenue Code of 1986, as amended.

(3) If any provision of this definition is held to be invalid or unenforceable by its terms, or as applied to any entity or circumstance, or stayed pending further agency action, the provision shall be construed so as to continue to give the maximum effect to the provision permitted by law, along with other provisions not found invalid or unenforceable, including as applied to entities not similarly situated or to dissimilar circumstances, unless such holding is that the provision is invalid

**ADD-034**

and unenforceable in all circumstances, in which event the provision shall be severable from the remainder of the definition and shall not affect the remainder thereof.

*Significant break in coverage* means a *significant break in coverage* within the meaning of § 2590.701–4(b)(2)(iii).

*Special enrollment* means enrollment in a group health plan or group health insurance coverage under the rights described in § 2590.701–6.

*State* means each of the several States, the District of Columbia, Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Northern Mariana Islands.

*State health benefits risk pool* means a *State health benefits risk pool* within the meaning of § 2590.701–4(a)(1)(vii).

*Travel insurance* means insurance coverage for personal risks incident to planned travel, which may include, but is not limited to, interruption or cancellation of trip or event, loss of baggage or personal effects, damages to accommodations or rental vehicles, and sickness, accident, disability, or death occurring during travel, provided that the health benefits are not offered on a stand-alone basis and are incidental to other coverage. For this purpose, the term travel insurance does not include major medical plans that provide comprehensive medical protection for travelers with trips lasting 6 months or longer, including, for example, those working overseas as an expatriate or military personnel being deployed.

*Waiting period* means *waiting period* within the meaning of § 2590.715–2708(b).

[69 FR 78763, Dec. 30, 2004, as amended at 74 FR 51683, Oct. 7, 2009; 75 FR 37229, June 28, 2010; 79 FR 10308, Feb. 24, 2014; 80 FR 72256, Nov. 18, 2015; 81 FR 75325, Oct. 31, 2016; 83 FR 38242, Aug. 3, 2018; 84 FR 29001, June 20, 2019; 89 FR 23413, Apr. 3, 2024]

### § 2590.701–3  Limitations on preexisting condition exclusion period.

(a) *Preexisting condition exclusion defined.* (1) A *preexisting condition exclusion* means a *preexisting condition exclusion* within the meaning of § 2590.701–2.

(2) *Examples.* The rules of this paragraph (a)(1) are illustrated by the following examples:

*Example 1.* (i) *Facts.* A group health plan provides benefits solely through an insurance policy offered by Issuer *S*. At the expiration of the policy, the plan switches coverage to a policy offered by Issuer *T*. Issuer *T*'s policy excludes benefits for any prosthesis if the body part was lost before the effective date of coverage under the policy.

(ii) *Conclusion.* In this *Example 1*, the exclusion of benefits for any prosthesis if the body part was lost before the effective date of coverage is a preexisting condition exclusion because it operates to exclude benefits for a condition based on the fact that the condition was present before the effective date of coverage under the policy. The exclusion of benefits, therefore, is prohibited.

*Example 2.* (i) *Facts.* A group health plan provides coverage for cosmetic surgery in cases of accidental injury, but only if the injury occurred while the individual was covered under the plan.

(ii) *Conclusion.* In this *Example 2*, the plan provision excluding cosmetic surgery benefits for individuals injured before enrolling in the plan is a preexisting condition exclusion because it operates to exclude benefits relating to a condition based on the fact that the condition was present before the effective date of coverage. The plan provision, therefore, is prohibited.

*Example 3.* (i) *Facts.* A group health plan provides coverage for the treatment of diabetes, generally not subject to any requirement to obtain an approval for a treatment plan. However, if an individual was diagnosed with diabetes before the effective date of coverage under the plan, diabetes coverage is subject to a requirement to obtain approval of a treatment plan in advance.

(ii) *Conclusion.* In this *Example 3*, the requirement to obtain advance approval of a treatment plan is a preexisting condition exclusion because it limits benefits for a condition based on the fact that the condition was present before the effective date of coverage. The plan provision, therefore, is prohibited.

*Example 4.* (i) *Facts.* A group health plan provides coverage for three infertility treatments. The plan counts against the three-treatment limit benefits provided under prior health coverage.

(ii) *Conclusion.* In this *Example 4*, counting benefits for a specific condition provided under prior health coverage against a treatment limit for that condition is a preexisting condition exclusion because it operates to limit benefits for a condition based on the fact that the condition was present before the effective date of coverage. The plan provision, therefore, is prohibited.

*Example 5.* (i) *Facts.* When an individual's coverage begins under a group health plan, the individual generally becomes eligible for all benefits. However, benefits for pregnancy are not available until the individual has been covered under the plan for 12 months.

(B) The effective date of coverage;

(C) Waiting (or affiliation) periods;

(D) Late and special enrollment;

(E) Eligibility for benefit packages (including rules for individuals to change their selection among benefit packages);

(F) Benefits (including rules relating to covered benefits, benefit restrictions, and cost-sharing mechanisms such as coinsurance, copayments, and deductibles), as described in paragraphs (b)(2) and (3) of this section;

(G) Continued eligibility; and

(H) Terminating coverage (including disenrollment) of any individual under the plan.

(iii) The rules of this paragraph (b)(1) are illustrated by the following examples:

*Example 1.* (i) *Facts.* An employer sponsors a group health plan that is available to all employees who enroll within the first 30 days of their employment. However, employees who do not enroll within the first 30 days cannot enroll later unless they pass a physical examination.

(ii) *Conclusion.* In this *Example 1*, the requirement to pass a physical examination in order to enroll in the plan is a rule for eligibility that discriminates based on one or more health factors and thus violates this paragraph (b)(1).

*Example 2.* (i) *Facts.* Under an employer's group health plan, employees who enroll during the first 30 days of employment (and during special enrollment periods) may choose between two benefit packages: an indemnity option and an HMO option. However, employees who enroll during late enrollment are permitted to enroll only in the HMO option and only if they provide evidence of good health.

(ii) *Conclusion.* In this *Example 2*, the requirement to provide evidence of good health in order to be eligible for late enrollment in the HMO option is a rule for eligibility that discriminates based on one or more health factors and thus violates this paragraph (b)(1). However, if the plan did not require evidence of good health but limited late enrollees to the HMO option, the plan's rules for eligibility would not discriminate based on any health factor, and thus would not violate this paragraph (b)(1), because the time an individual chooses to enroll is not, itself, within the scope of any health factor.

*Example 3.* (i) *Facts.* Under an employer's group health plan, all employees generally may enroll within the first 30 days of employment. However, individuals who participate in certain recreational activities, including motorcycling, are excluded from coverage.

(ii) *Conclusion.* In this *Example 3*, excluding from the plan individuals who participate in recreational activities, such as motorcycling, is a rule for eligibility that discriminates based on one more health factors and thus violates this paragraph (b)(1).

*Example 4.* (i) *Facts.* A group health plan applies for a group health policy offered by an issuer. As part of the application, the issuer receives health information about individuals to be covered under the plan. Individual *A* is an employee of the employer maintaining the plan. *A* and *A*'s dependents have a history of high health claims. Based on the information about *A* and *A*'s dependents, the issuer excludes *A* and *A*'s dependents from the group policy it offers to the employer.

(ii) *Conclusion.* In this *Example 4*, the issuer's exclusion of *A* and *A*'s dependents from coverage is a rule for eligibility that discriminates based on one or more health factors, and thus violates this paragraph (b)(1). (If the employer is a small employer under 45 CFR 144.103 (generally, an employer with 50 or fewer employees), the issuer also may violate 45 CFR 146.150, which requires issuers to offer all the policies they sell in the small group market on a guaranteed available basis to all small employers and to accept every eligible individual in every small employer group.) If the plan provides coverage through this policy and does not provide equivalent coverage for *A* and *A*'s dependents through other means, the plan will also violate this paragraph (b)(1).

(2) *Application to benefits—*(i) *General rule.* (A) Under this section, a group health plan or group health insurance issuer is not required to provide coverage for any particular benefit to any group of similarly situated individuals.

(B) However, benefits provided under a plan must be uniformly available to all similarly situated individuals (as described in paragraph (d) of this section). Likewise, any restriction on a benefit or benefits must apply uniformly to all similarly situated individuals and must not be directed at individual participants or beneficiaries based on any health factor of the participants or beneficiaries (determined based on all the relevant facts and circumstances). Thus, for example, a plan may limit or exclude benefits in relation to a specific disease or condition, limit or exclude benefits for certain types of treatments or drugs, or limit or exclude benefits based on a determination of whether the benefits are

experimental or not medically necessary, but only if the benefit limitation or exclusion applies uniformly to all similarly situated individuals and is not directed at individual participants or beneficiaries based on any health factor of the participants or beneficiaries. In addition, a plan or issuer may require the satisfaction of a deductible, copayment, coinsurance, or other cost-sharing requirement in order to obtain a benefit if the limit or cost-sharing requirement applies uniformly to all similarly situated individuals and is not directed at individual participants or beneficiaries based on any health factor of the participants or beneficiaries. In the case of a cost-sharing requirement, see also paragraph (b)(2)(ii) of this section, which permits variances in the application of a cost-sharing mechanism made available under a wellness program. (Whether any plan provision or practice with respect to benefits complies with this paragraph (b)(2)(i) does not affect whether the provision or practice is permitted under ERISA, the Affordable Care Act (including the requirements related to essential health benefits), the Americans with Disabilities Act, or any other law, whether State or Federal.)

(C) For purposes of this paragraph (b)(2)(i), a plan amendment applicable to all individuals in one or more groups of similarly situated individuals under the plan and made effective no earlier than the first day of the first plan year after the amendment is adopted is not considered to be directed at any individual participants or beneficiaries.

(D) The rules of this paragraph (b)(2)(i) are illustrated by the following examples:

*Example 1.* (i) *Facts.* A group health plan applies a $10,000 annual limit on a specific covered benefit that is not an essential health benefit to each participant or beneficiary covered under the plan. The limit is not directed at individual participants or beneficiaries.

(ii) *Conclusion.* In this *Example 1*, the limit does not violate this paragraph (b)(2)(i) because coverage of the specific, non-essential health benefit up to $10,000 is available uniformly to each participant and beneficiary under the plan and because the limit is applied uniformly to all participants and beneficiaries and is not directed at individual participants or beneficiaries.

*Example 2.* (i) *Facts.* A group health plan has a $500 deductible on all benefits for participants covered under the plan. Participant *B* files a claim for the treatment of AIDS. At the next corporate board meeting of the plan sponsor, the claim is discussed. Shortly thereafter, the plan is modified to impose a $2,000 deductible on benefits for the treatment of AIDS, effective before the beginning of the next plan year.

(ii) *Conclusion.* The facts of this *Example 2* strongly suggest that the plan modification is directed at *B* based on *B*'s claim. Absent outweighing evidence to the contrary, the plan violates this paragraph (b)(2)(i).

*Example 3.* (i) *Facts.* A group health plan applies for a group health policy offered by an issuer. Individual *C* is covered under the plan and has an adverse health condition. As part of the application, the issuer receives health information about the individuals to be covered, including information about *C*'s adverse health condition. The policy form offered by the issuer generally provides benefits for the adverse health condition that *C* has, but in this case the issuer offers the plan a policy modified by a rider that excludes benefits for *C* for that condition. The exclusionary rider is made effective the first day of the next plan year.

(ii) *Conclusion.* In this *Example 3*, the issuer violates this paragraph (b)(2)(i) because benefits for *C*'s condition are available to other individuals in the group of similarly situated individuals that includes *C* but are not available to *C*. Thus, the benefits are not uniformly available to all similarly situated individuals. Even though the exclusionary rider is made effective the first day of the next plan year, because the rider does not apply to all similarly situated individuals, the issuer violates this paragraph (b)(2)(i).

*Example 4.* (i) *Facts.* A group health plan has a $2,000 lifetime limit for the treatment of temporomandibular joint syndrome (TMJ). The limit is applied uniformly to all similarly situated individuals and is not directed at individual participants or beneficiaries.

(ii) *Conclusion.* In this *Example 4*, the plan does not violate this paragraph (b)(2)(i) because $2,000 of benefits for the treatment of TMJ are available uniformly to all similarly situated individuals and a plan may limit benefits covered in relation to a specific disease or condition if the limit applies uniformly to all similarly situated individuals and is not directed at individual participants or beneficiaries. (However, applying a lifetime limit on TMJ may violate § 2590.715–2711, if TMJ coverage is an essential health benefit, depending on the essential health benefits benchmark plan as defined in 45 CFR 156.20. This example does not address whether the plan provision is permissible

569

Revenue Code had a $2,400 deductible for family coverage on March 23, 2010. The plan is subsequently amended after June 15, 2021 to increase the deductible limit to the amount that is necessary to comply with the requirements for a plan to qualify as a high deductible health plan under section 223(c)(2)(A) of the Internal Revenue Code, but that exceeds the maximum percentage increase.

(ii) *Conclusion.* In this *Example 11*, the increase in the deductible at that time does not cause the plan to cease to be a grandfathered health plan because the increase was necessary for the plan to continue to satisfy the definition of a high deductible health plan under section 223(c)(2)(A) of the Internal Revenue Code.

[80 FR 72256, Nov. 18, 2015, as amended at 85 FR 81118, Dec. 15, 2020]

### §2590.715–2704 Prohibition of preexisting condition exclusions.

(a) *No preexisting condition exclusions.* A group health plan, or a health insurance issuer offering group health insurance coverage, may not impose any preexisting condition exclusion (as defined in §2590.701–2).

(b) *Examples.* The rules of paragraph (a) of this section are illustrated by the following examples (for additional examples illustrating the definition of a preexisting condition exclusion, *see* §2590.701–3(a)(2)):

*Example 1.* (i) *Facts.* A group health plan provides benefits solely through an insurance policy offered by Issuer *P.* At the expiration of the policy, the plan switches coverage to a policy offered by Issuer *N. N's* policy excludes benefits for oral surgery required as a result of a traumatic injury if the injury occurred before the effective date of coverage under the policy.

(ii) *Conclusion.* In this *Example 1,* the exclusion of benefits for oral surgery required as a result of a traumatic injury if the injury occurred before the effective date of coverage is a preexisting condition exclusion because it operates to exclude benefits for a condition based on the fact that the condition was present before the effective date of coverage under the policy. Therefore, such an exclusion is prohibited.

*Example 2.* (i) *Facts.* Individual *C* applies for individual health insurance coverage with Issuer *M. M* denies *C's* application for coverage because a pre-enrollment physical revealed that *C* has type 2 diabetes.

(ii) *Conclusion. See Example 2* in 45 CFR 147.108(a)(2) for a conclusion that *M's* denial of *C's* application for coverage is a preexisting condition exclusion because a denial of an application for coverage based on the

fact that a condition was present before the date of denial is an exclusion of benefits based on a preexisting condition. Therefore, such an exclusion is prohibited.

(c) *Applicability date.* The provisions of this section are applicable to group health plans and health insurance issuers for plan years beginning on or after January 1, 2017. Until the applicability date for this regulation, plans and issuers are required to continue to comply with the corresponding sections of 29 CFR part 2590, contained in the 29 CFR, parts 1927 to end, edition revised as of July 1, 2015.

[80 FR 72261, Nov. 18, 2015]

### §2590.715–2705 Prohibiting discrimination against participants and beneficiaries based on a health factor.

(a) *In general.* A group health plan and a health insurance issuer offering group health insurance coverage must comply with the requirements of §2590.702 of this part.

(b) *Applicability date.* This section is applicable to group health plans and health insurance issuers offering group health insurance coverage for plan years beginning on or after January 1, 2014.

[78 FR 33186, June 3, 2013]

### §2590.715–2708 Prohibition on waiting periods that exceed 90 days.

(a) *General rule.* A group health plan, and a health insurance issuer offering group health insurance coverage, must not apply any waiting period that exceeds 90 days, in accordance with the rules of this section. If, under the terms of a plan, an individual can elect coverage that would begin on a date that is not later than the end of the 90-day waiting period, this paragraph (a) is considered satisfied. Accordingly, in that case, a plan or issuer will not be considered to have violated this paragraph (a) solely because individuals take, or are permitted to take, additional time (beyond the end of the 90-day waiting period) to elect coverage.

(b) *Waiting period defined.* For purposes of this part, a waiting period is the period that must pass before coverage for an individual who is otherwise eligible to enroll under the terms

**ADD-038**

of a group health plan can become effective. If an individual enrolls as a late enrollee (as defined under § 2590.701–2) or special enrollee (as described in § 2590.701–6), any period before such late or special enrollment is not a waiting period.

(c) *Relation to a plan's eligibility criteria—(1) In general.* Except as provided in paragraphs (c)(2) and (c)(3) of this section, being otherwise eligible to enroll under the terms of a group health plan means having met the plan's substantive eligibility conditions (such as, for example, being in an eligible job classification, achieving job-related licensure requirements specified in the plan's terms, or satisfying a reasonable and bona fide employment-based orientation period). Moreover, except as provided in paragraphs (c)(2) and (c)(3) of this section, nothing in this section requires a plan sponsor to offer coverage to any particular individual or class of individuals (including, for example, part-time employees). Instead, this section prohibits requiring otherwise eligible individuals to wait more than 90 days before coverage is effective. *See also* section 4980H of the Code and its implementing regulations for an applicable large employer's shared responsibility to provide health coverage to full-time employees.

(2) *Eligibility conditions based solely on the lapse of time.* Eligibility conditions that are based solely on the lapse of a time period are permissible for no more than 90 days.

(3) *Other conditions for eligibility.* Other conditions for eligibility under the terms of a group health plan are generally permissible under PHS Act section 2708, unless the condition is designed to avoid compliance with the 90-day waiting period limitation, determined in accordance with the rules of this paragraph (c)(3).

(i) *Application to variable-hour employees in cases in which a specified number of hours of service per period is a plan eligibility condition.* If a group health plan conditions eligibility on an employee regularly having a specified number of hours of service per period (or working full-time), and it cannot be determined that a newly-hired employee is reasonably expected to regularly work that number of hours per period (or work full-time), the plan may take a reasonable period of time, not to exceed 12 months and beginning on any date between the employee's start date and the first day of the first calendar month following the employee's start date, to determine whether the employee meets the plan's eligibility condition. Except in cases in which a waiting period that exceeds 90 days is imposed in addition to a measurement period, the time period for determining whether such an employee meets the plan's eligibility condition will not be considered to be designed to avoid compliance with the 90-day waiting period limitation if coverage is made effective no later than 13 months from the employee's start date plus, if the employee's start date is not the first day of a calendar month, the time remaining until the first day of the next calendar month.

(ii) *Cumulative service requirements.* If a group health plan or health insurance issuer conditions eligibility on an employee's having completed a number of cumulative hours of service, the eligibility condition is not considered to be designed to avoid compliance with the 90-day waiting period limitation if the cumulative hours-of-service requirement does not exceed 1,200 hours.

(iii) *Limitation on orientation periods.* To ensure that an orientation period is not used as a subterfuge for the passage of time, or designed to avoid compliance with the 90-day waiting period limitation, an orientation period is permitted only if it does not exceed one month. For this purpose, one month is determined by adding one calendar month and subtracting one calendar day, measured from an employee's start date in a position that is otherwise eligible for coverage. For example, if an employee's start date in an otherwise eligible position is May 3, the last permitted day of the orientation period is June 2. Similarly, if an employee's start date in an otherwise eligible position is October 1, the last permitted day of the orientation period is October 31. If there is not a corresponding date in the next calendar month upon adding a calendar month, the last permitted day of the orientation period is the last day of the next calendar month. For example, if the employee's

**ADD-039**

start date is January 30, the last permitted day of the orientation period is February 28 (or February 29 in a leap year). Similarly, if the employee's start date is August 31, the last permitted day of the orientation period is September 30.

(d) *Application to rehires.* A plan or issuer may treat an employee whose employment has terminated and who then is rehired as newly eligible upon rehire and, therefore, required to meet the plan's eligibility criteria and waiting period anew, if reasonable under the circumstances (for example, the termination and rehire cannot be a subterfuge to avoid compliance with the 90-day waiting period limitation).

(e) *Counting days.* Under this section, all calendar days are counted beginning on the enrollment date (as defined in §2590.701–2), including weekends and holidays. A plan or issuer that imposes a 90-day waiting period may, for administrative convenience, choose to permit coverage to become effective earlier than the 91st day if the 91st day is a weekend or holiday.

(f) *Examples.* The rules of this section are illustrated by the following examples:

*Example 1.* (i) *Facts.* A group health plan provides that full-time employees are eligible for coverage under the plan. Employee *A* begins employment as a full-time employee on January 19.

(ii) *Conclusion.* In this *Example 1,* any waiting period for *A* would begin on January 19 and may not exceed 90 days. Coverage under the plan must become effective no later than April 19 (assuming February lasts 28 days).

*Example 2.* (i) *Facts.* A group health plan provides that only employees with job title *M* are eligible for coverage under the plan. Employee *B* begins employment with job title *L* on January 30.

(ii) *Conclusion.* In this *Example 2, B* is not eligible for coverage under the plan, and the period while *B* is working with job title *L* and therefore not in an eligible class of employees, is not part of a waiting period under this section.

*Example 3.* (i) *Facts.* Same facts as in *Example 2,* except that *B* transfers to a new position with job title *M* on April 11.

(ii) *Conclusion.* In this *Example 3, B* becomes eligible for coverage on April 11, but for the waiting period. Any waiting period for *B* begins on April 11 and may not exceed 90 days; therefore, coverage under the plan must become effective no later than July 10.

*Example 4.* (i) *Facts.* A group health plan provides that only employees who have completed specified training and achieved specified certifications are eligible for coverage under the plan. Employee *C* is hired on May 3 and meets the plan's eligibility criteria on September 22.

(ii) *Conclusion.* In this *Example 4, C* becomes eligible for coverage on September 22, but for the waiting period. Any waiting period for *C* would begin on September 22 and may not exceed 90 days; therefore, coverage under the plan must become effective no later than December 21.

*Example 5.* (i) *Facts.* A group health plan provides that employees are eligible for coverage after one year of service.

(ii) *Conclusion.* In this *Example 5,* the plan's eligibility condition is based solely on the lapse of time and, therefore, is impermissible under paragraph (c)(2) of this section because it exceeds 90 days.

*Example 6.* (i) *Facts.* Employer *V*'s group health plan provides for coverage to begin on the first day of the first payroll period on or after the date an employee is hired and completes the applicable enrollment forms. Enrollment forms are distributed on an employee's start date and may be completed within 90 days. Employee *D* is hired and starts on October 31, which is the first day of a pay period. *D* completes the enrollment forms and submits them on the 90th day after *D*'s start date, which is January 28. Coverage is made effective 7 days later, February 4, which is the first day of the next pay period.

(ii) *Conclusion.* In this *Example 6,* under the terms of *V*'s plan, coverage may become effective as early as October 31, depending on when *D* completes the applicable enrollment forms. Under the terms of the plan, when coverage becomes effective depends solely on the length of time taken by *D* to complete the enrollment materials. Therefore, under the terms of the plan, *D* may elect coverage that would begin on a date that does not exceed the 90-day waiting period limitation, and the plan complies with this section.

*Example 7.* (i) *Facts.* Under Employer *W*'s group health plan, only employees who are full-time (defined under the plan as regularly averaging 30 hours of service per week) are eligible for coverage. Employee *E* begins employment for Employer *W* on November 26 of Year 1. *E*'s hours are reasonably expected to vary, with an opportunity to work between 20 and 45 hours per week, depending on shift availability and *E*'s availability. Therefore, it cannot be determined at *E*'s start date that *E* is reasonably expected to work full-time. Under the terms of the plan, variable-hour employees, such as *E*, are eligible to enroll in the plan if they are determined to be a full-time employee after a measurement period of 12 months that begins on the employee's start date. Coverage is made effective no later than the first day of the first

643

**ADD-040**

calendar month after the applicable enrollment forms are received. *E*'s 12-month measurement period ends November 25 of Year 2. *E* is determined to be a full-time employee and is notified of *E*'s plan eligibility. If *E* then elects coverage, *E*'s first day of coverage will be January 1 of Year 3.

(ii) *Conclusion.* In this *Example 7,* the measurement period is permissible because it is not considered to be designed to avoid compliance with the 90-day waiting period limitation. The plan may use a reasonable period of time to determine whether a variable-hour employee is a full-time employee, provided that (a) the period of time is no longer than 12 months; (b) the period of time begins on a date between the employee's start date and the first day of the next calendar month (inclusive); (c) coverage is made effective no later than 13 months from *E*'s start date plus, if the employee's start date is not the first day of a calendar month, the time remaining until the first day of the next calendar month; and (d) in addition to the measurement period, no more than 90 days elapse prior to the employee's eligibility for coverage.

*Example 8.* (i) *Facts.* Employee *F* begins working 25 hours per week for Employer *X* on January 6 and is considered a part-time employee for purposes of *X*'s group health plan. *X* sponsors a group health plan that provides coverage to part-time employees after they have completed a cumulative 1,200 hours of service. *F* satisfies the plan's cumulative hours of service condition on December 15.

(ii) *Conclusion.* In this *Example 8,* the cumulative hours of service condition with respect to part-time employees is not considered to be designed to avoid compliance with the 90-day waiting period limitation. Accordingly, coverage for *F* under the plan must begin no later than the 91st day after *F* completes 1,200 hours. (If the plan's cumulative hours-of-service requirement was more than 1,200 hours, the requirement would be considered to be designed to avoid compliance with the 90-day waiting period limitation.)

*Example 9.* (i) *Facts.* A multiemployer plan operating pursuant to an arms-length collective bargaining agreement has an eligibility provision that allows employees to become eligible for coverage by working a specified number of hours of covered employment for multiple contributing employers. The plan aggregates hours in a calendar quarter and then, if enough hours are earned, coverage begins the first day of the next calendar quarter. The plan also permits coverage to extend for the next full calendar quarter, regardless of whether an employee's employment has terminated.

(ii) *Conclusion.* In this *Example 9,* these eligibility provisions are designed to accommodate a unique operating structure, and, therefore, are not considered to be designed

to avoid compliance with the 90-day waiting period limitation, and the plan complies with this section.

*Example 10.* (i) *Facts.* Employee *G* retires at age 55 after 30 years of employment with Employer *Y* with no expectation of providing further services to Employer *Y*. Three months later, *Y* recruits *G* to return to work as an employee providing advice and transition assistance for *G*'s replacement under a one-year employment contract. *Y*'s plan imposes a 90-day waiting period from an employee's start date before coverage becomes effective.

(ii) *Conclusion.* In this *Example 10,* *Y*'s plan may treat *G* as newly eligible for coverage under the plan upon rehire and therefore may impose the 90-day waiting period with respect to *G* for coverage offered in connection with *G*'s rehire.

*Example 11.* (i) *Facts.* Employee *H* begins working full time for Employer *Z* on October 16. *Z* sponsors a group health plan, under which full time employees are eligible for coverage after they have successfully completed a bona fide one-month orientation period. *H* completes the orientation period on November 15.

(ii) *Conclusion.* In this *Example 11,* the orientation period is not considered a subterfuge for the passage of time and is not considered to be designed to avoid compliance with the 90-day waiting period limitation. Accordingly, plan coverage for *H* must begin no later than February 14, which is the 91st day after *H* completes the orientation period. (If the orientation period was longer than one month, it would be considered to be a subterfuge for the passage of time and designed to avoid compliance with the 90-day waiting period limitation. Accordingly it would violate the rules of this section.)

(g) *Special rule for health insurance issuers.* To the extent coverage under a group health plan is insured by a health insurance issuer, the issuer is permitted to rely on the eligibility information reported to it by the employer (or other plan sponsor) and will not be considered to violate the requirements of this section with respect to its administration of any waiting period, if both of the following conditions are satisfied:

(1) The issuer requires the plan sponsor to make a representation regarding the terms of any eligibility conditions or waiting periods imposed by the plan sponsor before an individual is eligible to become covered under the terms of the plan (and requires the plan sponsor to update this representation with any changes), and

ADD-041

(2) The issuer has no specific knowledge of the imposition of a waiting period that would exceed the permitted 90-day period.

(h) *No effect on other laws.* Compliance with this section is not determinative of compliance with any other provision of State or Federal law (including ERISA, the Code, or other provisions of the Patient Protection and Affordable Care Act). *See e.g.,* § 2590.702, which prohibits discrimination in eligibility for coverage based on a health factor and Code section 4980H, which generally requires applicable large employers to offer coverage to full-time employees and their dependents or make an assessable payment.

(i) *Applicability date.* The provisions of this section apply for plan years beginning on or after January 1, 2015. *See* § 2590.715–1251 providing that the prohibition on waiting periods exceeding 90 days applies to all group health plans and group health insurance issuers, including grandfathered health plans.

[79 FR 10311, Feb. 24, 2014, as amended at 79 FR 35947, June 25, 2014]

### § 2590.715–2711 No lifetime or annual limits.

(a) *Prohibition*—(1) *Lifetime limits.* Except as provided in paragraph (b) of this section, a group health plan, or a health insurance issuer offering group health insurance coverage, may not establish any lifetime limit on the dollar amount of essential health benefits for any individual, whether provided in-network or out-of-network.

(2) *Annual limits*—(i) *General rule.* Except as provided in paragraphs (a)(2)(ii) and (b) of this section, a group health plan, or a health insurance issuer offering group health insurance coverage, may not establish any annual limit on the dollar amount of essential health benefits for any individual, whether provided in-network or out-of-network.

(ii) *Exception for health flexible spending arrangements.* A health flexible spending arrangement (as defined in section 106(c)(2) of the Internal Revenue Code) offered through a cafeteria plan pursuant to section 125 of the Internal Revenue Code is not subject to the requirement in paragraph (a)(2)(i) of this section.

(b) *Construction*—(1) *Permissible limits on specific covered benefits.* The rules of this section do not prevent a group health plan, or a health insurance issuer offering group health insurance coverage, from placing annual or lifetime dollar limits with respect to any individual on specific covered benefits that are not essential health benefits to the extent that such limits are otherwise permitted under applicable Federal or State law. (The scope of essential health benefits is addressed in paragraph (c) of this section).

(2) *Condition-based exclusions.* The rules of this section do not prevent a group health plan, or a health insurance issuer offering group health insurance coverage, from excluding all benefits for a condition. However, if any benefits are provided for a condition, then the requirements of this section apply. Other requirements of Federal or State law may require coverage of certain benefits.

(c) *Definition of essential health benefits.* The term "essential health benefits" means essential health benefits under section 1302(b) of the Patient Protection and Affordable Care Act and applicable regulations. For the purpose of this section, a group health plan or a health insurance issuer that is not required to provide essential health benefits under section 1302(b) must define "essential health benefits" in a manner that is consistent with the following:

(1) For plan years beginning before January 1, 2020, one of the EHB-benchmark plans applicable in a State under 45 CFR 156.110, and including coverage of any additional required benefits that are considered essential health benefits consistent with 45 CFR 155.170(a)(2), or one of the three Federal Employees Health Benefits Program (FEHBP) options as defined by 45 CFR 156.100(a)(3), supplemented as necessary, to satisfy the standards in 45 CFR 156.110; or

(2) For plan years beginning on or after January 1, 2020, an EHB-benchmark plan selected by a State in accordance with the available options and requirements for EHB-benchmark plan selection at 45 CFR 156.111, including an EHB-benchmark plan in a State that takes no action to change its

2024, unless otherwise provided in the following schedule:

TABLE 1 TO PARAGRAPH (b)

| Section 1557 requirement and provision | Date by which covered entities must comply |
| --- | --- |
| § 92.7 ..................................... | Within 120 days of July 5, 2024. |
| § 92.8 ..................................... | Within one year of July 5, 2024. |
| § 92.9 ..................................... | Following a covered entity's implementation of the policies and procedures required by § 92.8, and no later than one year of July 5, 2024. |
| § 92.10 ................................... | Within 120 days of July 5, 2024. |
| § 92.11 ................................... | Within one year of July 5, 2024. |
| § 92.207(b)(1) through (5) ... | For health insurance coverage or other health-related coverage that was not subject to this part as of July 5, 2024, by the first day of the first plan year (in the individual market, policy year) beginning on or after January 1, 2025. |
| § 92.207(b)(6) ...................... | By the first day of the first plan year (in the individual market, policy year) beginning on or after January 1, 2025. |
| § 92.210(b) and (c) .............. | Within 300 days of July 5, 2024. |

## § 92.2  Application.

(a) Except as otherwise provided in this part, this part shall apply to:

(1) Every health program or activity, any part of which receives Federal financial assistance, directly or indirectly, from the Department;

(2) Every health program or activity administered by the Department; and

(3) Every health program or activity administered by a title I entity.

(b) The provisions of this part shall not apply to any employer or other plan sponsor of a group health plan, including but not limited to, a board of trustees (or similar body), association or other group, with regard to its employment practices, including the provision of employee health benefits.

(c) Any provision of this part held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, shall be severable from this part and shall not affect the remainder thereof or the application of the provision to other persons not similarly situated or to other, dissimilar circumstances.

## § 92.3  Relationship to other laws.

(a) Neither section 1557 nor this part shall be construed to apply a lesser standard for the protection of individuals from discrimination than the standards applied under title VI of the Civil Rights Act of 1964, title IX of the Education Amendments of 1972, section 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, or the regulations issued pursuant to those laws.

(b) Nothing in this part shall be construed to invalidate or limit the rights, remedies, procedures, or legal standards available under title VI of the Civil Rights Act of 1964, title VII of the Civil Rights Act of 1964, title IX of the Education Amendments of 1972, section 504 of the Rehabilitation Act of 1973, or the Age Discrimination Act of 1975.

(c) Insofar as the application of any requirement under this part would violate applicable Federal protections for religious freedom and conscience, such application shall not be required. For example, 42 U.S.C. 18023 provides (among other things) that nothing in section 1557 shall be construed to have any effect on Federal laws regarding conscience protection; willingness or refusal to provide abortion; and discrimination on the basis of the willingness or refusal to provide, pay for, cover, or refer for abortion or to provide or participate in training to provide abortion.

(d) Nothing in this part shall be construed to supersede State or local laws that provide additional protections against discrimination on any basis described in § 92.1.

## § 92.4  Definitions.

As used in this part, the term—

*1991 Standards* means the 1991 ADA Standards for Accessible Design, published at appendix A to 28 CFR part 36

ADD-043

on July 26, 1991, and republished as appendix D to 28 CFR part 36 on September 15, 2010.

*2010 Standards* means 36 CFR part 1191, appendices B and D (2009), in conjunction with 28 CFR 35.151.

*ACA* means the Patient Protection and Affordable Care Act (Pub. L. 111–148, 124 Stat. 119 (2010) as amended by the Health Care and Education Reconciliation Act of 2010 (Pub. L. 111–152, 124 Stat. 1029) (codified in scattered sections of U.S.C.)).

*ADA* means the Americans with Disabilities Act of 1990 (42 U.S.C. 12101 *et seq.*), as amended.

*Age* means how old a person is, or the number of elapsed years from the date of a person's birth.

*Age Act* means the Age Discrimination Act of 1975 (42 U.S.C. 6101 *et seq.*), as amended.

*Applicant* means a person who applies to participate in a health program or activity.

*Auxiliary aids and services* include, for example:

(1) Qualified interpreters on-site or through video remote interpreting (VRI) services, as defined in 28 CFR 35.104 and 36.104; note takers; real-time computer-aided transcription services; written materials; exchange of written notes; telephone handset amplifiers; assistive listening devices; assistive listening systems; telephones compatible with hearing aids; closed caption decoders; open and closed captioning, including real-time captioning; voice, text, and video-based telecommunications products and systems, including text telephones (TTYs), videophones, and captioned telephones, or equally effective telecommunications devices; videotext displays; accessible information and communication technology (ICT); or other effective methods of making aurally delivered information available to persons who are deaf or hard of hearing;

(2) Qualified readers; taped texts; audio recordings; Braille materials and displays; screen reader software; magnification software; optical readers; secondary auditory programs (SAP); large print materials; accessible information and communication technology; or other effective methods of making visually delivered materials available to persons who are blind or have low vision;

(3) Acquisition or modification of equipment and devices; and

(4) Other similar services and actions.

*Companion* means a family member, friend, or associate of an individual seeking access to a service, program, or activity of a covered entity, who along with such individual, is an appropriate person with whom a covered entity should communicate.

*Covered entity* means:

(1) A recipient of Federal financial assistance;

(2) The Department; and

(3) An entity established under title I of the ACA.

*Department* means the U.S. Department of Health and Human Services.

*Director* means the Director of the Office for Civil Rights (OCR) of the Department, or their designee(s).

*Disability* means, with respect to an individual, a physical or mental impairment that substantially limits one or more major life activities of such individual; a record of such an impairment; or being regarded as having such an impairment, as defined and construed in the Rehabilitation Act, 29 U.S.C. 705(9)(B), which incorporates the definition of "disability" in the ADA, 42 U.S.C. 12102, as amended and adopted at 28 CFR 35.108.

*Exchange* means the same as "Exchange" defined in 45 CFR 155.20.

*Federal financial assistance*, as used in this part:

(1) Federal financial assistance means any grant, loan, credit, subsidy, contract (other than a procurement contract but including a contract of insurance), or any other arrangement by which the Federal Government, directly or indirectly, provides assistance or otherwise makes assistance available in the form of:

(i) Funds;

(ii) Services of Federal personnel; or

(iii) Real or personal property or any interest in or use of such property, including:

(A) Transfers or leases of such property for less than fair market value or for reduced consideration; and

(B) Proceeds from a subsequent transfer or lease of such property if the

581

**ADD-044**

Federal share of its fair market value is not returned to the Federal Government.

(2) *Federal financial assistance* the Department provides or otherwise makes available includes Federal financial assistance that the Department plays a role in providing or administering, including advance payments of the premium tax credit and cost-sharing reduction payments under title I of the ACA, as well as payments, subsidies, or other funds extended by the Department to any entity providing health insurance coverage for payment to or on behalf of a person obtaining health insurance coverage from that entity or extended by the Department directly to such person for payment to any entity providing health insurance coverage.

*Federally-facilitated Exchange* means the same as "Federally-facilitated Exchange" defined in 45 CFR 155.20.

*Health program or activity* means:

(1) Any project, enterprise, venture, or undertaking to:

(i) Provide or administer health-related services, health insurance coverage, or other health-related coverage;

(ii) Provide assistance to persons in obtaining health-related services, health insurance coverage, or other health-related coverage;

(iii) Provide clinical, pharmaceutical, or medical care;

(iv) Engage in health or clinical research; or

(v) Provide health education for health care professionals or others.

(2) All of the operations of any entity principally engaged in the provision or administration of any health projects, enterprises, ventures, or undertakings described in paragraph (1) of this definition, including, but not limited to, a State or local health agency, hospital, health clinic, health insurance issuer, physician's practice, pharmacy, community-based health care provider, nursing facility, residential or community-based treatment facility, or other similar entity or combination thereof. A health program or activity also includes all of the operations of a State Medicaid program, Children's Health Insurance Program, and Basic Health Program.

*Individual with limited English proficiency* means an individual whose primary language for communication is not English and who has a limited ability to read, write, speak, or understand English. An individual with limited English proficiency may be competent in English for certain types of communication (*e.g.*, speaking or understanding), but still be limited English proficient for other purposes (*e.g.*, reading or writing).

*Information and communication technology (ICT)* means information technology and other equipment, systems, technologies, or processes, for which the principal function is the creation, manipulation, storage, display, receipt, or transmission of electronic data and information, as well as any associated content. Examples of ICT include, but are not limited to: computers and peripheral equipment; information kiosks and transaction machines; telecommunications equipment; telehealth interfaces or applications; customer premises equipment; multifunction office machines; software; mobile applications; websites; videos; and electronic documents.

*Language assistance services* may include, but are not limited to:

(1) Oral language assistance, including interpretation in non-English languages provided in-person or remotely by a qualified interpreter for an individual with limited English proficiency, and the use of qualified bilingual or multilingual staff to communicate directly with individuals with limited English proficiency;

(2) Written translation, performed by a qualified translator, of written content in paper or electronic form into or from languages other than English; and

(3) Written notice of availability of language assistance services.

*Machine translation* means automated translation, without the assistance of or review by a qualified human translator, that is text-based and provides instant translations between various languages, sometimes with an option for audio input or output.

*National origin* includes, but is not limited to, a person's, or their ancestors', place of origin (such as country or world region) or a person's manifestation of the physical, cultural, or

ADD-045

linguistic characteristics of a national origin group.

*OCR* means the Office for Civil Rights of the Department.

*Patient care decision support tool* means any automated or non-automated tool, mechanism, method, technology, or combination thereof used by a covered entity to support clinical decision-making in its health programs or activities.

*Qualified bilingual/multilingual staff* means a member of a covered entity's workforce who is designated by the covered entity to provide in-language oral language assistance as part of the person's current, assigned job responsibilities and who has demonstrated to the covered entity that they are:

(1) Proficient in speaking and understanding both spoken English and at least one other spoken language, including any necessary specialized vocabulary, terminology and phraseology; and

(2) Able to effectively, accurately, and impartially communicate directly with individuals with limited English proficiency in their primary languages.

*Qualified individual with a disability* means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by the covered entity.

*Qualified interpreter for an individual with a disability* means an interpreter who, via a video remote interpreting service (VRI) or an on-site appearance:

(1) Has demonstrated proficiency in communicating in, and understanding:

(i) Both English and a non-English language (including American Sign Language, other sign languages); or

(ii) Another communication modality (such as cued-language transliterators or oral transliteration);

(2) Is able to interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary or terms without changes, omissions, or additions and while preserving the tone,

sentiment, and emotional level of the original statement; and

(3) Adheres to generally accepted interpreter ethics principles including client confidentiality.

(4) Qualified interpreters include, for example, sign language interpreters, oral transliterators, and cued-language transliterators.

*Qualified interpreter for an individual with limited English proficiency* means an interpreter who via a remote interpreting service or an on-site appearance:

(1) Has demonstrated proficiency in speaking and understanding both spoken English and at least one other spoken language (qualified interpreters for relay interpretation must demonstrate proficiency in two non-English spoken languages);

(2) Is able to interpret effectively, accurately, and impartially to and from such language(s) and English (or between two non-English languages for relay interpretation), using any necessary specialized vocabulary or terms without changes, omissions, or additions and while preserving the tone, sentiment, and emotional level of the original oral statement; and

(3) Adheres to generally accepted interpreter ethics principles, including client confidentiality.

*Qualified reader* means a person who is able to read effectively, accurately, and impartially using any necessary specialized vocabulary.

*Qualified translator* means a translator who:

(1) Has demonstrated proficiency in writing and understanding both written English and at least one other written non-English language;

(2) Is able to translate effectively, accurately, and impartially to and from such language(s) and English, using any necessary specialized vocabulary or terms without changes, omissions, or additions and while preserving the tone, sentiment, and emotional level of the original written statement; and

(3) Adheres to generally accepted translator ethics principles, including client confidentiality.

*Recipient* means any State or its political subdivision thereof; or any instrumentality of a State or political

583

subdivision thereof; any public or private agency, institution, or organization; other entity; or any person, to whom Federal financial assistance is extended directly or indirectly, including any subunit, successor, assignee, or transferee of a recipient. Such term does not include any ultimate beneficiary.

*Relay interpretation* means interpreting from one language to another through an intermediate language. This mode of interpretation is often used for monolingual speakers of languages of limited diffusion, including select indigenous languages. In relay interpreting, the first interpreter listens to the speaker and renders the message into the intermediate language. The second interpreter receives the message in the intermediate language and interprets it into a third language for the speaker who speaks neither the first nor the second language.

*Section 504* means section 504 of the Rehabilitation Act of 1973 (Pub. L. 93–112; 29 U.S.C. 794), as amended.

*Section 1557* means section 1557 of the ACA (42 U.S.C. 18116).

*State* includes each of the several States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, the United States Virgin Islands, and the Commonwealth of the Northern Mariana Islands.

*State Exchange* means an Exchange established by a State and approved by the Department pursuant to 45 CFR part 155, subpart B.

*Telehealth* means the use of electronic information and telecommunications technologies to support long-distance clinical health care, patient and professional health-related education, public health, and health administration. Technologies include videoconferencing, the internet, store-and-forward imaging, streaming media, and terrestrial and wireless communications.

*Title I entity* means any entity established under title I of the ACA, as amended, including State Exchanges and Federally-facilitated Exchanges.

*Title VI* means title VI of the Civil Rights Act of 1964 (Pub. L. 88–352; 42 U.S.C. 2000d *et seq.*), as amended.

*Title VII* means title VII of the Civil Rights Act of 1964 (Pub. L. 88–352; 42 U.S.C. 2000e *et seq.*), as amended.

*Title IX* means title IX of the Education Amendments of 1972 (Pub. L. 92–318; 20 U.S.C. 1681 *et seq.*), as amended.

*UFAS* means the Uniform Federal Accessibility Standards (Pub. L. 90–480; 42 U.S.C. 4151 *et seq.*), as amended.

## § 92.5  Assurances required.

(a) *Assurances.* An entity applying for Federal financial assistance to which this part applies must, as a condition of any application for Federal financial assistance, submit an assurance, on a form specified by the Director, that the entity's health programs and activities will be operated in compliance with section 1557 and this part. A health insurance issuer seeking certification to participate in an Exchange or a State seeking approval to operate a State Exchange to which section 1557 or this part applies must, as a condition of certification or approval, submit an assurance, on a form specified by the Director, that the health insurance issuer's or State's health program or activity will be operated in compliance with section 1557 and this part. An applicant or entity may incorporate this assurance by reference in subsequent applications to the Department for Federal financial assistance or requests for certification to participate in an Exchange or approval to operate a State Exchange.

(b) *Duration of obligation.* The duration of the assurances required by this section is the same as the duration of the assurances required in the Department's regulations implementing section 504, 45 CFR 84.5(b).

(c) *Covenants.* When Federal financial assistance is provided in the form of real property or interest, the same conditions apply as those contained in the Department's regulations implementing section 504, at 45 CFR 84.5(c), except that the nondiscrimination obligation applies to discrimination on all bases covered under section 1557 and this part.